IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ADLER MEDICAL, LLC; WALT ARNOLD                **EXHIBIT "C"**
COMMERCIAL BROKERAGE, INC.; XUAN
NATION, LLC; AND NM CCIM CHAPTER
OF THE COMMERCIAL INVESTMENT REAL
ESTATE INSTITUTE,

        Plaintiffs,

vs.                                    Case No. 1-22-cv-00072-KG-LF

BLAINE HARRINGTON, III,

        Defendant/Counterclaim Plaintiff
        Third-Party Plaintiff,

vs.

ADLER MEDICAL, LLC; WALT ARNOLD
COMMERCIAL BROKERAGE, INC.; XUAN
NATION, LLC; AND NM CCIM CHAPTER
OF THE COMMERCIAL INVESTMENT REAL
ESTATE INSTITUTE,

        Counterclaim Defendants,

and

CCIM INSTITUTE,

        Third-Party Defendant.

VIDEOTAPED DEPOSITION OF BLAINE HARRINGTON, III

September 28, 2022
9:00 a.m.
317 Commercial Street NE, Suite G-101
Albuquerque, New Mexico 87102

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1       PURSUANT TO THE NEW MEXICO RULES OF CIVIL PROCEDURE,
   this VIDEOTAPED DEPOSITION was:
2


3  TAKEN BY:  JEFFREY LOUIS SQUIRES, ESQ.
              ATTORNEY FOR PLAINTIFFS
4

   REPORTED BY:  VERONICA E. BYRD, CCR, RPR
5                NEW MEXICO CCR #36
                 WILLIAMS & ASSOCIATES, LLC
6                317 Commercial Street NE, Suite G-101
                 Albuquerque, New Mexico 87102
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

```
 1                    A P P E A R A N C E S

 2   For the Plaintiffs:

 3        Jeffrey Louis Squires, Esq.
          SQUIRES LEGAL COUNSEL, LLC
 4        P.O. Box 92845
          Albuquerque, New Mexico 87199
 5        (505) 835-5500
          jsquires@squireslegal.com
 6
          Ryan William Vetter, Esq.
 7        GUEBERT GENTILE & PIAZZA, PC
          P.O. Box 93880
 8        Albuquerque, New Mexico 87199-3880
          (505) 823-2300
 9        rvetter@guebertlaw.com

10   For the Defendant Blaine Harrington, III:

11        Daniel DeSouza, Esq.
          Lauren Hausman, Esq.
12        James D'Loughy, Esq.
          COPYCAT LEGAL, LLC
13        3111 N. University Drive, Suite 301
          Coral Springs, Florida 33065
14        (877) 437-6228
          dan@copycatlegal.com
15
     Also Present:  Jim Bess, Videographer
16

17

18

19

20

21

22

23

24

25
```

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

```
 1                    I N D E X

 2   WITNESS:                                    PAGE:LINE
     BLAINE HARRINGTON, III
 3   Examination by MR. SQUIRES                       7:3

 4

 5                   E X H I B I T S

 6   1    NOTICE OF DEPOSITION                         9:25

 7   2    SETTLEMENT COMMUNICATION LETTER             37:19

 8   3    SETTLEMENT COMMUNICATION LETTER             40:4

 9   4    LETTER                                      44:3

10   5    LETTER                                      46:24

11   6    COMPLAINT                                   51:24

12   7    ANSWER                                      52:7

13   8    FIRST AMENDED COUNTERCLAIM                  53:3

14   9    PACER LIST                                  73:5

15   10   DISCLOSURES                                 75:15

16   11   DEFENDANT'S RESPONSES-INTERROGATORIES       78:2

17   12   DEFENDANT'S RESPONSES-REQUEST FOR PRODUCTION  80:11

18   13   DISCOVERY PRODUCED                          87:1

19   14   LETTER                                     115:23

20   15   COMPLAINT-360 ABQ                          118:19

21   16   360 ABQ ANSWER/COUNTERCLAIMS               120:14

22   17   PLAINTIFF'S ANSWER TO COUNTERCLAIM-360 ABQ 121:4

23   18   PLAINTIFF'S RESPONSES-360 ABQ              123:12

24   19   PHOTOGRAPHS                                123:13

25   20   LICENSES                                   125:3
```

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

| 1 | 21 | LETTER | 129:12 |
| 2 | 22 | COMPLAINT-MOUNTAIN STATES AGENCY | 131:25 |
| 3 | 23 | ANSWER AND COUNTERCLAIMS-HARRINGTON | 133:2 |
| 4 | 24 | RESPONSES AND OBJECTIONS-HARRINGTON | 137:3 |
| 5 | 25 | RESPONSES AND OBJECTIONS-HARRINGTON | 139:15 |
| 6 | 26 | OFFER OF JUDGMENT | 146:23 |
| 7 | 27 | COMPLAINT-ATLANTIS | 148:22 |
| 8 | 28 | CONFIDENTIAL/SEALED EXHIBIT | 151:20 |
| 9 | 29 | COMPLAINT-BOEHMER DDS | 152:12 |
| 10 | 30 | VERIFIED ANSWER/COUNTERCLAIMS-BOEHMER DDS | 156:13 |
| 11 | 31 | OFFER OF JUDGMENT-BOEHMER DDS | 157:2 |
| 12 | 32 | JUDGMENT IN A CIVIL ACTION | 158:10 |
| 13 | 33 | COMPLAINT-ELEVATION COUNSELING | 161:13 |
| 14 | 34 | CONFIDENTIAL/SEALED EXHIBIT | 166:2 |
| 15 | 35 | COMPLAINT-INDUSTRIAL COMMERCIAL | 168:17 |
| 16 | 36 | COMPLAINT-COOL DESTINATIONS | 170:15 |
| 17 | 37 | COMPLAINT-PERIKIN ENTERPRISES | 172:18 |
| 18 | 38 | COMPLAINT-SANDIA INSURANCE | 174:12 |
| 19 | 39 | COMPLAINT-INT SPY MUSEUM | 175:20 |
| 20 | 40 | COMPLAINT-NORTH BAY | 184:6 |
| 21 | 41 | COMPLAINT-COLOR PASSPORT | 187:8 |
| 22 | 42 | COMPLAINT-TELLURIDE | 190:18 |
| 23 | 43 | HARRINGTON V. PINTEREST | 194:12 |
| 24 | | Deponent Signature/Correction Page | 201:1 |
| 25 | | Certificate of Completion of Deposition | 202:1 |

ADLER MEDICAL, LLC vs. HARRINGTON                     Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1           THE VIDEOGRAPHER:  It is Wednesday, the 28th of

2    September 2022.  The time is approximately 9:00 a.m.  We are

3    on the record.

4           My name is Jim Bess, Certified Video Specialist,

5    of Moir Litigation Video located in Albuquerque, New Mexico.

6           The court reporter is Veronica Byrd for Williams &

7    Associates.

8           We're here for the deposition of Blaine

9    Harrington, III, in the case of Adler Medical, LLC, et al.,

10   versus Blaine Harrington, III, filed in the United States

11   District Court for the District of New Mexico.  This is Case

12   No. 1-22-CV-00072-KG-LF.

13          This deposition is being held at the offices of

14   Williams & Associates located at 317 Commercial Street

15   Northeast, Suite G-101, in Albuquerque, New Mexico.

16          Would counsel now please state their appearances

17   for the record.

18          MR. SQUIRES:  I'm Jeffrey Squires, Counsel for the

19   Plaintiffs.  With me is Ryan Vetter, who is an associate

20   counsel in this matter.

21          MR. DeSOUZA:  This is Daniel DeSouza, Counsel for

22   Mr. Harrington.  Also on Zoom are Lauren Hausman and James

23   D'Loughy, who are attorneys in my office.

24          THE VIDEOGRAPHER:  Thank you.

25          Would you please swear in the witness.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1                        BLAINE HARRINGTON, III

2          having been first duly sworn, testified as follows:

3                            EXAMINATION

4    BY MR. SQUIRES:

5          Q.   Mr. Harrington, you've heard the introductions, so

6    you know who we are.  A couple of introductory comments.

7    Have you ever been deposed before?

8          A.   Yes.

9          Q.   How frequently?

10         A.   I think probably -- maybe three times in the past.

11         Q.   Okay.  So you're generally familiar with the

12   process?

13         A.   Yes.

14         Q.   Okay.  I'll ask you questions.  If your attorney

15   has any objections to my questions, he will state them.

16   Unless he instructs you not to answer, you are to answer the

17   questions.  So to save time, not every time he objects

18   should that engender a discussion.  It should just continue

19   on without further explanation, unless he instructs you not

20   to answer.  Do you understand that?

21         A.   Yes.

22         Q.   Okay.  Good.  You feel fine this morning?

23         A.   Yes.

24         Q.   When did you fly into Albuquerque?  I assume you

25   flew into Albuquerque.

1    A.    No.  I drove.

2    Q.    And you drove from Denver?

3    A.    Yes.

4    Q.    The Denver area?

5    A.    Right.

6    Q.    And you live in the Denver area; is that right?

7    A.    That's correct.

8    Q.    Your home address is?

9    A.    7533 South Overlook Way, Littleton, Colorado

10   80128.

11   Q.    And is that also the location of your, you know,

12   administrative offices for your photography practice?

13   A.    Yes.  I have a home office there.

14   Q.    Okay.

15         MR. DeSOUZA:  Jeff, very quick, before you ask

16   anything else, I -- I'm picking you up just fine.

17   Mr. Harrington's voice is very low.  I don't know if there's

18   a speaker there, in between the two of you, but it's picking

19   you up much better than it's picking him up.

20         THE WITNESS:  You want to adjust that up?

21         MR. SQUIRES:  He is -- he is a little -- a little

22   more soft-spoken than I am.  In general, from the

23   interchange so far, that might explain why that's the case.

24         THE WITNESS:  Is there anything you can do to

25   adjust it, or no?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

```
 1            THE VIDEOGRAPHER:  Just pull it closer to you.

 2            THE WITNESS:  Oh, this one?

 3            THE VIDEOGRAPHER:  Yeah.

 4            THE WITNESS:  All right.

 5            Is that better?

 6            MR. DeSOUZA:  I can hear you.  It's still --

 7   you're -- you're still not as loud as Mr. Squires, but

 8   I'll -- I'll carry on.

 9            THE WITNESS:  Okay.

10            MR. DeSOUZA:  Appreciate it, guys.

11       Q.   (BY MR. SQUIRES)  Circumstances here are a little

12   unusual and a little bit of a surprise.  I had not been

13   advised in advance that Mr. DeSouza would be participating

14   by Zoom.  There are documents that I will show you during

15   the course of this deposition and question you about, and I

16   cannot show them to Mr. DeSouza in a way that facilitates

17   his having access simultaneously to those documents.  We'll

18   provide Mr. DeSouza a full set of copies of the documents

19   that I question you about after the deposition takes place.

20       A.   Okay.

21       Q.   First, I think I'll show you a copy of the Notice

22   of Deposition.

23            MR. SQUIRES:  And I would ask that this be marked

24   as Deposition Exhibit 1.

25            (Exhibit 1 marked.)
```

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1       Q.   (BY MR. SQUIRES)   And I mentioned to the court

2   reporter there will be lots of exhibits in this deposition.

3   Are you -- have you seen this before?

4       A.   Yes, I have.

5       Q.   It was provided to you by your attorney?

6       A.   Correct.

7       Q.   And you discussed this notice with your attorney.

8   Now, I'm going to ask you a number of questions throughout

9   the course of the deposition about your engagement with your

10  attorney.   I do not expect you to tell me anything about

11  legal advice you sought or received from your attorney, but

12  there will be questions about whether or not you discussed a

13  certain subject with your attorney and there will be

14  questions about possibly the subject of advice, other than

15  legal advice, that you may have sought or received from your

16  attorney.   Those kinds of subjects are fair game.

17      A.   Yeah.

18      Q.   Okay.   You understand all this?

19      A.   Yes.

20      Q.   Good.   Okay.

21      A.   After -- after we're done with it, do I hand it

22  off, or what do I --

23      Q.   No.   You can keep it.   The court reporter has a

24  copy.

25      A.   Okay.   All right.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      Q.   And at the conclusion of the deposition, she will

2  provide a final set of copies, bound, to each of the

3  lawyers, along with the transcript of the deposition, for

4  their use.

5      A.   Okay.

6      Q.   So let me ask you a few questions about your

7  dealings with your attorney.  How long have you been

8  represented by CopyCat Legal?

9      A.   We started working together in December of 2021.

10     Q.   Okay.  CopyCat Legal has brought a number of

11  Complaints on your behalf in various federal courts in the

12  United States; is that right?

13     A.   Yes.

14     Q.   Have they brought any actions in any state courts

15  on your behalf?

16     A.   I don't believe so.

17     Q.   Do you know the difference between state courts

18  and federal courts?

19     A.   I do.

20     Q.   Okay.  And they have written letters on your

21  behalf to parties that are alleged to have infringed

22  copyrights in your photographs?  That's also correct, yes?

23     A.   Correct.

24     Q.   Do you review, in advance, every letter that goes

25  out from your attorney to an alleged infringer?

ADLER MEDICAL, LLC vs. HARRINGTON                          Blaine Harrington, III
1-22-cv-00072-KG-LF                                        September 28, 2022

1        A.    No.

2        Q.    Okay.  Do you review, in advance, every Complaint

3    filed by your attorneys on your behalf?

4        A.    Yes.

5        Q.    And have you approved of every Complaint that was

6    filed in your name by your attorneys?

7        A.    Yes.

8        Q.    Do you have any records showing that you reviewed

9    those Complaints, records which might consist of email

10   correspondence, back-and-forth, saying that you have

11   reviewed the Complaints and approve of them?

12       A.    Yeah.  I assume so, yes.

13       Q.    You say you assume so.  Do you know so?

14       A.    Well, if you're talking that -- that they have

15   provided me with them to review, and I say that it's okay,

16   then I would have an email to that effect.

17       Q.    Yes.  Okay.  So you do have emails to that effect?

18       A.    I believe so, yes.

19       Q.    How many Complaints, approximately, have they

20   filed on your behalf since you first engaged them in

21   December of 2021?

22       A.    I don't know exactly.

23       Q.    I didn't ask you exactly.  I said,

24   "approximately."

25       A.    I -- I don't know.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1        Q.    You have no idea?

2        A.    No.  I mean, I can't -- I can't tell you with

3   specificity.

4        Q.    I haven't asked for specificity.

5        A.    Well, I -- I -- I can't -- I can't be more clear

6   than that.  I know they've filed a number, but the number --

7   the exact number, I don't know.

8        Q.    Do you think it's more than ten?

9        A.    Yes.

10       Q.    Do you think it's more than 20?

11       A.    Perhaps.

12       Q.    Okay.  Do they ask you whether you want to file

13  suit or not in each case in which they have filed suit?

14       A.    No.

15       Q.    You are primarily, I understand, a travel

16  photographer; is that correct?

17       A.    That's correct.

18       Q.    Do you travel a lot?

19       A.    Most years.  The last two years, because of COVID,

20  not.  I -- I've -- I've started to travel again since

21  spring, this year, but yeah, there were several years

22  where -- where I didn't travel at all.

23       Q.    Do you have travel --

24            THE VIDEOGRAPHER:  Excuse me.

25       Q.    (BY MR. SQUIRES)  Do you have travel plans

ADLER MEDICAL, LLC vs. HARRINGTON                     Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1   scheduled over the next foreseeable future?

2        A.   Yes.

3        Q.   Could you briefly describe what your travel plans

4   are?

5        A.   Next Tuesday, I'm flying to New Zealand, and I

6   have other plans beyond that.

7        Q.   Do you plan to be away from your home for an

8   extended period of time?

9        A.   Yes.

10       Q.   For how long?

11       A.   Probably a year and a half.

12       Q.   And do you have a schedule of commitments during

13  that period of time?

14       A.   It's not scheduled, but I have a plan.

15       Q.   Okay.  Does your plan take into consideration the

16  trial of any lawsuits?

17       A.   No.

18       Q.   Okay.  Do you have any plans for any period of

19  time to return home during that year and a half?

20       A.   No, I don't.

21       Q.   So you expect to be away from home continuously

22  for a year and a half?

23       A.   Correct.

24       Q.   Okay.  How about beyond the year and a half?  Do

25  you have any plans that would commit you to --

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1        A.    No, I don't.

2        Q.    -- return to home?

3        A.    Well, I -- I do plan to return to home, yes.

4        Q.    Do you have a family that lives with you in

5   Littleton?

6        A.    Yes.

7        Q.    Who are your family members?

8        A.    My wife is Maureen.  My daughter -- adult

9   daughter, Lauren, who is 27, also lives there.  I have a son

10  who is 30, who lives in California.

11       Q.    Do any of your family members plan to travel with

12  you?

13       A.    Not that I know of, because they have lives of

14  their own, unfortunately.

15       Q.    Okay.  You take photographs sometimes on a

16  commissioned basis?  When I say that, I mean, you are

17  commissioned or hired --

18       A.    Yes.

19       Q.    -- to take photographs?

20       A.    Yes.

21       Q.    And you have to put a price on your services, I

22  assume --

23       A.    Yes.

24       Q.    -- when you do that?  What factors do you take

25  into consideration when you set prices for your photographic

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   services?

2        A.   That totally depends on the usage, whether it's

3   editorial, meaning a magazine or a newspaper, or corporate

4   or advertising.   There's entire -- different sets of --

5   of -- of pricing possibilities, and other factors include

6   specifically how it would be used, if it's going to be used

7   for one thing or multiple things.   For example, for

8   editorial, for a magazine, if it's used inside the magazine,

9   if it's for a cover.   The gen- -- the general -- the general

10  factors are how it's used, what size it's used, for how long

11  it's used.   In general, my photography is rights-managed,

12  meaning there's a specific thing that it can be used for as

13  opposed to just used in general for anything, which a lot of

14  photography is today.

15       Q.   Okay.   Do you take into consideration the

16  financial wherewithal of the client?

17       A.   To a certain degree.   You know, a -- a Fortune 500

18  company would be different than a local business.   I mean,

19  that's -- that's a factor.

20       Q.   Okay.   Have you ever been commissioned to provide

21  a photograph for the cover of a national consumer magazine?

22       A.   Yes.

23       Q.   An examp- -- can you tell me what magazines those

24  were?

25       A.   Well, many, and over many years.   I've been a

1  photographer for 45 years, but I mean -- as an example, I've

2  had covers on Smithsonian magazine.  I have covers on

3  various AAA publications.  There's one that I have stories

4  in their last two issues, that are three times a year now --

5  a lot of publications don't publish every month now --

6  called "AAA Traveler Worldwise."  It's for the mid-Atlantic,

7  and I -- I've done several stories for them recently.

8      Q.   And when -- when you shoot covers for magazines,

9  the prices are higher than when you shoot an image for a

10  local business to use on its website?

11     A.   Well, not necessarily, because a website, if it's

12  a commercial usage, might be more than an editorial usage,

13  if -- if you understand me.

14     Q.   I don't understand what you mean by "editorial

15  usage."

16     A.   "Editorial," again, is like a magazine.

17     Q.   A magazine cover?

18     A.   Well, a magazine cover traditionally has been

19  valuable, but more -- as I said, I've been a photographer 45

20  years, and so until 2005, roughly, it was all shot with

21  film, and so the -- and the digital age and the -- the --

22  the internet age has changed everything markedly, so there

23  are fewer things -- you know, up until that point, most

24  everything was done in print, and pricing was based upon

25  print.  Now, most everything is -- is online, and so that

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   has substituted it, and -- and so -- yeah.  There are

2   different factors.

3        Q.   Has that influenced -- that changeover, from film

4   to digital, influenced the pricing of your work?

5        A.   Not so much.  I mean, it's more what the -- what

6   the market does, but in terms of mine, I've tried to be

7   fairly consistent, because I have a -- a good track record

8   of publication and so on.

9        Q.   Okay.  Do you consult with others about the

10  pricing you charge?

11       A.   Well, in the past, there were pricing guides and

12  so on that were printed by -- someone like Jim Pickerell is

13  well-known in the -- in the photo- -- photographic

14  community.  Also, stock agencies used to be more

15  transparent, I guess I would say, in terms of providing

16  prices -- like pricing guides, pricing calculators.

17  That's -- that's not so common anymore.

18       Q.   How long ago did it start to become less common

19  for the stock agencies to --

20       A.   Oh, it's been the last five years, I'd say.

21       Q.   Okay.  You still are represented by one or more

22  stock agencies?

23       A.   No.

24       Q.   You have no connection now with any of the stock

25  agencies that you have had relationships with in the past?

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                        September 28, 2022

1       A.    Correct.

2       Q.    When did that occur?

3       A.    Over the last two years.

4       Q.    Was that the result of COVID or other factors?

5       A.    Mostly that I didn't think they had photographers'

6    best interests at heart, as they did in the past.  They're,

7    you know, corporate entity -- entities, so --

8       Q.    The stock -- or excuse me, the pricing guide that

9    you referred to -- guides, perhaps plural -- and you

10   mentioned the name Jim Pickerell --

11      A.    Correct.

12      Q.    -- do you use them?

13      A.    No.  I'm not -- he -- I'm not even sure he still

14   publishes them.  I'm just saying that those were things that

15   I used in the past, over 20 or 30 years.  I don't think I've

16   really used them in the last ten years or so.

17      Q.    Do you consult with your lawyers about the

18   prices -- the amounts you demand when you allege that

19   someone has infringed your copyrights?

20      A.    No.

21      Q.    So you instruct them as to what amounts to --

22      A.    No; no.

23            MR. DeSOUZA:  Object -- objection.

24      A.    No.

25            MR. DeSOUZA:  Attorney-client privilege.

1          Don't answer that, Blaine.

2          And -- and anything about his instructions to his

3    lawyers, we're not getting into today, Jeff.

4          MR. SQUIRES:  I'm going to take issue with that.

5    I'm not going to argue it at great length now, unless

6    Mr. DeSouza wants to, but discussions about the amounts to

7    charge are a question of business, not law, unless -- and

8    I'm not talking about statements of statutory damages and

9    ranges of statutory damages.  I'm talking about the amounts

10   that Mr. Harrington or his lawyers, on his behalf, demand

11   of -- to avoid litigation over the copyright issue.  That's

12   business advice, and I -- Dan, are you hearing me?

13         MR. DeSOUZA:  I hear you just fine --

14         MR. SQUIRES:  Okay.

15         MR. DeSOUZA:  -- but --

16         MR. SQUIRES:  The reason I ask -- the reason I ask

17   is there's something on the screen that is blocking your --

18   your face, not because I am concerned that this -- this

19   should lead to an argument.  I just wanted to make sure you

20   were hearing me and that the blockage on the screen isn't

21   preventing that.

22         MR. DeSOUZA:  No.  I -- I hear you.

23         THE WITNESS:  You want to do it?

24         MR. DeSOUZA:  I can see you.  I can see

25   Mr. Harrington.  Your associate appears to be just a tie,

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

1   but I can't see his face.  I -- I hear -- I hear and see

2   everything that's going on.

3            MR. SQUIRES:  Okay.  That's fine.

4            So I'm going to take issue with that.  I'm going

5   to reserve that.  I -- I may contest that at some future

6   time, because I think that is an improper assertion of the

7   privilege.  We'll see.

8            THE WITNESS:  I'd like to get rid of this thing so

9   I can see him.  He's trying.

10           THE VIDEOGRAPHER:  We need to go off the record --

11           (Court reporter response.)

12           THE VIDEOGRAPHER:  We're now going off the record.

13  The time is approximately 9:24 a.m.

14           (A discussion was held off the record.)

15           THE VIDEOGRAPHER:  We're now going back on the

16  record.  The time is approximately 9:25 a.m.

17       Q.   (BY MR. SQUIRES)  Over the years, you've spent

18  some time in New Mexico; is that correct?

19       A.   Little.

20       Q.   A number -- you filed, in the past, a number of

21  lawsuits in New Mexico --

22       A.   Correct.

23       Q.   -- based upon photographs taken in New Mexico?

24       A.   Yes.

25       Q.   So you have taken photographs in New Mexico, but

1  how often have you been in New Mexico for the purpose of

2  taking photographs?

3       A.   I've been several times.  But the majority of them

4  were all shot during the Balloon Fiesta, and I was a guest

5  of Visit Albuquerque for that.

6       Q.   But you were here?

7       A.   Yeah, I was here.

8       Q.   And you were taking photographs --

9       A.   Correct.

10      Q.   -- for your own purposes?

11      A.   Yes, and for Visit Albuquerque, who -- who

12  licensed quite a few of the photos.

13      Q.   So explain to me what your relationship with Visit

14  Albuquerque was.

15      A.   As an example, I'm a member of an organization

16  called "Society of American Travel Writers," which includes

17  photographers, video people, public relations people,

18  et cetera, and so there are a number of public relations

19  people who either work for public -- public relations firms

20  or -- you listening? --

21      Q.   Yes.

22      A.   -- or for a specific company like Carnival Cruise

23  Lines [sic] or for the Netherlands Tourist Board or

24  something like that.  So Visit Albuquerque was -- or it

25  probably still is -- a member of that organization, and

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  through that -- they use that to vet travel journalists who

2  they would like to invite to help them cover their area.

3      Q.   How often did you visit New Mexico at the behest

4  of Visit Albuquerque?

5      A.   Once.

6      Q.   Have you visited New Mexico for the purpose of

7  taking photographs on other occasions?

8      A.   Yes.

9      Q.   Were you doing so at the behest of anyone in

10 particular?

11     A.   I don't believe so.

12     Q.   Okay.  How often?

13     A.   I -- you want me to guess?

14     Q.   Sure.

15     A.   Maybe five times.

16     Q.   Okay.  Over the past how many years?

17     A.   Over the past 20 years.

18     Q.   Okay.  And have you used those photographs for

19 your business?

20     A.   Yes.

21     Q.   How do you use them?

22     A.   Well, primarily, they were made available to -- to

23 either my regular clients or potential clients through my

24 website and through the stock agencies that licensed my

25 work.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1       Q.   Okay.  When you were here at the behest of -- when

2   were you here at the behest of Visit Albuquerque?

3       A.   I think it was -- hang on.  Just a sec.  I think

4   it was 2011.

5       Q.   Okay.  And did you have any written agreement with

6   Visit Albuquerque about your being here and the photographs

7   you took?

8       A.   No.  As I said, I was their guest.  They got me up

9   in a number of balloons, for example.  They arranged for me

10  to get on top of the TV station to shoot the skyline, you

11  know, some things that were not -- that were out of the

12  ordinary and made the photos more valuable, because not

13  everybody could shoot them, but there -- no.  There was no

14  written agreement.  It was more of a, "We will support you,"

15  and then -- and then I gave them the ability to -- to see

16  the take afterward.  And they chose what they wanted to use,

17  and then they licensed them.

18      Q.   So you have licenses that you entered with Visit

19  Albuquerque?

20      A.   Correct.

21      Q.   Okay.  I'd like to see those licenses.  I'll --

22  I'm making notes of these things, and I will follow this up

23  with a written request for a number of items that will be --

24  those will be one of them, along with any correspondence

25  between you and the representatives of Visit Albuquerque

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1  about the visit and your role taking photographs.  Did they

2  provide you any financial support in connection with your

3  taking the photographs?

4      A.   Well, as I said, like they do for all the travel

5  journalists, they pay your expenses, so in other words, a

6  hotel is provided, et cetera.

7      Q.   And they provided you the facilities for you to

8  take a balloon ride for the purpose of your taking

9  photographs?

10      A.   Right.

11      Q.   Okay.  Tell me briefly about your formal training

12  as a photographer, and when I say "formal training," I mean

13  advanced level education.

14      A.   I have been a published photographer since I was

15  17 years old.  I started out when I -- I raced motocross as

16  a teenager and kind of crossed over from racing to writing

17  and photographing for a motorcycle newspaper -- a racing

18  newspaper in Southern California.  This is when I was still

19  in high school.  I interned with them during the summer in

20  their office in Orange County, California.  One -- a

21  nighttime desert race with the two -- the publisher and the

22  editor, in the Mojave Desert, photographed Steve McQueen

23  when they -- he was making a movie called "On Any Sunday"

24  about motorcycle racing, that was picked up by other

25  publications.  And after -- so that was -- that was the

1  beginning of my career.  Now, as far as formal, I -- after

2  that, I -- after I graduated -- graduated high school in

3  Colorado, I attended Brooks Institute of Photography in

4  Santa Barbara, California, and graduated number one in my

5  class in advertising illustration.

6       Q.   How long was that curriculum?

7       A.   I think it was around three years.

8       Q.   Okay.  Any postgraduate work?

9       A.   No.  I mean, most people who are photographers

10  don't even go to photography school.  They either are self

11  taught or they intern.  After I -- after I graduated from

12  that school, I went to work in an advertising studio in

13  Amsterdam in the Netherlands, and from there, I moved to

14  New York -- decided it was -- had more to offer me -- and

15  started out as an assistant because I didn't know the city

16  and didn't have the connections to work as a photographer

17  immediately, and I worked both as a staff assistant and a

18  freelance assistant to about 20 different well-known

19  photographers in advertising and fashion.  So many people I

20  met there, that -- that's how they learned the craft,

21  through interning, but I did it both through formal

22  education and through interning -- not interning, but

23  assisting.

24       Q.   With whom -- I'm focusing on your business now, on

25  photography as a business.  With whom are you in

ADLER MEDICAL, LLC vs. HARRINGTON                     Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

1  competition?

2        A.    Primarily other travel photographers.

3        Q.    How about stock agencies?

4        A.    Well, stock agencies represent photographers.

5        Q.    Sometimes, and sometimes they have portfolios of

6  photographs that are not the subject of ownership rights.

7        A.    True.  But I don't have anything to do with that,

8  and I have little knowledge of it.

9        Q.    Okay.  How about Google Images?

10       A.    What -- what's the question?

11       Q.    Is Google Images a competitor of yours?

12       A.    I'm not even aware that Google sells photos.  I

13  know --

14       Q.    No?

15       A.    I know -- I know Adobe does.  I'm not -- I don't

16  know anything about Google Images.

17       Q.    You are aware that Google Images has galleries of

18  photographs available on the internet, right?

19       A.    No, I'm not aware.

20       Q.    You're not aware of that?  Accept the

21  assumption -- not the assumption -- accept, for these

22  purposes, which does not mean you are accepting the truth of

23  what I'm about to say, but as a predicate, that there is a

24  website generally known as "Google Images" which allows

25  access to lots of photographs.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1      A.   Okay.  No.  I was -- I was unaware.  The only time

2  I've used Google Images is to do reverse searches, which is

3  perhaps something separate.

4      Q.   It -- I'm -- I'm -- we'll get there, but not right

5  now.  But would that be considered a -- a competition with

6  your business?

7      A.   Well, I'd say, at this --

8           MR. DeSOUZA:  Object -- object to form.

9      Q.   (BY MR. SQUIRES)  You -- you can answer.

10          THE WITNESS:  Do I answer?

11          MR. DeSOUZA:  Yeah.  Sorry, Blaine.  In fact, if I

12  don't instruct you --

13     Q.   (BY MR. SQUIRES)  Do you remember the original

14  instruction?  Unless he instructs you not to answer --

15     A.   Okay.

16     Q.   -- the fact that he objects --

17     A.   Fine.

18     Q.   -- shouldn't -- shouldn't --

19     A.   So would you please repeat that, your question?

20     Q.   Do you -- accepting my predicate statements --

21     A.   Are they -- are they competition?

22     Q.   Yeah.

23     A.   Well, you know -- I mean, here's -- here's the way

24  I look at it.  I was a fairly big player.  I mean, I had a

25  hundred thousand images online before leaving these

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   agencies.  I have a library of at least half a million

2   photos.  I have a reputation.  I had clients.  I've worked

3   for everyone from National Geographic and Smithsonian to

4   Time and Newsweek, Businessweek, Forbes, so, you know, I've

5   paid my dues, which is something happened in a previous

6   generation.  Now people just kind of start out and get

7   themselves a website and call themselves a business, but I

8   had large numbers of high quality photos.  And so in the

9   past, I would have -- you know, ten years ago maybe, I would

10  have said, "No.  I don't consider these people competition.

11  Their" -- "their" -- "the quality of their material is not

12  in my" -- "in my range," and so on, but, you know, things

13  have changed, and so now -- like -- I'll give you an

14  example.  If this is the pizza or whatever, and this is my

15  piece of the pie, that's -- I -- I thought, well, there's no

16  one -- none of these people can take away my piece of the

17  pie, but, you know, all the people who are semipros and so

18  on, creating pictures now, can -- can, you know, take

19  nibbles away, and -- and then -- and so they -- they do

20  affect my business.

21       Q.   Do you know what Canva is?

22       A.   No.

23       Q.   How about Pinterest?  Is Pinterest a -- a source

24  of competition with you?

25       A.   I wouldn't -- I wouldn't say it's a form of

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   competition, but people have put about a hundred thousand

2   hit -- links of my photos on Pinterest.

3        Q.   Do you do anything to try to prevent people from

4   downloading and using your photographs without your consent?

5        A.   Yes.

6        Q.   What do you do?

7        A.   Well, primarily, I let it be known that it's not

8   okay, so it starts with the metadata.  On the metadata of

9   every photograph -- all of my information, including

10  copyright notices, instructions, are on every photograph.

11  Now, that doesn't mean that people don't strip it away or it

12  get -- it gets lost.  For example, if somebody, which is

13  often the case, takes a screenshot of one of my photos off

14  of my website or somewhere else, if they find it on the

15  internet, then there's no -- there's no metadata attached

16  any longer.  On my website, on every single page, is a

17  disclaimer, a -- of a complete paragraph warning people not

18  to steal my photography and that I take it seriously and

19  that they can be sued in federal court.  And as well, on my

20  website, that is provide -- provided by PhotoShelter, I have

21  disabled the ability to right click and save photographs to

22  anyone who visits my website.

23       Q.   And when did you -- PhotoShelter, when did you

24  begin to use this --

25       A.   I think --

ADLER MEDICAL, LLC vs. HARRINGTON                     Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1      Q.    -- service?

2      A.    I think -- because a lot happened around the

3   economic crash of 2008/2009 -- I'm not telling you for sure,

4   but I'm guessing around 2009.

5      Q.    Okay.  And do you put watermarks on all your

6   photographs?

7      A.    No, I do not.

8      Q.    Why not?

9      A.    Because it's aesthetically un- -- unpleasing.

10  Clients -- major clients who want to get -- legitimately

11  download my pictures and use them for comps for possible

12  use, do not want to see watermarks all over them.  When I --

13  when I put them out into public, which is not my website,

14  for example, on social media, I do watermark them.

15     Q.    Can you explain what it means to watermark a

16  photograph?

17     A.    Well, you apply, with a program -- in this case,

18  from Lightroom, which is the main way that I do

19  postproduction -- it will overlay that onto the copy that

20  you create.

21     Q.    Can you be a little more technical, a little more

22  descriptive, of what the proc- -- process is?

23     A.    Well, there's not a process.  I -- you know, like

24  if you have a picture -- and you go someplace into the

25  program, and you can, you know, write your copyright notice.

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                September 28, 2022

1   I write, you know, "Copyright Blaine Harrington, III," the

2   year of publication, "All" -- "all rights reserved."

3        Q.   And you do this digitally, I assume.

4        A.   Correct.

5        Q.   Could you not watermark a photograph without

6   having that interfere with your ability to provide the same

7   photograph to a client without the offensive appearance of

8   the watermark?

9        A.   I'm not sure I understand the question.  Can I --

10  can I put a watermark without making it be offensive?  Is

11  that your question?

12       Q.   Well, can you not apply a -- can you not provide a

13  photograph to a client, and then have a watermark version of

14  it posted on a website?

15       A.   Yes, you could, but as I said, they -- the people

16  who -- the professionals who search my website find

17  watermarks offensive.  If you would look at most

18  photographers' websites -- not stock agencies, but

19  photographers -- and if you would look at other websites on

20  PhotoShelter, for example, they do not contain watermarks.

21  It just isn't something that's done.  And I'll add that

22  somehow is -- is a belief of some people, that a watermark

23  is what gives them the idea that they can't steal a picture,

24  and that's -- that's a fallacy.  I mean, the idea that

25  people can search on the -- on the internet and take

1   pictures and not assume that there's an owner of the picture

2   is -- is what gets people into trouble.

3       Q.   Okay.  I'd like you to go back to the document

4   that I had previously given you that I've marked as

5   Exhibit 1.

6       A.   Uh-huh.

7       Q.   And attached to and part of that document, as

8   Exhibit A, are a series of document requests, and I'd

9   like -- did you discuss these document requests with your

10  attorney?

11      A.   No, only that he was denying them.

12      Q.   Okay.  Then let's --

13          MR. DeSOUZA:  Well, Blaine -- Blaine, the --

14          MR. SQUIRES:  No.

15          MR. DeSOUZA:  Jeff --

16          MR. SQUIRES:  Dan --

17          MR. DeSOUZA:  Jeff, don't.

18          MR. SQUIRES:  Dan --

19          MR. DeSOUZA:  Jeff, don't.

20          MR. SQUIRES:  It's his testimony, not yours, that

21  I am asking for here.  And you do not have a basis for

22  objecting, so please wait until you have a basis for

23  objecting, and then feel free to object on legitimate --

24          MR. DeSOUZA:  I am --

25          MR. SQUIRES:  -- grounds.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                        September 28, 2022

```
 1            MR. DeSOUZA:  I am objecting, so calm yourself
 2    down before you start yelling at me.  Okay?
 3            MR. SQUIRES:  I'm not yelling at you.  I'm
 4    explaining to you --
 5            MR. DeSOUZA:  Knock it off.
 6            MR. SQUIRES:  -- what your role is.
 7            MR. DeSOUZA:  Mr. Harrington, my instruction is
 8    simply, do not get into the substance of any conversation
 9    between you and me.  If Mr. Squires had allowed me to get
10    that out, we wouldn't have to have this back-and-forth on
11    the record.  I am simply asking, any attorney-client
12    communication between you and me, Mr. Harrington, please do
13    not reveal for purposes of today.
14            Mr. Squires, back to you.
15            MR. SQUIRES:  Good.
16       Q.  (BY MR. SQUIRES)  Mr. Harrington, I -- if I ask
17    for you to divulge to me the content of communications
18    between you and your attorney, the content that are in
19    connection with your solicitation of or his provision of
20    legal advice, you don't have to answer.  If I ask you, "Did
21    you discuss a certain topic with your attorney?" you are
22    required to answer.  That is not protected by the
23    attorney-client privilege.  Do you understand the
24    distinction?
25       A.  Yes.
```

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1    Q.   Good.  So I guess I ask again.  Did you discuss

2    with your attorney the subject of the document requests that

3    were served on you?

4    A.   Not specifically, no.

5    Q.   Okay.  I'm going to go down the list.  Number 1,

6    "Documents evidencing any damages you claim to have suffered

7    from the alleged infringements by each of the

8    Plaintiffs/Counterclaim Defendants in this case."  Did you

9    bring documents with you?

10   A.   No, I did not.

11   Q.   Number 2 -- well, let me go back.  Why not?

12   A.   Jeff --

13        THE WITNESS:  I mean, Dan --

14   Q.   (BY MR. SQUIRES)  You can't ask him.

15   A.   Okay.  Well, essentially -- essentially, I was

16   told that I --

17        MR. DeSOUZA:  Hold on.  No, Blaine.  You're not --

18   you're not going to say what you were told.  That is

19   attorney-client communications.

20        THE WITNESS:  Okay.

21        MR. SQUIRES:  That's true.

22        MR. DeSOUZA:  You can answer the question --

23        THE WITNESS:  Okay.  Well --

24        MR. DeSOUZA:  -- without getting into the

25   substance of communications between yourself and counsel.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

```
 1            THE WITNESS:  Then I really have nothing to say,
 2   because --
 3            MR. SQUIRES:  Okay.
 4            THE WITNESS:  -- it's -- it's all what we
 5   discussed.
 6       Q.   (BY MR. SQUIRES)  Number 2, "Documents evidencing
 7   any efforts you have made since January 1st, 2017, to
 8   identify any websites where photographs you had taken were
 9   available to the public without notice of att-" -- "or
10   attribution of your authorship."  Did you bring any such
11   documents with you?
12       A.   No, I did not.
13       Q.   Do you have any such documents?
14       A.   I don't know.
15       Q.   Okay.  So I take it you did not search for any
16   such documents?
17       A.   No, I did not.
18       Q.   Item No. 3, "Documents evidencing correspondence
19   between yourself or your lawyers with any persons you have
20   accused of infringing copyright in your photographs, with
21   respect to infringement claims or [sic] demands you have
22   made for payment ... since January 1st, 2017."  Did -- have
23   you brought any such documents?
24       A.   No, I have not.
25       Q.   Do you have any such documents?
```

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1          A.    I don't know.

2          Q.    Did you search for any such documents?

3          A.    I did not.

4          Q.    Number 4, "Documents evidencing correspondence

5    between yourself or your lawyers with any person [sic] you

6    have accused of infringing copyright in your photographs,

7    ... after the initiation of litigation about such claims,

8    since January 1st, 2017."  I don't want to belabor this or

9    waste time.  Would your answer to my question about each one

10   of these numbered items be the same?

11         A.    Yes.

12         Q.    And I'd say each one of these numbered items.  I

13   mean between Nos. 1 and 12.

14         A.    Correct.

15         Q.    Okay.  I'm going to show you -- and ask that it be

16   marked as Exhibit 2 -- a letter dated December 30th, 2021,

17   from CopyCat Legal to Ethan and Michelle Adler.  Are you

18   familiar with this letter?

19              (Exhibit 2 marked.)

20         A.    I am.

21         Q.    Did you review it before it was sent to Mr. and

22   Mrs. Adler?

23         A.    I'm not sure if I reviewed it.  I -- I certainly

24   saw it once it was sent.

25         Q.    Okay.  And in this letter, you see that there was

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  a demand made -- on page 3, I believe, of this letter --

2       A.   Uh-huh.

3       Q.   -- that they pay $30,000 within 14 days.  Did you

4  specifically approve that demand?

5       A.   No.

6       Q.   Did you have anything to say about the selection

7  of that dollar amount as the demand?

8       A.   In our dealings, this is a standard amount.

9       Q.   When you say "a standard amount," what do you

10  mean?

11      A.   This is the general request from a claim in --

12  in -- in -- in demand letters that -- that CopyCat has sent.

13      Q.   And did you discuss with CopyCat the subject of

14  determining how much should be demanded?

15      A.   No.

16      Q.   So how do you know that this is a general amount?

17      A.   Well, because we've -- we've had a number of these

18  demand letters, and they're -- they're all the same, the --

19  the amount.

20      Q.   Who set the amount, the $30,000 amount?

21      A.   CopyCat.

22      Q.   Okay.  Have you ever licensed the right to a

23  photograph to a small business for use on its website as a

24  background image for $30,000?

25      A.   No.

1    Q.    Okay.

2    A.    But if this is relevant, I would add that I have

3    had judgments far in excess of that amount, so it's -- it's

4    apples and oranges.  They're not the same thing.  What I

5    would license something for is not what I would expect when

6    someone has stolen my photography.

7    Q.    You say you have had judgments far in excess of

8    that amount?

9    A.    Yes.

10   Q.    You have provided information in response to

11   written interrogatories previously in this case.  Generally

12   speaking, do you recall -- do -- do you understand what I'm

13   talking about?

14   A.    Yes.

15   Q.    Is it not the case that in every case in which you

16   have received a judgment of an amount in excess of

17   $30,000 -- or that that has been the case in which the

18   defendant that you sued did not appear, and that a default

19   judgment was entered by --

20   A.    That's correct.

21   Q.    -- by the Court as a result?  Have you ever taken

22   a case of copyright infringement actually to trial?

23   A.    No.  Are you going to refer to this one more, or

24   should I put it aside?

25   Q.    You can put it aside.  I'm going to show you

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                     September 28, 2022

1  another letter written by CopyCat Legal dated January 5th,

2  2022, addressed to Walt Arnold Commercial Brokerage, Inc.,

3  and I'm going to ask that this be marked as Exhibit 3.

4           (Exhibit 3 marked.)

5           MR. SQUIRES:  And I want to make sure that the

6  court reporter understands, which I'm sure she will, I'm

7  going to lose track of numbers, eventually, and I'm going to

8  say, "Next."

9           (Court reporter response.)

10      Q.   (BY MR. SQUIRES)  Are you familiar with -- well,

11  you know, I -- I want to go back to Exhibit 2 and ask

12  another question; I apologize before.  Exhibit 2 contains an

13  image.  This is a black-and-white document that you're

14  looking at.  It is -- does not have anywhere near the same

15  vibrancy of color -- even a color reproduction of the

16  photograph.  But in Exhibit 2, the letter to the Adlers,

17  there's an image of the photograph.  Do you see that image?

18      A.   On page 3?

19      Q.   On page 3 of -- of the --

20      A.   Yeah; yeah.  Yeah, I see it.

21      Q.   Now, it's -- it is on page 3 of an attachment to

22  the letter, which is a draft of a Complaint that you sent

23  with the letter.  If you look forward two pages, not

24  backwards.  If you look ahead, you'll see that it is -- no,

25  no.  You -- you're about to do the right thing.  Yes.  Next

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1   page; one more.  You see that that's a draft of a

2   Complaint --

3        A.   Correct.

4        Q.   -- that was sent with the letter?

5        A.   That's right.

6        Q.   Okay.  And the image is the image of the

7   photograph that you allege was infringed --

8        A.   Correct.

9        Q.   -- correct?  Do you know when you took that

10  photograph?

11       A.   Yes.  As I -- as I stated earlier, these were all

12  made on one trip in fall of 2011, I believe.

13       Q.   When you were the --

14       A.   No, no.  I'm sorry.  I misspoke, because I -- and

15  this is -- you know, I've shot hundreds of thousands of

16  pictures, and the way they're identified is by the file

17  number.  And it's 2012.  October 8th, 2012, was the

18  beginning of the trip, so it was taken within that week.

19       Q.   Was that the week that you were here as the guest

20  of something Albuquerque?

21       A.   Yes.

22       Q.   Okay.  All right.  Now we'll go back to Exhibit 3

23  and ask you if you recognize this letter.

24       A.   Yes, I do.

25       Q.   I'm trying to minimize duplication here, so I'll

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  go as quickly as I can.  Did you review this letter before

2  it was sent?

3       A.    No.  I don't think so.

4       Q.    Okay.  This letter also asks for $30,000.  In

5  fact, this is -- this letter is virtually identical with the

6  letter that was sent to the Adlers, Exhibit 2; is that

7  correct?

8       A.    Correct.

9       Q.    Okay.  You had no input into the determination of

10  the amount of money being demanded?

11       A.    Correct.

12       Q.    Okay.  And the image, which is, again, contained

13  on the attachment to that letter that is the subject of your

14  claim of infringement, when was that taken?

15       A.    Well, as I stated, they were all taken at the --

16  during the same five-day period, sometime --

17       Q.    Okay.

18       A.    -- after October 8th, 2012.

19       Q.    Okay.

20       A.    I would add, as well, that this is a panoramic,

21  which is done by stitching a number of different photographs

22  together, so again, this adds to the value of the

23  photograph, because it's not something that most

24  photographers can do, and certainly not sort of semipros who

25  sell their work today.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1        Q.    Okay.

2              MR. DeSOUZA:  Jeff, I'm assuming you're going on

3   to another letter.  Can we take a quick restroom break just

4   before we do that?

5              MR. SQUIRES:  Of course.

6              MR. DeSOUZA:  All right.  Thank you.

7              THE VIDEOGRAPHER:  We're now going off the record.

8   The time is approximately 10:00 a.m.  Watch your

9   microphones, if you stand up.

10             (Brief recess taken.)

11             THE VIDEOGRAPHER:  We're now going back on the

12  record.  The time is approximately 10:12 a.m.

13        Q.    (BY MR. SQUIRES)  I want to go back to Exhibit 2,

14  which is the letter to Adler.

15        A.    Okay.

16        Q.    And with respect to the photograph, have you

17  licensed that image to anyone?

18        A.    I don't know.

19        Q.    Okay.  Fair enough.  In Exhibit 3, which is the

20  letter to Walt Arnold, a copy of that image is attached I

21  think as the last page of the group of papers, the very last

22  page, very last page.  Have you licensed that picture to

23  anyone else?

24        A.    I don't know.

25        Q.    I'm going to give you a document to be identified

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  as Exhibit Next; I think it's 4.  This is essentially the

2  same letter, correct, that --

3          (Exhibit 4 marked.)

4      A.   I imagine, yeah.  I -- I -- I believe so; yes.

5      Q.   I don't want to repeat -- it also asks for

6  $30,000.  Your answers to my questions about this -- this

7  letter and the demand for $30,000 would be the same as your

8  answers to the previous letter?

9      A.   Well, I think I should expound on it a little

10  bit --

11      Q.   Okay.

12      A.   -- in that before any letters were sent, we had

13  discussed -- DeSouza and I had discussed that amount, and I

14  was okay with it.  In terms of the specifics of the

15  different demands that have gone out, I was not -- well, it

16  was the same amount, so --

17      Q.   So there's a certain one-size-fits-all aspect to

18  this?  You were comfortable asking for the same amount of

19  money regardless of the individual photograph involved and

20  regardless of the individual use involved; is that correct?

21      A.   As a starting point, yes.

22      Q.   Okay.  If you will look at the last page of

23  this --

24      A.   Absolute last page?

25      Q.   The absolute last page.  This is -- this is the

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1  image involved that you were alleging infringement by

2  Xuan Nation, LLC, correct?

3      A.   Yes.

4      Q.   When did you take that?

5      A.   Again, the same --

6      Q.   If you -- if you --

7      A.   -- the same week.

8      Q.   -- say the same -- same time?

9      A.   Yep.

10     Q.   Okay.  I know.  And have you licensed this image

11  to --

12     A.   I know that I have, because it's kind of a

13  best-selling image.  It's been -- it's been used on puzzles,

14  for example, because I relicensed it not too long ago.

15     Q.   How much have you licensed it for?

16     A.   In total or -- or per?

17     Q.   Per.

18     A.   I don't know.

19     Q.   Okay.

20     A.   I mean, there -- you know, there's a wide range, I

21  would say.

22     Q.   Okay.  Have you produced copies of all the

23  licenses you have entered for that photograph in response to

24  the previous discovery requests in this case?

25     A.   Not that I'm aware of.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1        Q.    Why not?

2        A.    I -- I have done what I'm instructed by my

3   attorney.

4        Q.    I request that you provide copies of all licenses

5   that you have entered for any of the photographs that are

6   the subject of your infringement claims in this case.

7        A.    Now, beyond my own sales from my web- -- or that

8   I -- that I have invoiced myself, that becomes cumbersome,

9   because not all the agencies I work with gave really solid

10  information, so chasing some of that could be difficult.

11       Q.    Well, I will leave that in your hands.

12       A.    Well --

13       Q.    I'm making the request.

14       A.    Okay.

15       Q.    Any Court -- and I think your lawyer will

16  confirm -- would require you to do so.

17       A.    Okay.

18       Q.    I'm going to show you a document marked as

19  Exhibit 5, which is a letter addressed to Ms. Collins and

20  Ms. Yevoli of the -- well, it doesn't make it clear.  It's

21  addressed to two addressees, the CCIM Institute and the CCIM

22  Institute, New Mexico Chapter.  You see that?  Did you see

23  this letter before it --

24              (Exhibit 5 marked.)

25       A.    Yes.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      Q.    -- was sent?  Did you discuss this particular

2   letter with your attorney?

3      A.    No.

4      Q.    Do you know anything about what the CCIM Institute

5   is?

6      A.    I believe they have members who are realty

7   companies, and I think -- one thing I'm aware of is

8   they're -- is that they are -- they give guidance to their

9   members about copyright infringement, and that they

10  shouldn't infringe on people's copyrights.

11     Q.    How do you know that?

12     A.    I -- I -- I'm not sure.

13     Q.    Before this letter was sent -- proposed, did you

14  have any knowledge of the CCIM Institute?

15     A.    No.

16     Q.    And the CCIM Institute, New Mexico Chapter, do you

17  know what that is?

18     A.    A chapter of the national organization --

19     Q.    Right.

20     A.    -- I'm assuming.

21     Q.    And did you have any knowledge of it before --

22     A.    No, I didn't.

23     Q.    -- this letter?  And this letter also asks for

24  $30,000.  Would you say that the same -- would you give the

25  same answers if I asked you questions about how the $30,000

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1  number was arrived at?

2      A.   Yes.  As I said, I -- I approved of it, but beyond

3  that, I can't say if I -- I was aware of -- of any other

4  specificity.

5      Q.   You see the photograph that is the subject of this

6  letter and your claim.  I believe that there's an image of

7  it on the very last page also.

8      A.   Yes.

9      Q.   Was this taken at the same time the other -- as

10 part of the same session of photographs in 2011 or '12

11 that --

12     A.   2012, yes.

13     Q.   2012, before.  Have you licensed this image to any

14 others?

15     A.   I'm -- I'm -- I'm not sure.

16     Q.   And so you do not know, if you did, what the price

17 charged for such licenses was?

18     A.   No.

19     Q.   But this is one of the -- comprised within the

20 group of these four cases, the photographs that are the

21 subject of your claims of infringement.  You will search for

22 and provide me copies of all licenses that --

23     A.   Yes, as -- as I'm instructed by my attorney.

24     Q.   You were here in Albuquerque, at that time, in

25 connection with circumstances that you've described.  How

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                      September 28, 2022

1   many images did you take at the time?

2        A.   I can't say.

3        Q.   Approximately.

4        A.   Thousands.

5        Q.   Thousands.  Did you take thousands of pictures of

6   the Balloon Fiesta?

7        A.   Well, as I say, the whole -- I -- I can't say.

8   I -- I can't say specifically.  I -- I mean I'm sure I took

9   a lot.

10       Q.   Hundreds, at -- at the very least, correct?

11       A.   Certainly.

12       Q.   And how about of the Albuquerque skyline, the same

13   thing --

14       A.   No, not so many.

15       Q.   Approximately how many?

16       A.   Fifty or a hundred maybe.

17       Q.   Okay.  Did you take photographs of any other

18   identifiable vistas in Albuquerque at the time?

19       A.   Yeah, some -- I think some other vistas, but also

20   other tourist-type attractions, like the -- the Indian --

21   I'm not sure what the place is called.  There's a -- there's

22   a Native American --

23       Q.   Something.

24       A.   Site where they -- during -- I imagine they do it

25   regularly, anyway, but during the Fiesta, they do -- they --

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1   they do Native dances, and so on.  Also in Old Town and --

2   yeah.  I mean, you know, we discussed a number of things

3   that both they thought I would benefit from photographing

4   and also some things that they might have wanted to license.

5       Q.   What percentage, approximately, of the photographs

6   you took during your visit to Albuquerque at that time were

7   taken of the Balloon Fiesta?

8       A.   I can't say exactly.

9       Q.   I am not asking exactly.

10      A.   Well --

11      Q.   More than 10 percent?

12      A.   Yes.

13      Q.   More than 20 percent?

14      A.   I assume so.

15      Q.   As many as half?

16      A.   Perhaps.

17      Q.   So probably thousands?

18      A.   Perhaps.

19      Q.   So far we've looked at four photographs.  They are

20  the four photographs -- we've looked at the letters that

21  your lawyers wrote, to which were attached, in one form or

22  another, images of the photographs.

23      A.   Correct.

24      Q.   Have you won any awards for any of those

25  photographs?

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1    A.   I don't believe so.  Several -- several of the

2  photographs have been used by Bing as photo of the day,

3  which Bing is Microsoft, and they have access to hundreds

4  and millions of photos.  Over a period of time, they've used

5  a number of my photos for different subjects, but on

6  different years that the Fiesta was beginning, they -- they

7  used my photo on multiple years -- different photos on

8  multiple years.

9    Q.   Did they do so with your consent?

10    A.   Yes.

11    Q.   Do you have any written evidence of that?

12    A.   Well, I had -- I had an agreement with them,

13  and -- and -- and then when they use it, they -- they send

14  you a notice, and -- and you get paid.

15    Q.   I'd like to have you produce to me a copy of

16  whatever agreement, or agreements, you have had with Bing,

17  pursuant to which they were authorized to reproduce any of

18  those photographs.  We're talking just about these four.

19    A.   Right; right.

20    Q.   Okay.  I am going to show you a copy of the

21  Complaint filed by my clients in this case, which will be

22  marked as Exhibit Next; 6.  Did you receive a copy of this

23  Complaint?

24         (Exhibit 6 marked.)

25    A.   Yes, I did.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                               September 28, 2022

1        Q.    And did you review it?

2        A.    Yes.

3        Q.    And you discussed it with your attorney?

4        A.    Yes.

5        Q.    I'm going to show you a document marked as

6   Exhibit 7.

7              (Exhibit 7 marked.)

8        A.    Are we not going to look at this more?

9        Q.    No.  And this was the Answer you initially -- your

10  attorneys initially filed in response to the Complaint.

11       A.    Right.

12       Q.    Did you review that before your attorneys served

13  it --

14       A.    Yes.

15       Q.    -- served it --

16       A.    Yes.

17       Q.    -- filed it --

18       A.    Yes.

19       Q.    -- filed it --

20       A.    Yes.

21       Q.    -- in this case?  Okay.  Did you approve of it?

22       A.    Yes.

23       Q.    Okay.  I'm now -- I'm -- I'm done with that.  I'm

24  now going to ask you to look at your First Amended

25  Counterclaim and Third-Party Complaint, which should be

1  marked as Exhibit -- and did you review that before your

2  attorney --

3          (Exhibit 8 marked.)

4     A.   Yes.

5     Q.   -- filed it?

6     A.   Yes, I did.

7     Q.   Do you know why -- what was different about this

8  document, what the amendment consisted of?

9     A.   No, I don't recall.

10    Q.   I'd like you to look -- I'm going to spend a

11 little time with this document now.

12    A.   Okay.

13         MR. DeSOUZA:  Jeff, you're still on the Answer?

14         MR. SQUIRES:  I am on the Amended Counterclaim

15 and --

16         MR. DeSOUZA:  Okay.  Thank you.

17         MR. SQUIRES:  -- and Third-Party Complaint.

18    Q.   (BY MR. SQUIRES)  Now, I'm going to reverse a

19 little bit and go back to the previous document.  Apologize

20 for any confusion.  This is the Answer, Counterclaim, and

21 Third-Party Complaint, before amendment, and it is

22 Exhibit No. 7 I think.  In paragraph No. 10 of your

23 Answer --

24    A.   Yes.

25    Q.   -- you say that your works have been infringed

1    thousands of times on the internet.  What is the basis for

2    your saying that?

3         A.    Having reverse searched and found them.

4         Q.    Have you brought action or threatened to bring

5    action, hired lawyers to act on your behalf, with respect to

6    every one of those?

7         A.    No.

8         Q.    Why not?

9         A.    It's -- it's -- that's impossible.  I mean,

10   even -- I'm -- I'm a photographer, you know.  My business

11   isn't -- isn't based upon these people infringing on me.  I

12   do take very seriously that people do infringe, but it's

13   impractical to -- to -- to do action on all of them.  I

14   would also add that -- you know, when I mentioned -- I think

15   I mentioned previously that we had originally found a

16   hundred thousand infringements.  Many of those are outside

17   the United States and are in jurisdictions where I couldn't

18   do anything about it, anyway, such as China or India.  I

19   have -- I have safari companies in Africa who steal my

20   wildlife pictures.  Unless -- unless this was to become my

21   full-time job, there simply isn't enough time to -- to

22   handle the -- the, you know, great majority of these cases.

23        Q.    Setting aside all those outside the

24   United States --

25        A.    Right.

1    Q.    -- concerns and issues, have you brought actions

2  or threatened to bring actions or retained counsel to pursue

3  every instance of infringement you've identified on the

4  internet?

5    A.    No.

6         MR. DeSOUZA:   Object to form.

7    Q.    (BY MR. SQUIRES)   Okay.   Why not?

8    A.    For a variety of reasons.   As I said, the

9  impracticality of some of them, the -- the -- just the

10  mechanics of maybe finding out about a particular

11  infringement and whether -- whether it's worth pursuing, and

12  then, of course, some of them are also by private

13  individuals, which are not pursued.

14    Q.    I don't understand what you say when you say

15  "private individuals."

16    A.    As opposed to a commercial company.

17    Q.    So you've never pursued claims against private

18  individuals?

19    A.    I don't believe so.

20    Q.    Okay.

21    A.    For example, on social media -- on LinkedIn, on

22  Facebook, and so on -- and there -- and a lot of those are

23  by private individuals as well.

24    Q.    So explain what reverse image searching is.

25    A.    Basically, in -- in the -- do you want to know in

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1  general or do you want to know in -- in -- in the

2  particulars of these cases -- your cases?

3       Q.   Let's do general first.

4       A.   All right.  Well, I mentioned that I had worked

5  with Pixie, which is -- which is a company that helps

6  identify --

7       Q.   Okay.  But I'm not interested in Pixie for the

8  present purposes.  I'm --

9       A.   Well, the reason --

10      Q.   -- interested in your reverse image searching.

11      A.   Well, I did use Pixie for reverse image searching.

12      Q.   In these cases?

13      A.   No.

14      Q.   Okay.  So I'm interested in these cases.

15      A.   Okay.  So --

16      Q.   I'm interested in what you did, because you've

17 represented that you didn't use Pixie, that you did this

18 yourself.

19      A.   Correct.

20      Q.   So tell me about reverse image searching.

21      A.   Well, again, you take an actual copy of the

22 picture, and then -- and then you put it into TinEye or

23 Google Images or several others, and it will bring back the

24 results.  And previously -- or I -- I -- I should say,

25 generally -- it doesn't have the ability to differentiate

1  between legitimate uses and infringements, so I have to be

2  able to determine whether something actually was licensed,

3  as it should be, or whether someone took it and stole it.

4      Q.   So do I understand when you do a reverse image

5  search that by use of the computer and the techniques that

6  you employ, you can find all the uses of -- all the

7  instances in which an image appears on a website accessible

8  on the web?

9      A.   Ideally.  I -- I can't say that -- that it finds

10  all of them.

11      Q.   But -- but that's the general --

12      A.   That's -- that's the idea.

13      Q.   -- intent?

14      A.   Yes; uh-huh.

15      Q.   Okay; okay.  And you find copies of your works on

16  websites, correct?

17      A.   Yes.

18      Q.   Unauthorized websites?

19      A.   Yes.

20      Q.   What do you do about it, if you don't file

21  lawsuits?

22      A.   In some cases, I will ask -- pardon me -- I

23  will -- if -- if I can find the information on how to

24  contact the person who has the website, I will contact them

25  and ask them to remove it.  For example, with nonprofits, I

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   have contacted -- even in the -- even in this year, in the

2   period that I've been working with CopyCat, I've identified

3   some people who I wanted to give the ability to either just

4   remove the photograph with no payment or a very token

5   payment.  I will -- I will add, however, that many of these

6   people don't -- don't respond.  I -- I've had someone in

7   New Mexico, who was a nonprofit, who I said, "Please take

8   this down."  They didn't respond; they didn't take it down.

9   Did that several times, and gave up.

10      Q.   Who was that?

11      A.   I don't -- I can't recall, but in -- in -- in

12   general, I will say that -- whether or not I'm only seeking

13   for people to remove the photos or to pay damages, if I

14   contact them directly, they do not take things seriously.

15   It's the American way.  I mean, attorneys have to be

16   involved to get results.  Most people -- I mean, a lot of

17   people don't even listen -- you know, don't even pay

18   attention when an attorney contacts them, but certainly when

19   a photographer contacts them, they're, like, not -- not --

20   not very compliant.

21      Q.   So you've -- you've done reverse image searches on

22   each of the photographs that is the subject of your

23   infringement claims in this action, correct?

24      A.   Correct.

25      Q.   And you're familiar with a procedure called

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1    "takedown notices," correct?

2         A.    I am.

3         Q.    Have you ever issued a takedown notice to any web

4    host on which -- on whose -- the site that they hosted?

5         A.    Yes, a few times.

6         Q.    Can you give me the details of those times?

7         A.    No.  I -- I can only say that I've done it a few

8    times.  You know, even that's time consuming.

9         Q.    Have you ever -- so you did a reverse image search

10   on each of these photographs that are the subject of this

11   lawsuit, your -- your infringement claims.  Have you issued

12   a takedown notice to any web host hosting any of the

13   photographs that turned up as a result of your reverse image

14   search?

15        A.    In this case?

16        Q.    Yes.

17        A.    No.

18        Q.    You are aware that there are multiple websites on

19   the internet on which each of these photographs can be

20   found?

21        A.    No.

22        Q.    You're not?

23        A.    I -- well, I can't say I'm totally aware, no.

24        Q.    You did reverse image search; didn't turn up

25   anything?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1        A.   I guess not.

2        Q.   I'd like you to provide to me records of any

3   takedown notices that you've issued to any website host

4   during the past five years.

5        A.   If possible.  I'm not sure if I have that

6   information.

7        Q.   You wouldn't keep it?

8        A.   Not unless it was in an email or something; no.

9        Q.   Well, I'd ask you to make your best efforts.

10       A.   I will.

11       Q.   Do you have any knowledge as to how Adler Medical

12   found the image that they used that you have accused them of

13   infringing your copyright?

14       A.   No.

15       Q.   Is the same true of each of the other three named

16   defendants in this lawsuit and the images that you claim

17   were infringed by them?

18       A.   Yes.

19       Q.   Similar question:  But do you have any knowledge

20   of whether any of the four plaintiffs in this action who are

21   accused by you of infringement in your counterclaim were

22   aware -- do you have any knowledge of whether they were

23   aware of your copyright claim, ownership, in these

24   photographs?

25       A.   No.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1    Q.   Now I would like to turn to your counterclaims,

2   which I believe are Exhibit 8.  In paragraph 17 of your

3   counterclaims, you refer to the photograph that was used by

4   the Adler Medical party, and you say that the website where

5   you published your photograph uses technology to prevent

6   users from right-clicking and saving to their desktop?

7    A.   Correct.

8    Q.   And that's true with respect to all four of the --

9    A.   Yeah, my entire website.

10    Q.   Yeah.  But you have no idea where the defendants

11   to your counterclaims obtained the images they used?

12    A.   No.

13    Q.   So you have no reason -- you have no reason to

14   believe that they found it on your --

15    A.   I don't know.

16    Q.   -- website?

17    A.   Obviously, if I -- if I don't know where they got

18   it, I don't know if they got it on my website or elsewhere.

19    Q.   And you know that it is available elsewhere,

20   correct?

21    A.   No.

22    Q.   You don't?

23    A.   No.

24    Q.   So you did a -- you did reverse image searches.

25    A.   No.  What I'm saying is there's a possibility --

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1              THE WITNESS:  I'm sorry.

2        A.    There's certainly the -- the possibility, the way

3    the internet works, that images of mine could appear other

4    places that I'm unaware of.

5        Q.    (BY MR. SQUIRES)  Okay.  So tell me what --

6    assuming they found your image on a website that did not

7    identify you as a photographer or copyright owner, what

8    could they have done to know that you were the copyright

9    owner and photographer?

10       A.    They could have reverse searched it themselves

11   through Google Images, and more than likely, it would come

12   up with my website.

13       Q.    More than likely?

14       A.    I can't -- well, yeah.  I mean, you know, the

15   workings of the internet, you can't be sure of anything --

16       Q.    Right.

17       A.    -- but there -- you know, as an example, I had

18   another case where we went to federal court in Denver -- a

19   balloon company from Albuquerque -- and they -- they had

20   their -- their web designer sworn in as an expert on the

21   matter, and he claimed that he spent an hour searching for

22   my photograph.  I went home, fed it into Google, and found

23   it in about 30 seconds.  So I'm not sure if that's

24   disingenuous.  I mean, people who are web designers, web --

25   you know, et cetera -- first of all, they should know the

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1   law.  They should know that all photographs on the internet

2   can't be considered fair game and free photography.  You

3   know, they should search for the source, and if they -- if

4   they don't, they're -- well, they're leaving themselves open

5   to litigation for stealing photos.

6        Q.   Okay.  Your reverse image searches of these

7   photographs turned up nothing, correct?

8        A.   I'm not sure what you mean.

9        Q.   I think I'm -- you said you conducted reverse

10  image searches of these photographs.

11       A.   All I know is -- is what I found and what I --

12       Q.   That's what I --

13       A.   -- what I continued with.  There may have been

14  other -- others that -- I can't say.

15       Q.   Do you -- on what basis would you -- strike that.

16           Do you believe that it is reasonable to expect

17  that people who are not experts in photography or in the

18  operation of the internet should know what reverse image

19  searching was?

20           MR. DeSOUZA:  Object to form.

21       A.   If you are going to take a photograph for your use

22  on a -- for commercial purposes from anywhere on the web,

23  regardless of where you find it, it -- it is incumbent upon

24  you to try to find the owner or not use it.

25       Q.   (BY MR. SQUIRES)  Okay.  Other than your opinion,

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  do you have any source on which you would rely as

2  authoritative in making that statement?

3      A.   Well, just -- it's my experience as a photographer

4  and with copyright law and -- you know, look.  You -- you --

5  you question why I pursue cases.  From my point of view, all

6  the people who steal my photography are stealing from my

7  livelihood.  And from my point of view, whether or not

8  people legitimately license my photographs or when they

9  infringe, are made to pay settlements, it's -- it's all the

10 same.  I expect to be paid for all the photographs that

11 people use, legitimately or illegitimately.

12     Q.   Do you expect to be paid more than your regular

13 licensing fee?

14     A.   Absolutely.

15     Q.   Why?

16     A.   Well, because this is prescribed by the copyright

17 laws.  You wouldn't -- if somebody -- if somebody -- you

18 know, let's use an example of not photography, something

19 tangible.  If someone stole a bicycle from you, and six

20 months later you caught them with the bicycle, is it going

21 to be okay if they just hand it back?  I mean, you know,

22 there's -- there's got to be -- there's got to be

23 repercussions for theft.

24     Q.   Okay.

25     A.   And -- and again, I don't make the decisions on

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                        September 28, 2022

1   that.  They are prescribed by what has been written into the

2   copyright laws.

3       Q.   So are you -- so that is the source of your

4   entitlement, what is written in the copyright laws, correct?

5       A.   I believe so, yeah.

6       Q.   Where, in the -- are you familiar with the

7   copyright law as it applies to your business practices?

8       A.   In general terms.

9       Q.   Okay.  Where is it written in the copyright law

10  that you're entitled to recover more than the licensing

11  value of a photo if someone infringes it?

12      A.   I don't know specifically.  And -- and again, I

13  know that -- just from general knowledge about -- about

14  copyright infringements, that generally there's a multiplier

15  involved as a punishment, so oftentimes the multiplier is,

16  for example, at least five times what the licensing fee

17  might have been.

18      Q.   Okay.

19      A.   I think I need a short bathroom break, and really

20  just -- just to go to the bathroom, and I'll be right back.

21      Q.   Sure.  Can we try and make this as brief as

22  possible?  Five-minute break?

23           MR. DeSOUZA:  Fine -- fine by me.

24           MR. SQUIRES:  Yeah.

25           THE VIDEOGRAPHER:  We're now going off the record.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON

1-22-cv-00072-KG-LF

Blaine Harrington, III

September 28, 2022

1    The time is approximately 10:59 a.m.  Watch your microphones

2    when you stand up, please.

3            (Brief recess taken.)

4            THE VIDEOGRAPHER:  We're now going back on the

5    record.  The time is approximately 11:04 a.m.

6        Q.   (BY MR. SQUIRES)  Mr. Harrington, when you perform

7    reverse image searches, you do this on your computer, right?

8        A.   Correct.

9        Q.   Okay.  I assume this would have been done at or

10   around the time -- just before your attorneys first wrote

11   letters -- the end of 2021, beginning of 2022 -- to the four

12   defendants to your infringement claims in this matter?

13       A.   Yes.

14       Q.   Okay.

15       A.   Just -- just a moment, please.  Okay.

16       Q.   Do you keep your computer files?

17       A.   Of what kind?

18       Q.   Anything related to your business and the

19   litigation that you initiate.

20       A.   I would take -- I would take a screenshot, myself,

21   of what I've found, and so -- what's your question?  I'm

22   sorry.

23       Q.   Do you keep computer -- do you keep your files of

24   all the actions you take?

25       A.   No.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1        Q.    Why not?

2        A.    Just -- just for expediency of keeping track of

3   things, I don't -- just like anything in your business, you

4   don't -- you don't keep everything.  I mean, I keep what's

5   necessary.  We find -- we find the -- a URL for the

6   infringing use of the photo, and, you know, of course,

7   that's matched to my photo to show that it's one and the

8   same.

9        Q.    Okay.  And do you dispose of --

10       A.    Well, that might -- that might be all I have --

11  have -- have done.  I don't know.  But, you know, again,

12  I -- is everything that I do kept?  No.

13       Q.    Well, I'm concerned mostly about the reverse image

14  searches that you've said you conducted.

15       A.    Well, I mean -- why?

16       Q.    Why what?

17       A.    Why -- why -- why would I?  I mean, it's --

18  it's -- it's an unnecessary step.  I identify the

19  infringements, and I move forward with those that I think

20  should be handed over to an attorney.

21       Q.    Okay.  I would ask that you provide all records

22  you have of any reverse image searches you conducted with

23  respect to the four photographs that are the subject of your

24  infringement claims in this --

25       A.    I'll discuss that with my attorney.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1      Q.   Yeah.  Fine; fine.  Looking at Exhibit 8 --

2      A.   What page is that?

3      Q.   I'm looking at page 7, and I'm looking at

4  paragraph 23.  And it says that Adler Medical never

5  contacted you to seek permission to use the 2051 Skyline

6  Photograph.  Am I right in saying that the only way he could

7  have known to contact you would be if he had done a reverse

8  image search of that -- strike that.

9          Assuming he didn't find it on your website, on

10  your website --

11      A.   Right.

12      Q.   Is it fair to say that the only way he could have

13  known to contact you would be if he had conducted a reverse

14  image search and it had revealed your website disclosing

15  information about your ownership?

16          MR. DeSOUZA:  Object to form.

17      A.   That -- I mean, that's completely a hypothetical.

18  He would have had to discovered who the owner of the photo

19  was, somehow, and -- and -- whether it was through a reverse

20  image search or some other means, I don't know, but that's

21  incumbent upon that person, as I said.

22      Q.   (BY MR. SQUIRES)  What other means?

23      A.   Well, I don't -- I don't know, but, you know --

24  there -- you know, there are other places that identify me

25  as a photographer of images.  They all haven't been stripped

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

 1   out, but I -- since -- since -- and since -- I think in all

 2   cases of these four people -- four companies, that they

 3   don't even know where they got them, from their answers

 4   to -- to my attorney's interrogatories.  I can't -- you

 5   know, it's hard for me to speak hypothetically about what

 6   they should or shouldn't have done to find it.  They -- they

 7   should have done that, but what the reference were, I don't

 8   know.

 9       Q.    But what other than doing a reverse image search

10   could they have done?

11       A.    Well -- that's most likely the way.

12       Q.    Next page, paragraph 26, it says, "To date,

13   Harrington has been unable to negotiate a reasonable

14   license."  Do you see that?  What would be a reasonable

15   license?

16       A.    Well, considering, rather than contacting my

17   attorney, you got these four people to sue me, then they

18   have -- and as far as I know from anything that has

19   transpired since then, they have been unwilling to discuss

20   settlements.  A license fee would have -- you know, is --

21   where does it say "license fee"?

22       Q.    It doesn't.  It says "license."  What's a

23   reasonable license?  That's my question.  I assume a

24   reasonable license would involve a fee.  Is that a fair

25   assumption?

1      A.   Well, again -- this isn't my language.

2      Q.   Don't forget the language.

3      A.   So -- so what I'm saying is, you know, using the

4  word "license" is -- I think may be inappropriate, because,

5  you know, we're looking for --

6      Q.   Well, let's --

7      A.    -- for a copyright settlement.

8      Q.   Forget -- forget paragraph 26.  What would have

9  been a reasonable license fee for Adler Medical's use?

10 Adler Medical is a very small mom-and-pop business.  Accept

11 that for the moment.  I think your attorney will tell you it

12 is so.

13     A.   Wait a minute.  Well, again, if I'm looking at --

14 at notes about these uses by the four companies -- and

15 apparently Adler was using my picture for at least three

16 years, so again, that means they would be paying individual

17 licenses per year, times three.  So what I would have

18 considered acceptable at that time was 4,500, before the

19 infringement, if they wanted to license the picture to use

20 for three years.

21     Q.   Okay.  I assume -- let's -- let's ask about each

22 of the individual parties then.  How about Walt Arnold

23 Commercial Real Estate Brokerage?  What would have been a

24 reasonable fee to charge to it?

25     A.   Well, based upon them as an entity -- and

1  apparently the photograph was used at least since mid-2020,

2  so that would be two years -- would be $5,000; but if it was

3  used longer than that, then $7,500.

4        Q.    And what is the basis for your arriving at that

5  number?

6        A.    Well, basically, a fee per year, and times two or

7  three, or whatever.

8        Q.    Okay.

9        A.    And then again -- and, you know -- and I --

10  obviously, understand, this is licensing.  This is without

11  any kind of penalty for infringement.

12        Q.    How about Xuan Nation?

13        A.    2,500.

14        Q.    That would have been a reasonable fee?

15        A.    Yeah.

16        Q.    Okay.  Reasonable license fee.  And how about the

17  NM CCIM Chapter?

18        A.    Again, we -- the assumption is that they used it

19  for several years, and the fee would be 5,000.  If it was

20  longer than two years, 7,500.

21        Q.    I'm going to ask you to look at paragraph

22  No. 76 -- oh, strike that.

23              82; paragraph 82.

24        A.    Okay.

25        Q.    On page 21 of Exhibit 8.  It says, "Adler

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  Medical's infringement was willful as it acted with actual

2  knowledge or reckless disregard for whether its conduct

3  infringed upon Harrington's copyrights."  Do you have any

4  knowledge that Adler Medical acted with actual knowledge of

5  your copyright?

6       A.    No.

7       Q.    Do you have any knowledge as to whether its

8  conduct was done with reckless disregard for your rights?

9       A.    Myself, no.

10      Q.    Would the same be true with respect to each of the

11 four defendants in your counterclaim for --

12      A.    Yes.

13      Q.    -- copyright?  Okay.  Do you have any knowledge as

14 to whether any of the four defendants to your counterclaim

15 earned any profits as a result of your --

16      A.    I do not.

17      Q.    -- of their -- of their use of your photograph?

18      A.    I do not.  Are we referring to this one any

19 longer?

20      Q.    No; nope, nope, nope.  I'm going to show you what

21 is a list of cases identifying you as a plaintiff in federal

22 court system over the past years.  I represent that most, if

23 not all, of these cases are within the past five years, but

24 I don't want to represent that the year of the case is

25 indicated in the case numbers shown.  This is Exhibit 9.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                        September 28, 2022

1   This is not complete.  I represent that this was -- list was

2   printed out on January 27th of the current year.  There are

3   additional cases that have been filed since then.  Take a

4   little --

5              (Exhibit 9 marked.)

6              MR. DeSOUZA:  Jeff, can you just -- Jeff, since --

7   since I don't have it, can you just tell me is this -- is

8   this that PACER list?

9              MR. SQUIRES:  It's the PACER.  Yes; yes.  It's the

10  same.  You've seen it.  It's the PACER listing that was

11  attached to interrogatories that I --

12             MR. DeSOUZA:  Okay.  Thank you.

13             MR. SQUIRES:  -- served.

14        Q.   (BY MR. SQUIRES)  And I would ask you if you can

15  do a quick review and tell me if any of these cases are

16  different in nature from the current case, meaning were they

17  not the result of someone using a photograph of yours on a

18  website or social media page that produced the litigation.

19        A.   Some of these aren't copyright infringement.

20        Q.   Oh.  Well, tell me which ones are not copyright

21  infringement.

22        A.   On the first page, the fourth and the fifth were

23  damage to a house.

24        Q.   Oh, okay.  Gotcha.

25        A.   Also page 2, the very top one, that says, "Zurich

 1   American Insurance" -- "Oldach Windows," same thing.  On

 2   page 6 --

 3        Q.   Is --

 4        A.   -- the third one down --

 5        Q.   Is that the one that says "6 out of 10," on the

 6   lower right?

 7        A.   Yes.

 8        Q.   Okay.

 9        A.   The third -- the third item --

10        Q.   Right.

11        A.   -- says, "Genetically Modified Rice Litigation,

12   Missouri Eastern Court."

13        Q.   Yeah.

14        A.   I think it must be another Blaine Harrington --

15        Q.   Okay.

16        A.   -- because I don't do corn.  There are several on

17   page 9 of 10 at the top, first two boxes.

18        Q.   Yes.

19        A.   One says, "Ergo Science v. Martin" --

20        Q.   Yeah.

21        A.   -- "Texas Northern District."  I don't recognize

22   that as mine.  And then the second one says, "Harrington v.

23   Curis RIS, Virginia Eastern."  As far as I know, that's not

24   mine as well.  There's some -- yeah.  I mean, there's some

25   of the -- there -- there are some that -- most of them, I

1  can identify.  There are some, the names, that don't --

2  don't ring a bell.  And then on page 2 of 10, there are --

3  the bottom two.  One is Harrington v. McGraw-Hill, and the

4  other is Harrington v. Pearson.  These are involved in --

5  both of these textbook publishers exceeding their licenses,

6  which they -- which they did commonly, and they were sued by

7  many well-known stock photographers.  So those are -- those

8  are based on -- on print and not web uses.

9       Q.   Did either of those go to trial?

10      A.   No.  They settled.

11      Q.   I'm going to give you a document marked as

12  Exhibit 10, I believe.  I think I've got it right so far.

13  These are the initial disclosures that you provided in this

14  case.  Are you familiar with this document?

15           (Exhibit 10 marked.)

16      A.   Yes.

17      Q.   It has prompted a few questions on my part.  Do

18  you use -- one of the things you were required to provide --

19  one of the -- the information that you were required to

20  provide in this is the identification of individuals likely

21  to have discoverable information.  Do you have an agent?

22      A.   No.

23      Q.   Have you ever used an agent?

24      A.   No.

25      Q.   Other than -- other than stock photo agencies?

1      A.    Those are the only ones.

2      Q.    There is a name listed on page 3 that I don't

3   recognize.  Ryan Garcia, care of Peacock Law, do you have

4   any idea who that is?

5      A.    No, I don't.

6      Q.    Okay.  There is a category of information you were

7   required to provide, insurance agreements.  You have no

8   insurance that covers infringement of your copyrights?

9      A.    No.

10     Q.    Have you discussed such an issue with any

11  representative of any insurance company?

12     A.    No.

13     Q.    Why not?

14     A.    I don't know; I haven't.

15     Q.    One of the areas that you were required to address

16  is the location or description of documents, and you

17  referred to the fact that they're generally located on your

18  computers or email accounts.  Have you done anything, other

19  than things that we have discussed recently, to delete

20  information from your computers in the past five years?

21     A.    Referring to a case?

22     Q.    Re- -- referring to --

23     A.    I mean, I --

24     Q.    -- your -- your photographs and any claims for --

25     A.    No.

 1      Q.   -- infringement that you assert?

 2      A.   No; no.

 3      Q.   Okay.  Have you changed computers?

 4      A.   No.

 5      Q.   What kind of computers do you use?

 6      A.   Mac.

 7      Q.   Do you have more than one?

 8      A.   Yes.

 9      Q.   Do you use them for -- certainly, photo editing, I

10 assume?

11      A.   Uh-huh.

12      Q.   What else?  How many do you have?

13      A.   I have -- I -- I have two.  I have a desktop

14 computer, you know, a -- a tower, that is the main office

15 computer in my office, and then I have a laptop that I take

16 on location.

17      Q.   But I assume they share files and information?

18      A.   Right, because Apple shares, so your Apple

19 devices.

20      Q.   And what computer programs do you use for editing

21 and the like?

22      A.   Primarily Adobe and Lightroom, which is part of

23 Photoshop.

24      Q.   I would like to have the next document marked as

25 Exhibit 11.  This is Defendant's Responses to First Set of

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

 1  Interrogatories.

 2              (Exhibit 11 marked.)

 3              MR. SQUIRES:  I may have included something I

 4  didn't mean to include; yes.

 5       Q.   (BY MR. SQUIRES)  And same with you,

 6  Mr. Harrington.  If you could give me that back just for a

 7  second.  I think I may have provided more than I wanted to.

 8  I'm -- I'm looking at Request No. 11 and 12, and they --

 9  they are similar in discussion.  It says, "Identify any

10  website, including the host, of which you've become aware,

11  on which any of your photographs have been posted."  And you

12  provided an answer, a response, and it says since October --

13  your response, since October 2012, you've become aware of

14  thousands of infringements with many individual photographs

15  being used without your permission, and you explained this

16  previously.  I don't want you to reiterate your subject --

17  your previous testimony.  And you say the photographs

18  available at your website appear on 150 to 200 websites you

19  haven't authorized.  How do you know that?

20       A.   That answer is provided by my attorney.

21       Q.   Okay.  Are you aware of any websites, ever

22  anywhere, accessible on the internet that contain galleries

23  of large numbers of photographs?

24       A.   No.

25       Q.   You're not aware of any such --

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      A.   No.  I mean, I've seen some things, but I -- I

2  can't give you any specifics.

3      Q.   But you've seen such things?

4      A.   I -- I'm aware that a lot of my photographs are

5  around the internet.

6      Q.   And -- and are you --

7      A.   Something that you've said I planted, but I did

8  not.

9      Q.   Oh, no, I never said that.

10     A.   Well, that's essentially your claim.

11     Q.   No.  If -- if you believe that, you haven't read

12  carefully and you haven't heard carefully.

13     A.   Um.

14     Q.   So I'm going to repeat my question.  Are you aware

15  that there are websites that contain galleries of

16  photographs, of many photographs, that are available on the

17  web?

18     A.   Galleries?  No --

19     Q.   "Galleries" --

20     A.   -- I'm not aware.

21     Q.   -- meaning "lots of photographs."

22     A.   No, I'm not aware.

23     Q.   Has anybody ever told you that there were such

24  sources of photographs on the web?

25     A.   No, not specifically; no.  You know, as I said --

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1    Q.   What -- what do you mean "not" --

2    A.   -- my -- my attorney -- my attorney has looked

3 into these things and is aware of -- of a lot of the illegal

4 uses of my photos, but I'm not.

5    Q.   But you're not.  Okay.  Okay.  Have you engaged

6 anyone to act as an expert witness in this case?

7    A.   No, I haven't.

8    Q.   I'm going to show you a document that I've -- is

9 going to be marked as Exhibit No. Next.  Do you recognize

10 this?

11        (Exhibit 12 marked.)

12   A.   Yes.

13   Q.   This was prepared by your attorney, correct?

14   A.   Correct.

15   Q.   Did you review it before it was submitted?

16   A.   Yeah; yes.

17   Q.   Okay.

18        MR. DeSOUZA:  Jeff, can you identify it for me?

19        MR. SQUIRES:  I'm sorry.  It's Defendant's

20 Responses to Plaintiffs' First Request for Production.

21        MR. DeSOUZA:  Thank you.

22   Q.   (BY MR. SQUIRES)  Request No. 2, 3, 4, and 5 ask

23 you to produce documents evidencing certain expenses that

24 you have incurred in taking each of the four photographs in

25 this section, and you say you have no documents responsive

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   to this request.  Do you not normally keep documents

2   evidencing expenses you incur in taking photographs?

3       A.   I keep general copies of expenses for tax purposes

4   for a period of time, and considering these photographs are

5   taken nine years ago, there's a very good chance I don't

6   have any --

7       Q.   Okay.

8       A.   -- any receipts or things like that.

9       Q.   Okay.  And in fact, we now know your expenses were

10   all -- many of your expenses were picked up by --

11      A.   Some of them were, yeah.  I mean, I'm sure I had

12   other expenses, but yeah, quite a few were picked up by

13   them.

14      Q.   What was the name of the organization?

15      A.   Visit Albuquerque.

16      Q.   Visit Albuquerque.  Request No. 6 through 9 asked

17   you for correspondence with the copyright office concerning

18   your application to register copyright in these photographs.

19   And you say you don't have any?

20      A.   In general, when you register a set of

21   photographs, you go onto the copyright office website and

22   you fill out the forms, and then what is generated back to

23   you is the copyright certificate.  So normally, you don't

24   have any correspondence with them.  You just fill out the

25   forms, and they register the photographs.

1    Q.   And this was done; however, am I correct in

2  assuming that these were registered as part of a

3  registration of a large group of photographs?

4    A.   Very possibly, yes.

5    Q.   And when you do that, don't you have to submit

6  material to the copyright office in addition to --

7    A.   Yes.

8    Q.   -- filling the forms --

9    A.   I -- I'm sorry.  Yes.  I would have small, low res

10 JPEGs that -- that are provided as part of the registration.

11   Q.   And you would have had to do that separately, by

12 mail, right?

13   A.   No.  It's -- it's all done online.

14   Q.   And you have no communication and no reference --

15 no reference to the communication and the correspondence

16 with the copyright office about the submission of those?

17   A.   No.  I mean, they wouldn't get back to you unless

18 you had a problem with it, and they weren't going to --

19 either you did something wrong -- there was something wrong

20 in your application or they weren't going to honor it, which

21 has never happened.  So no, I don't have any.

22   Q.   But how do you submit these JPEGs?

23   A.   Online.

24   Q.   And you do that --

25   A.   As part of the application.  Like -- I'll explain

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   it to you.  You go on.  There's a form you fill out.

2   There's, like, ten different forms that are mostly copies of

3   your name on all these forms, and then they -- you have to

4   pay for it by credit card, and so then they -- you

5   temporarily -- pardon me -- temporarily leave the -- the --

6   the copyright office website.  You pay for it, and then once

7   it's paid for, they say, "Back to the copyright office," and

8   at that point, you -- you add on all of these photos in a

9   folder.

10       Q.   And this was part of a group registration,

11  correct?  We talked about that?

12       A.   Yeah.

13       Q.   These photos?  Do you remember how many photos

14  were in that group?

15       A.   No.

16       Q.   And -- and -- but there was no separate email

17  or --

18       A.   No.

19       Q.   Request No. 14 -- well, strike that.

20            Numbers 10 through 13 ask for documents supporting

21  your allegation that these entities acted willfully in

22  connection with the alleged infringement.  You've testified

23  that you have no such evidence, correct, with respect to any

24  of these?

25       A.   As I said, this is -- this is created by my

1  attorneys, and I have no specific knowledge beyond the fact

2  that I agreed to it.

3      Q.    Okay.  And No. 14, documents evidencing the terms

4  of licenses you've granted for others to use the Adler

5  photograph.  And you have no such licenses it says.  That's

6  correct?  Yes?

7      A.    Yes.

8      Q.    Number 15 is the same question with respect to the

9  Arnold photograph.  You say the same thing, correct?

10     A.    Yes.

11     Q.    And 16 is the same with respect to the Xuan Nation

12 photograph?

13     A.    Yes.

14     Q.    And 17 is the same thing in connection with the NM

15 CCIM Chapter?

16     A.    Yes.

17     Q.    So you have no evidence of previous licenses of

18 those photographs?

19     A.    No.

20     Q.    Number 18 is documents evidencing the terms on

21 which you've agreed to settle any claims.  And you've

22 objected to that.  Your lawyer --

23     A.    Yes.

24     Q.    -- has objected to that.  If that objection were

25 not to be vindicated by the Court, would you have documents

1   responsive to this request?

2        A.   Yes.

3        Q.   And No. 19 says, "Documents" -- asks for documents

4   evidencing actual damages you have suffered as a result of

5   Adler Medical's -- and then 20, 21, and 22 are the same for

6   the others.  And you say you are producing documents

7   contemporaneously herewith.  We'll get to those documents,

8   but can you recall what documents -- the types of -- nature

9   of documents you have that are responsive to that request?

10       A.   No.

11       Q.   Numbers 23 through 26, one with respect to each of

12  these four parties alleged to have infringed, ask for

13  documents evidencing licensing of those photos.  You claim

14  not to have any.  Did you look?

15       A.   Yes.

16       Q.   And you found none?

17       A.   Correct.

18       Q.   And you recall none?

19       A.   Correct.

20       Q.   Okay.  Number 28 through 30 -- well, I guess it's

21  27 through 30 -- asks for agreements with photo agencies or

22  similar -- and you've produced those, correct?

23       A.   I believe so.

24       Q.   And No. 32 -- well, strike that.

25            Number 31 says, "Notices you have sent to any

1  person by which you sought removal of any photographs you

2  have created from any website on which a photograph in which

3  you claim to own copyright has been posted," and you

4  object -- your lawyer objected to that on a ground that has

5  been repeated numerous times, as set forth in your answer to

6  Item No. 1.  But if a Court did not validate that objection,

7  you would have documents responsive to that request?  Is

8  that accurate?

9      A.    I don't know.

10     Q.    Number 32 says, "Documents, other than those

11  responsive to the preceding Request No. 31, evidencing any

12  action you took to prevent any website or host from using,

13  reproducing, or displaying any photograph you claim to own

14  the copyright."  And you say, "Documents responsive to this

15  request are being produced contemporaneously herewith."  Do

16  you recall what documents you produced?

17     A.    No.

18     Q.    Okay.  I'm finished with that, but keep it at the

19  ready, because that last document that we have been dealing

20  with, which I think was Exhibit 12 --

21         (Court reporter response.)

22     Q.    And while this is bulky -- the easiest way for me

23  to do this -- I apologize to everybody -- is just to give

24  you a set of all the documents you produced in discovery,

25  marked as Exit No. Next.

1          (Exhibit 13 marked.)

2     A.    I think I'm going to need another very quick

3   break.

4     Q.    Sure; sure.  It's 12:00 noon.

5          MR. SQUIRES:  Do you want to go off the record?

6          THE VIDEOGRAPHER:  We're now going off the record.

7   The time is approximately 11:57 a.m.

8          (A discussion was held off the record.)

9          THE VIDEOGRAPHER:  We're now going back on the

10  record.  The time is approximately 12:06 p.m.

11    Q.    (BY MR. SQUIRES)  When documents were produced,

12  they were nicely and properly identified to the individual

13  requests to which they were responsive.  I may not have

14  broken them out in the set that was given to you just now as

15  well --

16    A.    Right.

17    Q.    -- although they are in the sequence of what I

18  have in my hands here.

19    A.    Okay.

20    Q.    This -- after the -- can you find this page?  It

21  would be near the top, with a stethoscope pictured.

22    A.    Oh.

23    Q.    After -- after the lawyerly stuff.  No.  No, no,

24  no.

25    A.    Oh, okay.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1       Q.   No, no, no.  Near the top -- near the very top.  A

2  couple pages in from the very top.  Here.  You're doing this

3  more slowly than -- let me help you.

4       A.   Oh.

5       Q.   Just a few pages in, I think, starting with the --

6  the pictures.  There we go.

7       A.   Okay.

8       Q.   There you go.  This is -- and this is

9  responsive -- these -- these documents -- the next probably

10  20 pages or so are photographs, medical sort of subjects.

11  But answer my question, if you will.  The Request for

12  Production No. 10 asks for documents supporting your

13  allegation that Adler Medical acted willfully in connection

14  with its alleged infringement of your copyright, and it

15  says, "Documents responsive to this request are being

16  produced contemporaneously herewith."  And those are the

17  documents that are marked as RFP No. 10 --

18       A.   Okay.

19       Q.   -- starting with this, until you get to documents

20  that are No. 11, and then they're about 20 pages down, and

21  there's probably a -- a page that says, "11."

22       A.   Are all these Adler pages on there?

23       Q.   They are.

24       A.   Okay.

25       Q.   And my question is, how do these pages show that

ADLER MEDICAL, LLC vs. HARRINGTON                 Blaine Harrington, III
1-22-cv-00072-KG-LF                               September 28, 2022

1    Adler Medical acted willfully?

2         A.   Well, again, these were produced by my counsel,

3    not by me, and so I don't -- the answer is, I don't know.

4         Q.   Okay.  Fair enough.  The next is RFP 11.  Now

5    we've -- you've got the rhythm.  You understand what's --

6    I'm doing here.  And this is the same question about Arnold

7    Brokerage.  And so what I'm asking you is, how do these show

8    that Arnold Brokerage acted willfully?

9         A.   Well, my answer is the same.

10        Q.   I understand, but say it.

11        A.   I -- I did not produce these, and I'm not able to

12   answer.

13        Q.   Okay.  The next is No. 12 -- RFP 12.

14        A.   Okay.

15        Q.   First, it's a -- first picture is a series of

16   bowls, but -- and -- and "Xuan Nation [sic]" in the upper

17   right-hand corner.

18        A.   Yeah.

19        Q.   It's a -- it's a --

20        A.   I think I'm in the neighborhood.

21        Q.   Oriental -- oriental restaurant.

22        A.   Uh-huh.

23        Q.   And I -- I ask the same question.  How do these

24   documents show that Xuan Nation acted willfully in

25   connection with the alleged infringement?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

1       A.   As I said before --

2       Q.   If you want to just say, "The same answer

3  applies" --

4       A.   No -- yeah.  I mean, I -- I did not compile these

5  examples, and so I -- I cannot answer.

6       Q.   Okay.  When your attorney provided the written

7  response to these document requests and the written

8  responses that cover document that --

9       A.   Uh-huh.

10       Q.   -- is -- did he show it to -- did he show it to

11  you before he produced it?

12       A.   This part here?

13       Q.   Yes, the written responses.

14       A.   Yes.  I'm sure he did.

15       Q.   Okay.  Did he show you the documents that he was

16  producing with it at the time?

17       A.   These?

18       Q.   Yes.

19       A.   No.

20       Q.   Okay.  And I think that the last question in this

21  category is No. 13, documents supporting your allegations

22  that NM CCIM, the Chapter, acted willfully.  And if the same

23  answer you provided previously applies to this as well --

24       A.   Yes.

25       Q.   -- you can just say that.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

```
 1        A.    Same answer.

 2        Q.    Okay.  Number 19 --

 3        A.    Are we back at the beginning, at the -- this?

 4        Q.    Yes, sort of, No. 19 -- but there are also

 5   documents that are so marked -- documents evidencing actual

 6   damages you've suffered as a result of Adler Medical's

 7   alleged infringement, and 20, 21, and 22 follow same

 8   requests with respect to each of the named defendants --

 9        A.    Uh-huh.

10        Q.    -- in your case.  And your client [sic]

11   produced -- if you could pull out these documents.

12        A.    You mean my attorney produced?

13        Q.    Your attorney.  Sorry.

14        A.    Okay.

15        Q.    And they're a series of licenses all on a form

16   that you use.  I -- I believe that's fair, but you can

17   confirm that if you would --

18        A.    Yeah.

19        Q.    These are all your form licenses, right?

20        A.    Correct.

21        Q.    Okay.  Good.  I'd like to go through each of these

22   licenses.  The first one is dated April [sic] 21st, 2016, to

23   Rachel Winstead.  I'm not going to read the whole thing,

24   just so we can identify that.  You've got that in front of

25   you?
```

1      A.   The one I have says, "July 22nd, 2016."

2      Q.   We may be looking at different dates too, but can

3  you show me that?  This is the same one.  It says

4  "July 21st" in the upper right-hand corner.  You see that?

5      A.   Yes.

6      Q.   Okay.  To Rachel Winstead, correct?

7      A.   Correct.

8      Q.   It's a license.  Can you tell me what that was a

9  license for?

10     A.   Front cover of a magazine.

11     Q.   What magazine?

12     A.   AAA Living.

13     Q.   It's only for two months --

14     A.   Correct.

15     Q.   -- correct?

16     A.   Uh-huh.

17     Q.   Now, that didn't mean that they couldn't keep and

18  have magazines available for a longer period than two

19  months, right?

20     A.   Well, you know -- I mean, as far as I know, when

21  they go to print, they're mailed out to their circulation.

22     Q.   Right.  People may keep it for years?

23     A.   Oh, of course.

24     Q.   Okay.  And you charged $1,350?

25     A.   Correct.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1        Q.   It was a magazine cover for a large national

2   publication, right?

3        A.   Correct.

4        Q.   Okay.  In print and digital form, right?

5        A.   Correct.

6        Q.   Five million copies authorized?

7        A.   Yes.

8        Q.   All those things factored into the price you

9   charged, did they not?

10       A.   Yes.  But I might add, when you have regular

11  clients that you work with, oftentimes, they have a

12  framework in place of what they are allowed to pay for

13  specific uses.  So in some cases, and especially when I

14  don't know the client well, then I would either dictate what

15  I thought was appropriate or then that would be negotiated,

16  and in some cases -- and I can't say specifically in this

17  one, but I'm just telling you how it works, that, you know,

18  they have a specific rate they will pay, and I agree to it.

19       Q.   Okay; okay.  Going to the next license, to Steve

20  Streit -- I don't know how to pronounce it -- December 29th,

21  2020.  You see that?

22       A.   I do.

23       Q.   This was for Balloons Over Rio Grande.  Do you

24  remember the picture?

25       A.   Yes.  It was the one that I mentioned, and I'm --

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1  I'd have to look back as to which -- which -- I think this

2  might have been Xuan Nation, the -- I'd have to look back

3  to -- but this is --

4       Q.   This is the same --

5       A.   This is the -- this is the photograph that I said

6  has been used extensively, and I think I mentioned that it

7  was used on puzzles.

8       Q.   So when I asked you a question, earlier, if any of

9  these photographs had been subject to other licenses, and

10  you said, "No" -- I'm not suggesting you were lying.  I

11  don't think you were lying.  I don't -- no implication --

12  you were wrong.

13      A.   Apparently so.  I mean -- again, I don't remember

14  what -- I don't remember every sale I ever made; and I also

15  don't remember what documents were produced, either, so --

16  but I had mentioned that -- that -- somewhere in the

17  conversation, that -- that -- that that photo had been used

18  extensively, and it had been used for a puzzle.

19      Q.   So somewhere along the line, some of your answers

20  have been inaccurate, unintentionally?

21      A.   Perhaps.  Certainly not intentionally.

22      Q.   Well, some.  And you charged 2,000 -- what was

23  this -- how was this used?

24      A.   Puzzle.

25           MR. DeSOUZA:  Object to form.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      A.    And --

2      Q.    (BY MR. SQUIRES)  A puzzle -- what -- what do you

3   mean?  They sold a puzzle?  It was a -- they produced --

4   manufactured and sold puzzles?

5      A.    Correct.  That's their business.

6      Q.    Okay.

7      A.    And it was a relicense.  I think it may have been

8   licensed originally through a stock agency, but this was not

9   the first time they had used it.

10      Q.    So this is four years, $25,000 -- 25,000 quantity

11   of puzzles authorized throughout North America, exclusive,

12   and $2,000?  All correct?

13      A.    Correct.

14      Q.    Okay.  Next.  The next license is dated

15   December 14th, 2007, Anchorage Convention & Visitors Bureau.

16   What was this for?  "Ad running in Alaska Airlines."  Do you

17   remember that?

18      A.    I do now, by reading it.

19      Q.    Sure.  Do you remember the photograph?

20      A.    Yes.

21      Q.    Okay.  Now, Alaska Airlines is not United, but

22   it's a big airline, right?

23      A.    Yeah.  I mean, it -- it ran in their in-flight

24   magazine.

25      Q.    Right.  $1,100.  This was in 2007, a time ago.  I

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1    understand.

2            The next, dated August 24th, 2021, to Andres

3    Restrepo.  Do you remember this?

4        A.    I do.

5        Q.    What was it for?

6        A.    It was licensing for -- there was one image of

7    mine that they licensed, originally, for display in an

8    office building, and then they came back and relicensed for

9    several other locations.  And then some of this -- the

10   lower -- the -- the fee at the bottom, 700 times two, was

11   the fact that they wanted to make larger prints, so they

12   paid an additional fee for that.

13       Q.    Now, Andres Restrepo is -- is he the

14   representative?

15       A.    He is like an interior designer, I believe, who

16   works for Bowlero, and for whatever reason, that was sent to

17   his home address in California, but it was paid by Bowlero.

18       Q.    What's Bowlero?

19       A.    Bowlero owns a bunch of -- national chain of

20   bowling alleys.

21       Q.    You get free lanes?

22       A.    I don't know.  I suppose if I asked.  Yeah.  So --

23       Q.    Okay.  The next one is another to Andres Restrepo,

24   dated December 15th, 2020.  Same sort of -- I mean, also on

25   behalf of Bowlero?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1      A.   Yes.

2      Q.   Now, the -- these were just stock photos that you

3  had in your portfolio, right?

4      A.   Yes.

5      Q.   What was -- was it the same photo every --

6      A.   Yeah.  It was all one photo.

7      Q.   What was it a photo of?

8      A.   It's a photo of a -- a vintage Porsche Speedster

9  in California, along the coastline, convertible, with a

10 surfboard sticking out the back, something that's -- kind of

11 screams California.

12     Q.   When did you take the photo?

13     A.   Well, it was taken in 1997.

14     Q.   Did you take it on commission at the time or was

15 it a --

16     A.   No, I didn't.

17     Q.   Okay.  How did they come across it?  Do you know?

18     A.   Either from my website or from a stock agency

19 website, because it was also sold by at least one stock

20 agency at one point.

21     Q.   Okay.  Next, December 7th, 2006, Jennifer Wilson,

22 Marketing Manager, et cetera.  What was this for?

23     A.   Cover of their visitors' guide.

24     Q.   Is that a big deal?

25          MR. DeSOUZA:  Object to form.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1        A.    What do you mean "a big deal"?

2        Q.    Fair enough.  Is this a significant publication?

3        A.    Well, I think every city, including Albuquerque,

4   has a visitors' guide, which is given free to visitors and

5   is full of things you can do and ads of restaurants, and so

6   that's -- it's pretty common.  I think every -- just about

7   every city of any consequence has one.

8        Q.    So this is a picture of a church, apparently.

9        A.    Yes.

10        Q.    And -- and a -- separately, a picture of twilight.

11        A.    Correct.

12        Q.    And it says, "Street, one-half page use inside

13   Visitors' Guide."  What does that mean, if you know?

14        A.    I'm sorry.  Repeat that, please.

15        Q.    It's just a line item here on the -- "Street,

16   one-half page use inside Visitors' Guide."

17        A.    Oh, well, that's just a continuance of the

18   previous line.  So it said, "Twilight view of East Bay

19   Street, half-page use inside Visitor's Guide."

20        Q.    I see; I see.  So there's no additional -- it's

21   just part of the $600 charge for that photo?  Okay.  Do you

22   get credited on the cover?  Does it say, "Copyright Blaine

23   Harrington"?

24        A.    Not on the cover, per se.  It -- probably on the

25   table of contents page, or something like that.  That's

1  certainly a stipulation of sales editorial, is that they

2  do -- do give you a photo credit.

3      Q.   Next is to Brian Miller, Photo Editor, at

4  Diversion Magazine, July 9, 2007, Cover assignment fee.  So

5  this was an assignment?

6      A.   Right.  So in other words -- I mean, there's --

7  there's different things that are on here.  So -- so an

8  assignment fee is what would have been paid to me to do it.

9      Q.   Right.

10     A.   Then additionally, they paid -- because they used

11 it for the entire cover.  So you can add, like, 1,200 and

12 500 together, and then, as well, there was an additional

13 half-page photo, and then they paid -- they paid -- I'm not

14 sure.  Part of it is digital postproduction, but I'm not

15 sure exactly -- if -- if they used more photos.  I'm not

16 sure how that worked at that time.

17     Q.   Okay.  Next is to Future Energy Project,

18 December 1st, 2011, Blue Lagoon.  How did this come to pass?

19     A.   Well, this was -- and again, I'm -- I'm searching

20 my memory myself, but this was like a -- a major supplement.

21 I'm not sure if it went into newspapers or something like

22 that, but it was, you know, producing new forms of energy.

23 So the picture that they used was a famous place in Iceland

24 called "Blue Lagoon," which is a tourist attraction, but

25 it's also next to a geothermal power plant.  So you have the

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

 1  steam from the geothermal power plant in the background with

 2  people swimming in this big pool.

 3      Q.   Okay.  And the client was in the Netherlands, so

 4  this is a --

 5      A.   Yeah; yeah.

 6      Q.   -- double-page spread of a publication in the

 7  Netherlands?

 8      A.   Right.

 9      Q.   What -- what was the publication?

10      A.   Well, like I say, I -- I think it was probably in

11  their biggest newspaper.

12      Q.   Okay.

13      A.   Let me see.  Oh, yeah.  It says -- it says, back

14  on the second page, back in the -- back in the license --

15  it -- it was -- it was published in NRC Handelsblad, which

16  is a national newspaper in Holland.

17      Q.   Okay.  Next is March 3rd, 2006, Bridgett Noizeux,

18  Denver International Airport at twilight.  What was this

19  for, Architecture and Airports?

20      A.   GEO France, magazine.

21      Q.   GEO France?

22      A.   Yeah.  GEO is a publication somewhat equivalent to

23  National Geographic, and they have a French edition and a

24  German edition.

25      Q.   Okay.  Next is Bonnie Carheden for Karsh & Hagan,

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1   July 30th, 2020, Unlimited trade publication advertising for

2   one year.  What's Karsh & Hagan?

3       A.    Advertising agency.

4       Q.    So they're the representative of the user of this

5   photograph?

6       A.    Correct.

7       Q.    And the user is?

8       A.    Visit Denver.

9       Q.    Visit -- excuse me?

10      A.    Visit Denver.

11      Q.    Which is a publication of the chamber of commerce

12  or something like that?

13      A.    No.  Visit Denver.  It's like what -- it's like

14  Visit Albuquerque.

15      Q.    The --

16      A.    They don't call themselves the Albuquerque CB -- B

17  anymore.  Most of them say, "Visit Albuquerque," "Visit

18  Denver," whatever.

19      Q.    Sold at newsstands?

20      A.    No.  Well, this was -- this was for an ad in trade

21  publications.

22      Q.    Oh, okay.  So the ad could be used in different

23  media?

24      A.    No.

25      Q.    Different trade publications?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

1        A.    Well, yeah.  I mean, they -- they -- they licensed

2    it for unlimited trade publication use for one year, and

3    generally, they give me an idea what that is.  I mean, it

4    doesn't say so here, but, like, they probably used it two

5    or -- pardon me -- two or three times, and trade

6    publications are very specific and -- and are not large

7    circulation.

8        Q.    The next is August 25th, 2016, to Kate Moore,

9    $10,000.  What was --

10       A.    There were two to Karsh & Hagan here.

11       Q.    Oh.

12       A.    One after the other.

13       Q.    I missed --

14       A.    And -- and just relicensing.  So one was 2018 and

15   one was 2020.

16       Q.    I see.  So is the 2018 the same image?

17       A.    Just a minute.  I'm sure it is, but let me just

18   look.  Yeah.  You can -- you can see it where the license

19   terms are, at the top line.  That's -- when it says,

20   "20140802_yoga_137," that's the exact image that was used,

21   and that's the subject matter, Yoga on the Rocks.

22       Q.    I see.  Okay.  So the next is Kate Moore, Art

23   Producer, August 25th, 2016, for $10,000.  What was this

24   for?

25       A.    This was for use by -- pardon me -- Royal

WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                        September 28, 2022

1   Caribbean for -- for various uses, and they had used the

2   image previously, licensed it through Corbis when Corbis

3   still existed, before the Corbis collection was rolled over

4   into Getty.  So when -- when Corbis closed down, they

5   approached me directly to relicense.

6       Q.   Oh, so the original license was through Corbis,

7   and then the subsequent 2020 --

8       A.   For a different period of time, yeah.

9       Q.   Okay.

10      A.   And I think it was around the similar amount too.

11      Q.   The next is to Erika Santucci, February 28th,

12  2007, $1,500, Burma.  Did you go to Burma to take this

13  photograph?

14      A.   No, I didn't.

15      Q.   Tell me about the photograph.

16      A.   In times past, because -- and I'm not sure if

17  you're aware, but Nikon is not in very good condition any

18  longer.  They're -- they slipped from being one of the top

19  two.  Now Canon and Sony are -- are the top, but at any

20  rate --

21      Q.   Are we talking about Canon and Sony --

22      A.   Cam- -- like digital single-lens reflex cameras.

23      Q.   So what's the top now?

24      A.   Well, I think Canon is, probably.

25      Q.   Okay.

1       A.   At any rate, back in better times, Nikon was a

2  pretty solid client of mine, using my images for all kinds

3  of things.  I had several covers of their magazine that

4  is -- went defunct, eventually.  They used many pictures for

5  trade shows.  This particular use was just for the right to

6  display the print in their U.S. headquarters.  I had

7  pictures on their website.  That -- that has kind of gone by

8  the wayside as -- as -- as their fortunes have changed.  I

9  will -- I will add as well that, previously, they did a lot

10 of print material, and then -- and that all disappeared.

11      Q.   But at the time, in 2007, Nikon was Nikon.  It was

12 a preeminent camera manufacturer, yes?

13      A.   Correct.

14      Q.   And the next is October 23rd, 2012, Barbara

15 Heineman -- also Nikon, another Nikon.  2012 is a little

16 later, five years hence.

17      A.   Right.  Well, I would say -- yeah.  For a number

18 of years, they were a -- a good client of mine.

19      Q.   And this was for what use?

20      A.   Print as well.

21      Q.   When you say "print," what -- for what use was the

22 print to be made, do you know?

23      A.   Well, on the line above, where it says, "License

24 expired," it says, "Trade show graphics."  So there are --

25 there are two or three big shows annually that Nikon would

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   have a booth, and then they would have booth graphics,

2   prints, and so on.

3       Q.   You don't suppose the fact that you took these

4   pictures for Nikon was the central factor that caused the

5   diminution of the quality of Nikon cameras, do you?

6       A.   I hope -- hopefully not.  I did my best for them.

7       Q.   The next is Savannah Chen, July 1st, 2020, $6,430

8   fee.  For what?

9       A.   They were allowed to have this on their website

10  and distribute it to tour companies publicizing New Zealand,

11  and as a matter of fact, a couple days ago -- they've --

12  they've continued to license it regularly.  A couple -- a

13  couple of days ago, they just licensed it again.

14      Q.   Same terms?

15      A.   Well, no, not necessarily.  I mean, I -- I think

16  that sometimes the years change.  They had -- they had asked

17  about getting more usage for higher -- much higher prices,

18  and they opted to continue with similar terms to this.

19      Q.   Okay.  Next is to Chris Ferguson at AAA Living,

20  July 30th, 2013.  This is for an editorial magazine article.

21  I assume that it was for a photograph to a company, the

22  article; is that right?

23      A.   Yes.

24      Q.   $1,250.

25      A.   For the cover.

1      Q.    For the cover?  2.5 million press run?

2      A.    Uh-huh.

3      Q.    Okay.  Next is Jeff Campagna, C-A-M-P-A-G-N-A,

4  November 13th, 2007, Camel with Taj Mahal, $1,400.  Did you

5  take that photo?

6      A.    Yes.

7      Q.    At the Taj Mahal?

8      A.    Yes.

9      Q.    Okay.  And did -- when they used it, originally,

10 was it just a stock image, or did they commission you to go

11 to the Taj Mahal?

12     A.    No.  It was a stock image.

13     Q.    Okay.  But this is -- this is a continuation of a

14 previous license?  Yes?  No?  It says, "This license expired

15 on 11-13-2008 or as described below."  What does that mean?

16     A.    Well, it -- it -- in that case -- I mean, it was

17 for -- it -- it was for use on one month's cover, but -- you

18 know, I have a place in my software where I can put in a

19 license, and -- and it appears that -- that I gave them the

20 license for one year, although that's not how they used it.

21 They used it for one month.

22     Q.    The next is Zaina, Z-A-I-N-A, Razzaq, R-A-Z-Z-A-Q.

23     A.    I think you missed one.

24     Q.    Excuse me?

25     A.    There was one -- The Teaching Company, I have

1   here.

2        Q.   Maybe I missed one.  Oh, you're right.  Sorry.

3   Let's go back.  Matthew Mayer, January 27th, 2009, Spring --

4   2009 Spring outside wave 3-B_Smithsonian cover test,

5   whatever that -- what does that mean?

6        A.   I don't know.

7        Q.   Okay.  Was it for a cover of Smithsonian magazine?

8        A.   I don't know.  I mean, I know what The Teaching

9   Company was.  I -- I -- I -- I -- I can't recollect what

10  happened.

11       Q.   The Great Wall of China, is that a picture you

12  took?

13       A.   Yes.

14       Q.   This was just a stock image, though, right?

15       A.   Yes.

16       Q.   Okay.

17       A.   Yeah.  I mean, all of these that are identified,

18  up here, "Stock Photography Invoice" --

19       Q.   Yeah.  Yeah, yeah.  Yeah.  I see.

20       A.   So they are stock.

21       Q.   And the next -- and the last of this group -- is

22  Zaina Razzaq, September 26th, 2013, Photo use/New Zealand

23  Story Tool Kit.  What's that?

24       A.   Again, it was some kind of library that they had

25  where tour companies could access it.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      Q.    Okay.

2      A.    So these -- all this that we went through already,

3  the examples that were given as -- for -- for the -- for the

4  four -- the four people, the -- you're done with these,

5  right --

6      Q.    Yes.  Well, yes --

7      A.    -- or no?

8      Q.    -- but not with all the rest of them.  Yeah, I'm

9  done with that part of it.  Just -- there are some pages

10 after the licenses.

11     A.    Well, was -- were these -- were these invoices

12 part of that?  My invoices?

13     Q.    Invoices/licenses, I think of them as -- yes, but

14 they were --

15     A.    They were a part of this thing?

16     Q.    Yes, and then there's --

17     A.    And then there's more?

18     Q.    Continue on --

19     A.    That's what you were saying.

20     Q.    -- with your stock agency --

21     A.    Right.  Right, right.

22     Q.    So if we can continue on with --

23     A.    Okay.

24     Q.    -- the stock agency -- these are your

25 arrangements -- your contracts with two stock agencies, I

1    think Alamy and --

2         A.    And Getty.

3         Q.    -- Getty.  And the arrangements with them is that

4    they have a portfolio -- or access to your portfolio and

5    they license the images under -- pursuant to their

6    agreements with you, and they keep a percentage, and you

7    keep -- and then they remit to you that which is your share;

8    is that right?

9         A.    Correct.

10        Q.    Okay.  But you don't use them anymore?

11        A.    No.

12        Q.    And you stopped when?

13        A.    I don't recall.  I mean, it's been I think

14   probably about two years ago.

15        Q.    Too expensive?

16        A.    What was?

17        Q.    Was it too expensive to use them?

18        A.    Too expensive to use them?

19        Q.    Yes.

20        A.    As I said, I mean, the -- the kind of relationship

21   between photographers and photo agencies has evolved greatly

22   in recent years, and -- because I -- I -- I was in stock

23   agencies starting in 1980.  So at that point, photographers

24   were more well respected, and it was considered more of a

25   partnership deal.  That's no longer true, you know.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1      Q.   Life.

2      A.   They don't -- they don't -- they don't -- they

3  don't treat us like partners; I'll say that.  That had

4  something to do with me not continuing.

5      Q.   Next is 32, documents, other than those responsive

6  to the preceding Request No. 31, evidencing any action you

7  took to prevent any website or host from using, reproducing,

8  or displaying any photograph.  And it says here, "Documents

9  responsive to this request are being produced."  And what I

10  want to know is, what do these documents that you've

11  produced show that is responsive to these requests -- to

12  this request, documents evidencing action you took to

13  prevent any website or host from using, reproducing, or

14  displaying?  And this is what -- it's after all these

15  licenses or invoices.  How do these images --

16      A.   Well, for one thing -- and I think it's very hard

17  to see -- you can see that, as I stated before, at the

18  bottom of every page on my website is a disclaimer about the

19  fact that I take infringement seriously and -- and --

20      Q.   I see.

21      A.   -- if you're discovered -- I -- I -- I'm -- I

22  don't have the thing in front of me, but, you know -- you

23  know, if you're discovered to -- to have infringed, you will

24  be contacted and you may be sued in federal court.

25      Q.   Other than what you've just described, which I

ADLER MEDICAL, LLC vs. HARRINGTON                 Blaine Harrington, III
1-22-cv-00072-KG-LF                                      September 28, 2022

1   don't think that's responsive, but what I think is

2   unimportant here --

3        A.   And --

4        Q.   Do you --

5        A.   As well, like I said, it's shown where the ability

6   to -- to copy off my website is disabled.

7        Q.   Yeah, but did you take -- have you taken any

8   affirmative action other than these -- type of labeling

9   something at the outset to prevent websites or hosts from

10  using, reproducing?

11       A.   You know, as I stated previously, the -- the web

12  is a -- is a huge monstrosity, if you will, and without

13  becoming my full-time job, there are limits to what I can do

14  to protect myself.

15       Q.   So the answer to the question I asked is no?  Is

16  that fair to say?

17       A.   Say it again, please.

18            MR. SQUIRES:  Would you read back the question.

19            (Record read as requested.)

20       A.   Yeah.  So I think the answer is probably no.

21       Q.   (BY MR. SQUIRES)  Okay.  I'm done with this batch,

22  and now, it seems to me, would be a good time to take a

23  break for --

24       A.   Okay.

25       Q.   -- lunch, if that's suitable.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                     September 28, 2022

1          THE VIDEOGRAPHER:  We're now going off the record.

2    The time is approximately 12:52 p.m.  Watch your microphone

3    when you stand up, please.

4          (Lunch recess taken.)

5          THE VIDEOGRAPHER:  We're now going back on the

6    record.  The time is approximately 1:43 p.m.

7          Q.   (BY MR. SQUIRES)  Mr. Harrington, do you have a

8    contingent fee relationship with your lawyer in these

9    matters?

10         A.   Yes.

11         Q.   Who bears the out-of-pocket expenses in your

12    relationship with respect to any cases that are brought?

13         A.   I do.

14         Q.   Can you tell me, have there been any cases, of all

15    of the cases that you have brought, in which the defendants

16    that you have alleged to have infringed your photographs

17    have admitted that they took the photographs from your

18    website?

19         A.   I don't know.

20         Q.   Is it not the case that the defendants who you

21    have brought actions against have asserted that they found

22    the photograph, whatever that was, on a website that did not

23    identify you as the owner or copyright proprietor?

24         A.   Well, from what I understand --

25              MR. DeSOUZA:  Jeff --

1          Well, hold -- hold on.

2          Object to form.

3          Jeff, are you asking generally, like all lawsuits

4  he's brought or all claims he's brought, or just here?

5          MR. SQUIRES:  All -- all the infringement claims

6  that he has brought.

7          MR. DeSOUZA:  But -- but not -- not limited to

8  this --

9          MR. SQUIRES:  Not limited --

10         MR. DeSOUZA:  -- lawsuit?

11         MR. SQUIRES:  Not limited to this case.

12         MR. DeSOUZA:  All right.  Thank you.

13         THE WITNESS:  I'm sorry.  Ask me again, please,

14  sir.

15         MR. SQUIRES:  Want to read back?

16         (Record read as requested.)

17    A.   I don't know.

18    Q.   (BY MR. SQUIRES)  Are you aware of what the

19  defendants in the cases that you have brought say about --

20    A.   Well, they're --

21    Q.   -- where they found --

22    A.   No, not -- not generally.

23    Q.   Do you not pay attention?

24    A.   Well, I'm not necessarily privy to it, to that

25  information.

1        Q.    Why not?

2        A.    Well, because I haven't heard it said.

3        Q.    Do your lawyers not talk with you about these

4   sorts of things?

5        A.    I -- I can't recall conversations about that.

6        Q.    So is it fair to say that you have no knowledge of

7   where any of the subjects of your accusations and lawsuits

8   of copyright infringement have found photographs?

9        A.    No.

10           MR. DeSOUZA:  Object to form.

11       A.    I mean, you're talking very generally about many

12   cases.

13       Q.    (BY MR. SQUIRES)  Is it not true that you have no

14   knowledge of where --

15           MR. DeSOUZA:  Object --

16       Q.    (BY MR. SQUIRES)  -- defendants in any of the

17   cases that you have brought for copyright infringement found

18   the photographs that were the subject of your claims?

19           MR. DeSOUZA:  Object to form.

20       A.    No.

21       Q.    (BY MR. SQUIRES)  It is -- to say no, that means

22   it is -- I think you are mishearing my question, and I think

23   you are answering contrary to what you -- the question calls

24   for, so I'm going to say it again.  It is true, is it not,

25   that you have no knowledge of where the defendants in the

1  cases --

2      A.   Yes.

3      Q.   -- you have brought found the photographs that

4  they -- that you allege they infringed?

5      A.   Yes.

6           MR. DeSOUZA:  Object to form.

7      Q.   (BY MR. SQUIRES)  What knowledge do you have of

8  where defendants in cases you have brought alleging

9  infringement -- strike that.

10          What knowledge do you have of where defendants you

11  have accused of infringement found the allegedly infringing

12  photographs?

13          MR. DeSOUZA:  Object to form.

14     A.   I do not have knowledge.

15     Q.   (BY MR. SQUIRES)  Okay.  I'm going to put a series

16  of -- well, it will be easier if I do this.  I'm going to

17  show you a document --

18          THE WITNESS:  Bless you.

19          THE VIDEOGRAPHER:  Excuse me.

20     Q.   (BY MR. SQUIRES)  Mark this Exhibit Next.  This is

21  a letter dated January 6th, 2022, from CopyCat Legal to

22  360 ABQ, LLC.  Do you know what 362 -- 360 ABQ, LLC, is?

23          (Exhibit 14 marked.)

24     A.   Yes.

25     Q.   Okay.  Did you review this letter before it was

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

1  sent?

2        A.   Yes.

3        Q.   It is essentially the same -- the same form letter

4  that CopyCat Legal has sent to all the defendants in the

5  present case --

6        A.   Yes.

7        Q.   -- correct?  And is it also the same form letter

8  that CopyCat Legal sends to all defendants that you have

9  accused of infringement since you engaged that firm?

10       A.   I -- I believe so, more or less.

11       Q.   On page 2, in the first full paragraph on that

12  page -- it's a very short paragraph -- it says, "The

13  unauthorized use of our client's work deprives him," meaning

14  you, Mr. Harrington, "of much-needed income."  What are your

15  financial circumstances that you are in great need of such

16  income?

17       A.   I'm not really sure I follow what you're saying.

18  I mean, if -- if -- if -- as I explained already, being a

19  photographer for 45 years has never been an easy business,

20  and this is long before I ever found out about copyright

21  infringements, which, as I told you, were -- are primarily a

22  result of -- of the web.  So, for example, as -- because as

23  the business has become tougher and as many things that were

24  more well paid in the past have disappeared, that income has

25  been reduced substantially, at the same time that, as I

ADLER MEDICAL, LLC vs. HARRINGTON                 Blaine Harrington, III
1-22-cv-00072-KG-LF                                         September 28, 2022

1  pointed out, thousands of people use my picture without

2  paying anything, so -- yeah.  I think that's a fair thing

3  to -- fair thing to say.

4       Q.   What was your earned income in 2021?

5       A.   I don't recall, offhand.

6       Q.   What was your earned income in 2020?

7       A.   I don't recall.

8       Q.   What was your earned income in 2019?

9       A.   Same.

10      Q.   What was your earned income in 2018?

11      A.   Same answer.

12      Q.   Can you give me an approximate answer to that

13 question for each of those years, starting with 2018?

14      A.   No, not without, you know, searching for

15 information.  Off the top of my head, I can't tell you.

16      Q.   Did you file federal income tax years -- returns

17 for each of those years?

18      A.   Yes.

19      Q.   And they would reveal that information, correct?

20      A.   The government would reveal it?

21      Q.   Your tax returns.

22      A.   I'm sorry.  Just -- just a moment.

23      Q.   Your tax returns would reveal -- would reveal that

24 information?

25      A.   Yes.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      Q.    Okay.   It also says on that page, somewhere, that

2  you have been forced to incur substantial costs in

3  identifying violators and enforcing your rights.   Can you

4  tell me what the amount of and type of costs you've incurred

5  for each of the years 2018 through 2021 to identify

6  violations --

7      A.    Well --

8      Q.    -- and enforce your rights?

9      A.    -- I would -- I would say as the use of my time.

10  It has taken time away from my other work.

11     Q.    Okay.   That's one thing.   What else?

12     A.    Well, primarily, I'm -- I'm the one who is

13  identifying them, so that's what it would be, you know.

14     Q.    Anything else?

15     A.    Not off the top of my head.

16     Q.    Okay.   Next, I'm going to ask you to look at a

17  copy of the Complaint you filed against 360 ABQ.   I'm going

18  to have that marked as the next --

19          (Exhibit 15 marked.)

20          MR. DeSOUZA:   Jeff, did you say this was the

21  Complaint in 360 ABQ?

22          MR. SQUIRES:   Yes, I said that.

23     Q.    (BY MR. SQUIRES)   Paragraph 9 on page 3 refers to

24  the photograph that's the subject of that Complaint.   Has

25  anyone ever licensed that work?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1      A.   I don't know.

2      Q.   How would you determine that?

3      A.   I could search by the file number.

4      Q.   Okay.  Paragraph 19 says that the -- you have been

5   unable to negotiate a reasonable license -- "for the past

6   infringement of his work."  What would be a reasonable

7   license?

8      A.   I don't know in this case, without reviewing

9   further.

10     Q.   Do you know what communications have taken place

11  between your counsel and 360 ABQ's counsel concerning a

12  resolution of that case?

13     A.   Well, as you know, there are a number of cases,

14  and -- you know, without looking into it further, I don't

15  remember.

16     Q.   Okay.  When you say "a number of cases," you're

17  referring to all the Complaints that you have brought

18  against alleged infringers, correct?

19     A.   Yes.

20     Q.   Do you know what use was made by 360 ABQ of the

21  photograph in question?

22     A.   Well, I believe it was web use.  As I said,

23  without looking into the facts of it further, I don't know.

24     Q.   Okay.  And in section -- in paragraph 26 of your

25  Complaint, you allege that the infringement was willful as

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1   it acted with actual knowledge or reckless disregard for

2   whether its conduct infringed the copyright, but you have no

3   knowledge of what facts might support such a contention; is

4   that true?

5        A.   Correct, except my assumption is because they

6   are --

7        Q.   I'm not asking for your assumption.

8        A.   All right.

9        Q.   Next, I'm going to show you a document marked as

10  Exhibit No. Next that is 360 ABQ's answer and counterclaims

11  in this matter -- in that matter.  And I'd ask you, do you

12  know what the Defendant 360 ABQ asserted about your claim of

13  infringement and demand for payment?

14           (Exhibit 16 marked.)

15       A.   Again, this is a document that I've seen in the

16  past, but without reviewing it further, I -- I have no

17  further comment.

18       Q.   Did you review it with care at the time you --

19       A.   Well, I --

20       Q.   -- saw it?

21       A.   -- believe so, but --

22       Q.   Did you discuss it with your attorney?

23       A.   I -- I assume so, yes.

24       Q.   Assume.  I'm asking you if you recall.  Do you

25   specifically recall discussing --

1      A.    No, I don't specifically recall.

2      Q.    And next I'm going to show you a document marked

3  as Exhibit No. Next.

4            (Exhibit 17 marked.)

5      A.    Is that ring of yours Greek?

6      Q.    Well, it's -- it is Greek key design.

7      A.    Yeah.  Sorry.  Unrelated.

8      Q.    And I ask you if you were provided a copy of this

9  to review before it was --

10     A.    Yes.

11     Q.    -- served?

12           MR. DeSOUZA:  Jeff, can you tell me what this

13  exhibit is?

14           MR. SQUIRES:  Sorry.  Plaintiff's Answer to

15  Counterclaim.

16           MR. DeSOUZA:  In 360 ABQ?

17           MR. SQUIRES:  Yes.  All the documents --

18           MR. DeSOUZA:  Thank you.

19           MR. SQUIRES:  -- that I am discussing now, until I

20  change course here, are 360 ABQ action.

21           MR. DeSOUZA:  Thank you; thank you.

22     Q.    (BY MR. SQUIRES)  And in your Answer, paragraph

23  No. 6, which is a response to paragraph 6 of Defendant

24  360 ABQ's counterclaims -- I'm going to refer you to the

25  counterclaim allegation that the letter sent to 360 -- which

1   you just saw the demand letter -- "is identical in form to

2   form letters Mr. Harrington has sent to numerous targets of

3   his scheme, sweep [sic]" -- "excepting only that the

4   particular photographs such others were alleged to have

5   infringed were different.  On information and belief, each

6   case the photographs in question had been found by the

7   targeted party on a website that provided no information or

8   indication that the photograph had been taken by, or the

9   copyright was owned by, Mr. Harrington," and it -- that's

10  only part of the -- paragraph 6.  But in response, you say

11  you are without knowledge or information sufficient to admit

12  or deny those allegations concerning methods by which

13  infringers searched for and ultimately infringed plaintiff's

14  photography.  That's still the case, correct, you have no

15  knowledge about the methods by which infringers -- alleged

16  infringers searched for and ultimately, allegedly, infringed

17  your photography?

18       A.   I'm not sure what your question is.

19       Q.   You have no knowledge of the methods --

20       A.   No.

21       Q.   -- employed by --

22       A.   No.

23       Q.   -- the defendants in -- in any of these cases?

24       A.   Correct.

25       Q.   Okay.  The next document I'm going to show you is

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                              September 28, 2022

1  your response to the Defendant 360 ABQ's first request for

2  production of documents, and it will be marked as -- in

3  connection with that, I am going to show you two

4  photographs -- two images perhaps of the same photograph,

5  marked as Exhibit No. Next.  And these are identified as

6  being responsive to Request for Production No. 7.  Number 7

7  says, "Document" -- it asks for documents evidencing actual

8  damages you've suffered as a result of 360 ABQ, LLC's,

9  alleged infringement.  And the response from your attorney

10  correctly [sic] -- your attorney prepared these

11  responses? --

12          (Exhibit 18 marked.)

13          (Exhibit 19 marked)

14     A.   Yes.

15     Q.   -- is, "The documents responsive to this request

16  are being produced," and what I just handed you --

17          MR. SQUIRES:  As Exhibit No. 18?

18          (Court reporter response.)

19     Q.   (BY MR. SQUIRES)  -- 19, excuse me, 19 -- are the

20  two documents identified as being responsive to that

21  request.  And what I want to know is how do these documents

22  evidence actual damages you have suffered?

23     A.   I don't know.

24     Q.   Okay.

25          MR. DeSOUZA:  Jeff, did you say "Request for

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1    Production No. 7"?

2            MR. SQUIRES:  Yes.

3            MR. DeSOUZA:  I think Request for Production No. 7

4    in 360 ABQ was all of those same invoices and licenses we

5    covered for this case.

6            MR. SQUIRES:  I'm sorry.

7            MR. DeSOUZA:  At least that's what's -- that's

8    what's --

9            MR. SQUIRES:  I --

10           MR. DeSOUZA:  -- in the folder --

11           MR. SQUIRES:  I --

12           MR. DeSOUZA:  -- in My Documents.

13           MR. SQUIRES:  I apologize.  You are right.  This

14   was Request for Production No. 4.

15      Q.   (BY MR. SQUIRES)  And 4 reads, "Documents

16   supporting your allegations that 360 ABQ willfully" --

17   alleged the infringement of your copyright in the subject

18   photograph.

19           MR. SQUIRES:  My mistake.  Thank you, Dan.

20      Q.   (BY MR. SQUIRES)  How do these two photographs

21   support the contention that Defendant 360 ABQ acted

22   willfully?

23      A.   I don't know.

24      Q.   Next --

25           THE WITNESS:  I assume they can shred these after?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1              (Court reporter response.)

2              MR. SQUIRES:  Exhibit No. 20?

3              (Exhibit 20 marked.)

4              (Court reporter response.)

5      Q.   (BY MR. SQUIRES)  Now, I'm willing to accept your

6   client's -- your attorney's submission and forego asking

7   questions about these if he will confirm, as I believe to be

8   the case, that these are identical to the invoices for

9   licenses that were produced in response to the Harrington,

10  plaintiff's, request for production, which we've reviewed

11  previously.

12             MR. DeSOUZA:  Jeff, are you -- you haven't

13  announced what Exhibit 20 is.  If it's the -- if it's the

14  same invoices that we just looked at, that were produced --

15  I -- I guess if what you have is the document production for

16  Request No. 7 in 360 ABQ --

17             MR. SQUIRES:  Yes.

18             MR. DeSOUZA:  Then yes.  Then yes, I agree.  Those

19  are the same invoices that were produced in the Adler

20  Medical case, that we've already covered.

21             MR. SQUIRES:  Okay.  Good enough.  Good enough for

22  me.

23             THE WITNESS:  Can we ask them if they have more

24  coffee?  The -- the bit I had before was the end of the pot.

25             (Court reporter response.)

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                September 28, 2022

```
1              THE WITNESS:  I -- this is my low-ebb part of the

2    day.

3              (Court reporter response.)

4              THE WITNESS:  Either way.  It doesn't matter.

5       Q.  (BY MR. SQUIRES)  Let's continue for a few

6    minutes, and then --

7       A.  Sure.

8       Q.  Then I'd ask you to look at Request No. 10, and

9    your response to the request for production of documents

10   that I believe was marked as -- as Exhibit 19 [sic].

11      A.  What does it start with?

12      Q.  Plaintiff's responses, written responses, to

13   defendant's request for production of documents on the

14   360 ABQ caption.

15             THE WITNESS:  Do you have it there?

16             (Court reporter response.)

17      Q.  (BY MR. SQUIRES)  18.

18             THE WITNESS:  Can I see the front, please?

19             (Court reporter response.)

20      A.  Yeah.  Okay.

21      Q.  (BY MR. SQUIRES)  Number 10, "Documents" -- it

22   calls for "Documents you have sent to any person, including

23   but not limited to DMCA takedown notices ... by which you

24   sought removal of any photographs you have created from any

25   website."  And in response to that, it says, "See response
```

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1  to Request No. 1."  Request No. 1, the response is --

2  Objection.  It cites a case, sets an argument.  My question

3  is, do you have any such documents that you've sent to any

4  person, including DMCA takedown notices, by which you sought

5  removal of any photograph from a website?  Any -- any

6  documents?

7       A.   Yeah.  And the -- several I mentioned earlier,

8  that were -- were nonprofits, I would have emails about

9  that.  As I said, in terms of DMCA takedowns, I don't think

10 I have any, although I've -- as I said, I -- I may have

11 filed a few in the past.

12      Q.   You may have or you know you did?

13      A.   I know I did, but in terms of when or how many, I

14 don't remember.

15      Q.   How long ago would it have been?

16      A.   I don't know.  Like I just said, I don't remember

17 exactly when it would --

18      Q.   Well, would you remember if it were yesterday?

19      A.   Yes, I would.

20      Q.   Would you remember if it was last month?

21      A.   It wasn't last month; it wasn't this year.

22      Q.   Was it the year prior to this year?

23      A.   I doubt it, but I'm guessing.

24      Q.   How long ago would you --

25      A.   I don't know; I don't know.

1      Q.    You have no idea?

2      A.    No.

3      Q.    Would it have been within the last three years?

4      A.    I don't know.

5      Q.    Okay.  Could it have been within the last five

6  years?

7      A.    I imagine so, because most of my activity

8  regarding copyright infringements has been in that period of

9  time.

10     Q.    And you wouldn't consider that to be a

11  sufficiently important record to keep?

12     A.    No.  As I -- as I said -- I mean, you know, like,

13  look.  The world is full of paper.  Do I keep all that

14  stuff?  No, I don't.  My primary job is not takedown

15  notices; otherwise, I would have done hundreds -- hundreds

16  of them.  I've done a few, and I don't have any -- you know,

17  it's like the email you keep.  I've -- I've -- you know,

18  this deep in it.  I'm running a business.  I have other

19  things that take my time -- take my attention.  Sorry.

20     Q.    Has the issue of takedown notices been raised in

21  any of the other lawsuits in which you accused alleged

22  infringers of infringing your copyrights?

23     A.    No.

24          MR. SQUIRES:  You want to go check on the coffee

25  now?

1          (Court reporter response.)

2          MR. SQUIRES:  Take a very short break to check on

3  coffee?

4          (Court reporter response.)

5          THE VIDEOGRAPHER:  We're now going off the record.

6  The time is approximately 2:23 -- watch your microphones

7  when you stand up, please -- p.m., 2:23 p.m.

8          (Brief recess taken.)

9     Q.   (BY MR. SQUIRES)  I'm going to show you what I

10 have -- will have marked as Exhibit --

11          MR. SQUIRES:  Maybe 21?

12          (Exhibit 21 marked.)

13          (Court reporter response.)

14    A.   Aha.

15    Q.   (BY MR. SQUIRES)  Fond memories.

16    A.   Not exactly.

17    Q.   This is a letter --

18          THE VIDEOGRAPHER:  We're not on the record were

19 we?

20          MR. SQUIRES:  Oh, we're not?

21          THE VIDEOGRAPHER:  I don't believe so.

22          MR. SQUIRES:  My goodness.  I could have gone on a

23 tangent.

24          (Court reporter response.)

25          THE VIDEOGRAPHER:  We're now going on -- back on

1   the record.  The time is approximately 2:25 p.m.

2       Q.   (BY MR. SQUIRES)  Mr. Harrington, I've offered you

3   a document that is a letter from David Deal addressed to

4   Mountain States Agency, LLC, dated December 30th, 2019, as

5   Exhibit --

6            MR. SQUIRES:  21?

7            (Court reporter response.)

8       Q.   (BY MR. SQUIRES)  Exhibit 21.  And I ask you if

9   you've seen this letter before.

10      A.   Yes.

11      Q.   Do you recall under what circumstances you saw

12  this letter?

13      A.   I'm not sure what you -- what your question is.

14      Q.   When did you see this letter?

15      A.   I -- I don't remember.

16      Q.   David Deal formerly represented you in copyright

17  infringement litigation, correct?

18      A.   Correct.

19      Q.   Over what period of time did he represent you?

20      A.   I can't tell you exactly.  My guess would be about

21  three years.

22      Q.   Okay.  And was he your lawyer immediately previous

23  to CopyCat Legal?

24      A.   Yes.

25      Q.   Okay.  Did you always review letters that Mr. Deal

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1  sent out to alleged infringers before he sent them?

2      A.   Not necessarily.

3      Q.   But you remember reviewing this letter?

4      A.   I believe so; but, frankly, one of the many

5  problems I had dealing with David Deal was that he was not

6  very organized.  He was also not very forthcoming on things,

7  and he made decisions without consulting me.

8      Q.   Was Mr. Deal's practice to send out letters that

9  were of a form basis, in the sense that essentially he would

10  send out the same letters to alleged infringers, changing

11  only certain details?

12      A.   Yeah, I believe so.

13      Q.   In this December 30th, 2019, letter, Mr. Deal

14  demanded that Mountain States tender $6,000 to him.  Did

15  Mr. Deal discuss that amount with you before he sent the

16  letter?

17      A.   I don't believe so.

18      Q.   Do you know why $6,000 was selected?

19      A.   No.

20      Q.   But he was your lawyer and he spoke for you,

21  correctly -- correct?

22      A.   Yes; correct.

23      Q.   Okay.  I'm going to show you a document that's now

24  marked as Exhibit 20 Something.

25              (Exhibit 22 marked.)

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1           (Court reporter response.)

2     A.    Did they say they were going to bring the coffee?

3     Q.    Yes, they did.  This was a Verified Complaint that

4  was filed by Mountain States Agency against you.  Do you

5  recall that?

6     A.    At the time, essentially, I was not in the loop.

7     Q.    So are you saying you were never made aware of

8  this Complaint being filed against you?

9     A.    Yeah.  I believe that's correct.

10    Q.    Did you ever find out about it?

11    A.    After the fact, and not very clearly from him.  I

12 understand it more today from hearing more about it, but --

13 I was never asked and I was not in agreement with this --

14 whatever settlement came about from it that basically

15 included, I think, attorney's fees that you collected.

16    Q.    Well, I'm always happy to collect attorney's fees,

17 Mr. Harrington, but --

18          MR. SQUIRES:  Do you have this?

19          (Court reporter response.)

20    Q.    (BY MR. SQUIRES)  I'm going to show you a

21 document --

22    A.    Are you done with that document?

23    Q.    Yes.  I think so.  Yes.  The document marked as

24 Next is the Answer and Counterclaims filed by you in

25 response to the Mountain States Agency Complaint.  Have you

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1    ever seen that?

2            (Exhibit 23 marked.)

3       A.   I believe I have, but I can't say at what point.

4       Q.   In your answer in that case to the counterclaim --

5    to the Complaint -- sorry -- you state that, "Defendant,"

6    that's you, "does not conduct business in New Mexico or have

7    the required minimum" -- "requisite minimum contacts."  Do

8    you see that?

9       A.   No.  Where?

10      Q.   No. 5.

11      A.   I'll look.

12   .        (Court reporter clarification requested.)

13           MR. DeSOUZA:  I think -- I think it's my

14   computer's internet connection.  It just killed the video,

15   because it got unstable for some reason.

16      A.   Okay.

17      Q.   (BY MR. SQUIRES)  Do you believe that to be the

18   case?

19      A.   Yes.

20      Q.   Why did you not raise that in the current case?

21      A.   I'm sorry?

22      Q.   Why did you not raise that issue in the present

23   case?

24      A.   I don't know.

25      Q.   In your answer to No. 10 in that case --

ADLER MEDICAL, LLC vs. HARRINGTON                     Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1          MR. DeSOUZA:  Jeff -- Jeff, I apologize.  I didn't

2   catch the prior one.  It looks like your internet is bad

3   now.  I -- I heard -- I heard, "Why did you not raise that

4   in the prior case?"  And then it froze, and I didn't hear

5   anything beyond that.

6          MR. SQUIRES:  Oh.  This is in -- we're dealing

7   with the Harrington Answer and Counterclaims in the

8   Mountain States Agency case.

9          MR. DeSOUZA:  Right; right.  No.  I -- I heard --

10  I heard the question about --

11         MR. SQUIRES:  Okay.

12         MR. DeSOUZA:  -- why did he not raise personal

13  jurisdiction in this case, and then it froze.  I didn't hear

14  the answer to the question or not.

15         MR. SQUIRES:  I think he said he doesn't know.

16         MR. DeSOUZA:  Okay.

17     Q.   (BY MR. SQUIRES)  Is that --

18     A.   I -- I'm not sure.

19     Q.   I'm -- I'm -- I'm repeating what you said in

20  response to that question, and did you not say, "I don't

21  know"?

22     A.   What was the question again?

23         MR. SQUIRES:  Let the court reporter read back the

24  question and your answer.

25              (Record read as requested.)

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1           MR. SQUIRES:  You got it, Dan?

2           MR. DeSOUZA:  Yeah.  Now I hear you.

3      Q.   (BY MR. SQUIRES)  In paragraph No. 10 of your

4  Answer, you state, "On information" -- that you, on

5  information and belief, assert that plaintiff used a

6  screenshot of the photograph in question obtained from

7  defendant's, that's your, website.

8      A.   Yes.

9      Q.   What's the information and belief on which you

10 base that statement?

11     A.   I don't know.  Do you need to go off the record?

12 I'm just going to go over there and grab some coffee, or

13 I'll just be right back.

14     Q.   We can continue, and I'll --

15     A.   Okay.

16     Q.   Mr. Harrington, I'm going to refer -- take your

17 time.  I'm not rushing you -- that in your Answer, you raise

18 certain affirmative defenses.  The affirmative defenses

19 begin on the bottom of the third page, and on the top of the

20 fourth page, there is a second affirmative defense, unclean

21 hands.  Do you see that?

22     A.   Yes.

23     Q.   It says that, "Upon information and belief,

24 plaintiff's goal" -- plaintiff was Mountain States Agency --

25 "is not the adjudication on the merits, but to use the

1  federal court system to smear defendant."  What was the

2  information and belief on the basis of which you so stated?

3       A.   Well, again, I didn't write it.  And I wasn't

4  really privy to it, but I would -- I would assume it was

5  some of the -- some of the claims that were made, and --

6  and --

7       Q.   I'm not asking for you to assume anything.  I'd

8  like to know what you know.

9       A.   Well, again -- I didn't write it.  I don't know.

10      Q.   Okay.  There were also counterclaims asserted in

11 this document, and I'd refer you to Counterclaim --

12 paragraph 18, which is at the top of page 8, and it says

13 that, "Harrington asserts that Mountain States ... knowingly

14 and with the intent to conceal infringement, intentionally

15 removed the copyright management information from

16 Harrington's copyrighted photograph."  What factual basis

17 was there for that statement to be made?

18      A.   Well, again, this -- this -- that -- that

19 paragraph was written by David Deal, and he may have been

20 privy to information that I don't know about to make that

21 claim.

22      Q.   So the answer is you don't know any information to

23 support that contention; is that correct?

24      A.   Correct.

25      Q.   I'm going to show you a document marked as Exhibit

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  No. 24 I think, which are your responses and objections to

2  plaintiff's interrogatories in the Mountain States case.

3          (Exhibit 24 marked.)

4          THE WITNESS:  Pretty soon they'll be calling in a

5  masseuse.

6          (Court reporter response.)

7          THE WITNESS:  I can give a little yoga class.

8    Q.   (BY MR. SQUIRES)  Number 9 -- that's the answer --

9  asks you to identify any websites, including the hosts,

10  which you've become aware, which posted or displayed any

11  photograph you have taken without providing notice of your

12  claim of copyright ownership.  In response to that, you

13  objected.  "In addition to the objections set forth

14  above" -- you object on the grounds that it's

15  disproportionately burdensome and unlikely to lead to

16  information relevant to the case.

17          Now that was the Mountain States case, not this

18  case.  I want to make sure I'm being clear.  We don't want

19  to confuse the two, but I do want to know -- do you know of

20  any websites -- did you, at the time, know of any websites

21  that posted photographs of yours without identifying you as

22  the owner or photographer or copyright proprietor?

23    A.   Well, again, in terms of -- and I answered earlier

24  something similar.  In terms of specificity, I can't say.

25  But in terms of just overall general knowledge, yes -- yes,

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   there are many cites that contain photos of mine that are

2   doing so without licensing.

3        Q.   And you cannot recall, other than some general

4   suspicion that you may have issued a takedown notice, that

5   you have ever specifically -- strike that.

6             You do not recall any specific instances in which

7   you have ever issued a takedown notice to such a website?

8        A.   You said that I -- I'm sorry.  Please repeat it.

9        Q.   You -- you do not recall any specific instances in

10  which you have ever issued a takedown notice to the host of

11  such websites?

12       A.   Well, again, as I said earlier, I do recall

13  sending several takedown notices in the past, but only a

14  relative few, and -- and in terms of when and -- when and

15  who they were, I don't remember.

16       Q.   Or what photographs they were?

17       A.   Or what photographs they were.

18       Q.   They were concerned with?

19       A.   Right.

20       Q.   Okay.  Next, I'm going to show you a document to

21  be marked as Exhibit 25.  Now, I want to make note that

22  on -- that this consists of Plaintiff Blaine Harrington's

23  responses and objections to the first request for production

24  of documents and four exhibits attached, identified as

25  MS_0001 through 0004.  On the document itself, not the

1   exhibits, there are some markings.  They pre- -- they are my

2   markings.  There are circles of some numbers of the items,

3   consisting of the request, and there are a couple of

4   instances of some words being crossed out.  But everything

5   about the original document is legible, and make of this as

6   you will.  I have a few questions about this document.

7           Item No. 4 -- Request No. 4 asks for documents

8   containing information on which you rely as the basis for

9   your asserted belief that Mountain States's goal in this

10  lawsuit is to smear you, and you object to that for various

11  and sundry reasons.  But you have testified, I believe --

12  and I want to reiterate that -- that you -- you know of no

13  factual basis for that assertion, about the intention being

14  to smear you; is that correct?

15          (Exhibit 25 marked.)

16      A.   Correct.

17      Q.   Request No. 7 seeks copies of all photographs you

18  took from a hot air balloon during the photo shoot during

19  which you took the photograph that's the subject of this

20  proceeding, that proceeding being the Mountain States

21  proceeding of several years ago.  That photograph was also

22  one taken during the same period of time that you were in

23  Albuquerque as the guest of something Albuquerque; is

24  that --

25      A.   Yes.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      Q.    And you did take many other photos of balloons at

2  that time, correct?

3      A.    Correct.

4      Q.    Okay.  You objected to providing those copies of

5  other photos you took.  Why?

6      A.    As it stated, it's considered burdensome.  You

7  know, if I took thousands, why do you need to see thousands?

8      Q.    Okay.  Many of the photographs you took are very

9  similar in nature; is that correct?

10     A.    Well, they're of hot air balloons, but --

11     Q.    They're taken during a particular time period,

12  correct?

13     A.    Yeah, but I use many different lenses.  Some are

14  close up.  Some are wide.  Some -- some show other balloons.

15  Some are single balloons.  Some are taken from -- as you're

16  ascending.  Some are taken from the ground.  Some are taken

17  above the Rio Grande River.  So, I mean, it depends on who

18  you are as to whether you're not -- whether or not you

19  consider them similar or not.  They are similar in nature

20  and they are similar that they're hot air balloons, but

21  other than that, there is a lot of unique photographs.

22     Q.    How long were you taking photographs -- for what

23  period of time? -- when you were photographing the Balloon

24  Fiesta?

25     A.    During the entire week?

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1      Q.    Yeah.   How -- how long were you up in a balloon?

2      A.    Well, the balloons usually go up for a couple of

3  hours at a time.

4      Q.    How many times did you go up in balloons?

5      A.    I can't say exactly.   I'd say probably three or

6  four.

7      Q.    And you don't remember how many photographs you

8  took during those time periods?

9      A.    Well, I think you asked me that before, and -- and

10  it's -- it's a large number, but in terms of exactly, no, I

11  don't remember.

12      Q.    And you can't approximate?

13      A.    Well, no.

14      Q.    Well, let's -- let's look at these licenses that

15  are attached, or whatever they are, and I will ask a few

16  questions.

17      A.    Okay.

18      Q.    First is identified as MS_0001.   Can you tell me

19  what that is?

20      A.    I'm sorry.   I didn't hear you.

21      Q.    Can you tell me what MS_0001 is?

22      A.    Yes.   What's the question?

23      Q.    Can you tell me what -- what is it?

24      A.    What this piece of paper is?

25      Q.    Yes.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1     A.   It's a -- basically, the license -- as opposed to

2  a license on my invoice, there are some companies that

3  produce their own.  So this is called "GuestLife."

4     Q.   Right.  And what was the image?  Do you know?

5     A.   No.

6     Q.   Now, this was produced by you in discovery, so

7  presumably it fits the description of what was being asked

8  for, which was copies of licenses.  Is that a fair

9  representation of what this is?

10    A.   Yes.  And, I mean, it's -- it is -- you know,

11 there -- there's -- there's a chance that it's -- that it's

12 a image in question, Balloons Touching Rio Grande River.

13    Q.   Do you remember particularly what the image was?

14    A.   Yeah, I -- I believe so.  I believe it's the same

15 one that we've discussed that was on the puzzles, for

16 example.

17    Q.   Okay.  And the fee was $275.  The usage size was

18 "spread."  What does that mean?

19    A.   Two pages.

20    Q.   And it says for first-time usage, standard rates

21 are -- are those standard rates?

22    A.   Yes.

23    Q.   Okay.

24    A.   So again, as I explained to you before, in some

25 circumstances, I dictate what the price is.  In some

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   instances, they're -- they are negotiated, and in some they

2   are standard rates of a publication, of what they pay

3   everybody, and that's what this is.

4       Q.   Is there a duration or period of time for the

5   rights being granted?  Well, strike that.

6       A.   I don't -- I don't --

7       Q.   Strike that; strike that.

8            I think in paragraph No. 1, it says, "To appear in

9   the 2016/'17 GuestLife New Mexico, a GuestLife-branded

10  publication."  So this was for a publication?

11      A.   Well, if you're familiar, GuestLife is like one of

12  those books that they leave in hotels, about Phoenix or

13  Albuquerque, or whatever.  That's what GuestLife is, so it's

14  a book that's -- that's placed for travelers who come to

15  hotels, for example.

16      Q.   Did you ever do any other work for GuestLife?

17      A.   I think they may have used my photos of

18  Albuquerque several times.  I don't recall working with them

19  on any other cities.

20      Q.   Okay.  Let's look at MS_0002.  Now, this is on

21  your standard form --

22      A.   Correct.

23      Q.   -- dated February 26th, 2016, to Dina Soto of Soto

24  Properties New Mexico.  Do you know what Soto Properties

25  New Mexico is?

1      A.    From my memory, I believe they were a -- a very

2  small real estate firm.

3      Q.    Okay.  And this was --

4      A.    And you see the license is for six months, which

5  is basically the shortest term that I offer for web use.

6      Q.    Now -- and -- and I -- does this cover two

7  different photographs?

8      A.    Correct.  You can see they're -- again, my file

9  numbers, at the top line on each one, identify a different

10 photograph, 0273, 02959.

11     Q.    So the second photograph, the charge was less?

12 Oh, no, more.  $50 more.  What was the difference?

13     A.    I don't know.

14     Q.    Let's look at MS_0003 to Anna Palucka, dated

15 November 18th, 2013, for ZUK ELZAB SA, in someplace probably

16 far away.

17     A.    In Poland.

18     Q.    And how did it come to pass that you did some work

19 for Anna Palucka?

20     A.    I -- I think they probably identified photographs

21 from my website, and this was for a corporate calendar of a

22 Polish company.

23     Q.    What kind of company was it?  Do you know?

24     A.    I don't recall.

25     Q.    How did you set the fee?

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                September 28, 2022

1       A.    I don't recall.  In general, though, I will add

2  that other countries outside the U.S., particularly a

3  country like Poland, that isn't extremely well off, fees

4  would be lower.

5       Q.    MS_0004.  It says -- what is this?

6       A.    It appears to be -- oh, it is.  Yeah.  This is a

7  pricing software that's built into -- into the photo

8  business -- software that I use for licensing, et cetera,

9  and so this -- this shows, you know,

10 Website.Promotional.Worldwide Market, 5 years, up to half

11 screen.

12      Q.    So who is the -- did you have a client here?  I

13 assume you did.

14      A.    I don't recall.  I'm not sure really how -- how

15 relevant it is, and it must have been, somehow, but I -- I

16 can't tell you why.

17      Q.    So in the -- there are three boxes across the

18 center of that which is copied.  In the box on the right --

19 I hate to tell you my eyesight is not what a younger

20 person's would be.  I have a hard time reading this.

21 Something about duration.  Can you read it?

22      A.    Yeah.  That's what I said.  It -- it -- there are

23 like drop-downs -- drop-down menus of -- on the left is

24 the -- is -- is the type of use, Editorial/Corporate

25 Website, and then the center gives some information about

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                September 28, 2022

1  that particular screen.  And on the right side, it -- it

2  lists durations between one month and five years.  It's

3  highlighted to "5 Years," so that's what -- and it's

4  highlighted to "Half Screen" on a website, and then above

5  shows the average price.

6       Q.   Average price?  What does that mean?

7       A.   Well, it -- it -- you know, like this is -- this

8  is to help in -- in -- a photographer in -- in negotiating a

9  price and the value, and so you -- you can see there that --

10  and that's hard for me to read too.  The low is around

11  2,037, and the high is around 4,074.

12       Q.   I'm not seeing that, but --

13       A.   It's below the larger price.  It's right below it.

14  There's a box -- there's a white box that says,

15  "Geographic: --

16       Q.   Okay.  I see it.

17       A.   -- U.S. Only."

18       Q.   It says, "Range" and --

19       A.   Right.  Yep.

20       Q.   Okay.  Now, in that case, I'm going to show you a

21  document marked No. Next.  It says, "Offer of Judgment."

22  Are you familiar with that?

23            (Exhibit 26 marked.)

24       A.   Well, as I said, after the fact, not at the time.

25            MR. DeSOUZA:  I'm sorry, Jeff.  Which -- what is

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1  this?

2          MR. SQUIRES:  Offer of Judgment in the

3  Mountain States case.

4          MR. DeSOUZA:  Thank you.

5      Q.   (BY MR. SQUIRES)  Are you telling us that this

6  offer was submitted without your authority?

7      A.   Frankly, I can't -- I can't tell you for certain,

8  but in terms of the -- my knowledge of that entire case,

9  much of it was done by Mr. Deal without getting my approval.

10     Q.   And you are aware that that Offer of Judgment was

11  accepted, correct?

12     A.   Yes.

13     Q.   Okay.  And that all transpired in the summer of

14  2019, correct?

15     A.   If that's what it says, yes.  2019; I see it right

16  there.

17     Q.   Okay.  And you were aware of the result of that

18  case, correct, at the time?

19     A.   At the time?

20     Q.   At the time the case was finally resolved.

21     A.   I believe so.  When it was resolved, yeah.

22     Q.   Okay.  And you've testified that you engaged

23  CopyCat Legal in December of 2021, correct?

24     A.   No.  Oh, yes.  I'm sorry.

25     Q.   Okay.

ADLER MEDICAL, LLC vs. HARRINGTON                      Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1        A.    Getting my years --

2        Q.    And was Mr. Deal your attorney in the cases that

3    you brought and in the actions you took against alleged

4    infringers until you engaged CopyCat Legal?

5        A.    In the previous -- in that previous year, 2021,

6    Mr. Deal became very hard to get ahold of.  He was not

7    responding to my messages about any particular cases.  He

8    left me in the dark about a lot of things, and essentially,

9    for about three-quarters of the year, he stopped trying to

10   close any cases.

11       Q.    So at that time, you chose to change horses?

12       A.    Correct.

13       Q.    Okay.  I'd like to take a break.

14             THE VIDEOGRAPHER:  We're now going off the record.

15   The time is approximately 3:12 p.m.  Watch your microphones

16   when you stand up, please.

17             (Brief recess taken.)

18             THE VIDEOGRAPHER:  We're now going off the record.

19   The -- on the record.  The time is approximately 3:26 p.m.

20       Q.    (BY MR. SQUIRES)  Mr. Harrington, I'm going to

21   show you a document marked as Exhibit 20 Something.

22             (Exhibit 27 marked.)

23             THE VIDEOGRAPHER:  7.

24       Q.    (BY MR. SQUIRES)  Wait, wait.  I'm sorry.  I've

25   given you too much, I think.  I'm not sure -- maybe -- I've

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

 1  given you too much.  This is a Complaint for Copyright

 2  Infringement in the case of Blaine Harrington v. Atlantis

 3  CDS, LLC.  Have you seen this before, Mr. Harrington?

 4       A.   Yes.

 5       Q.   Did you see it before it was filed?

 6       A.   I -- I'm not sure.  Again, this is -- what year is

 7  this from?

 8       Q.   2018.

 9       A.   Okay.

10       Q.   It's a Complaint for Copyright Infringement.

11  Would -- to save some time, would it be fair to say it is

12  similar in nature to the other copyright infringement

13  actions we've been dealing with today, in the sense that you

14  allege someone used a photograph that you took and owned

15  copyright in without consent and posted it on a website?

16       A.   Yes.

17       Q.   Okay.  Do you know anything more than that about

18  the use by the defendant in that case?

19       A.   Again, it's been some time, and I don't recall.

20       Q.   Paragraph 17 of the Complaint says, "Plaintiff is

21  informed and believes that the foregoing act of infringement

22  was willful and intentional, in disregard of and with

23  indifference to the rights of plaintiff."  Do you see that?

24       A.   Yes.

25       Q.   What facts do you have to support such a

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  contention?  What facts did you have to support such a

2  contention at the time?

3      A.   Again, I can only say that this is written by the

4  attorney.  He probably had knowledge of that.  What that is

5  at this point, I -- I can't tell you.

6      Q.   Okay.  I'm going to show you a document marked as

7  Exhibit 28.  In deference to you and Mr. DeSouza, I note

8  this is a Confidential Settlement Agreement and Release in

9  that case, Blaine Harrington v. Atlantis CDS.  It contains a

10 confidentiality provision.

11          MR. SQUIRES:  Do you wish to have this

12 submitted -- treated as confidential, under seal.  Do you?

13          MR. DeSOUZA:  I would say treat it as

14 confidential -- designate it as "Confidential."  But beyond

15 that, Jeff, do -- do you not have any concern that your

16 client is violating a confidentiality clause by sharing that

17 in this deposition with -- I mean, I don't know what the

18 confidentiality clause is.  I don't have the agreement.  I

19 can't see it.  It doesn't matter to me, but are -- are you

20 running afoul of some confidentiality obligation by using

21 this as an exhibit here?

22          MR. SQUIRES:  That's why I'm asking you if you

23 want to have it treated as confidential and marked so under

24 seal, in connection with --

25          MR. DeSOUZA:  Stop a second.  If --

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1          MR. SQUIRES:  -- in connection with --

2          MR. DeSOUZA:  If it's not a confiden- --

3          MR. SQUIRES:  -- in connection with the

4  confidentiality order -- agreement and order in place in

5  this case.  I have no such concerns.

6          MR. DeSOUZA:  So my answer is yes, certainly;

7  however, I do not believe that simply calling it

8  "Confidential" under our protective order -- somehow avoid

9  the confidentiality clause, a contractual nature of such,

10 but that's not my concern.  You know, that's between you and

11 your former client, not for me to worry about.  So for

12 purposes of today, I will designate it as "Confidential"

13 under our protective order.

14         MR. SQUIRES:  Okay.

15         Please have it so marked, as --

16         (Court reporter clarification requested.)

17         MR. SQUIRES:  "Confidential" and "Sealed," under

18 the protective order, to assure that Mr. DeSouza's concerns

19 are respected.

20         (Exhibit 28 marked.)

21    Q.   (BY MR. SQUIRES)  Mr. Harrington, you agreed to a

22 settlement of this case for the payment of $2,000.

23    A.   Okay.

24    Q.   Why?

25    A.   Why?  I don't know.  Again, I think that --

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1  through a lot of things, as I've already expressed, that

2  Mr. Deal did, that, in hindsight -- or after a period of

3  time, I don't really approve of.

4       Q.   Okay.  Fair enough.  Turn to page 6 of this

5  agreement.  Is that your signature?

6       A.   Electronic signature, yes.

7       Q.   Placed on this document under your authority?

8       A.   Yes.

9       Q.   I'm going to show you a document to be marked as

10  Exhibit Next.  I'd ask you to turn to page 4 of this

11  document.

12            (Exhibit 29 marked.)

13            MR. DeSOUZA:  Can you tell me what this is, Jeff?

14            MR. SQUIRES:  I'm sorry.  It is the Complaint for

15  Copyright Infringement in the case of Blaine Harrington v.

16  Monica Boehmer, DDS.

17            MR. DeSOUZA:  How do I spell that?  B-O-M-E-R?

18            MR. SQUIRES:  B-O-each (phonetic) -- excuse me,

19  B-O-E-H-M-E-R.

20            MR. DeSOUZA:  Thank you.

21       Q.   (BY MR. SQUIRES)  Are you familiar with this

22  matter, Mr. Harrington?

23       A.   Again, in the past.  I -- I -- I'm aware of the

24  name.  I'm aware of the case, but beyond that, it's a long

25  time ago.

1      Q.    Do you remember any of the details of the case?

2      A.    Not really.

3      Q.    Do you remember what photograph was the subject of

4  the case?

5      A.    One of the hot air balloon ones, I believe; yeah.

6      Q.    I --

7      A.    Yeah.

8      Q.    -- note that it is -- a copy is attached as

9  Exhibit 2 and shown in Exhibit 3.

10     A.    Yes.

11     Q.    Have you ever alleged that anyone infringed a

12 copyright in that image before?

13     A.    I can't say for certain, but I wouldn't -- I

14 wouldn't doubt it.  This is a very popular photo.

15     Q.    This is also taken at the same period of time --

16     A.    Yes.

17     Q.    -- in 2012, that you've been testifying about,

18 before?

19     A.    Or was it 2013?

20     Q.    Well, you said --

21     A.    Wait a minute.  I think -- let's see if it shows

22 my -- no.  I don't know.  It is what it is.

23     Q.    Well, let me --

24     A.    Let's --

25     Q.    -- refer you to paragraph 8 of the Complaint.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1     A.   Okay.  2012.

2     Q.   So would it -- this have been taken at the same

3 time that you have testified you took the other photographs

4 that have been the subject of the claims you've alleged in

5 our present case?

6     A.   Yes.

7     Q.   Now, you've been asked, in discovery, as to

8 whether or not there had been previous instances of you

9 having licensed photographs.  At the time, in the Boehmer

10 case --

11     A.   Uh-huh.

12     Q.   -- did you do a search to determine whether or not

13 you'd ever licensed that photograph?

14     A.   I would assume that I did.

15     Q.   But you don't specifically recollect?

16     A.   Correct.

17     Q.   Okay.  And in the Complaint in the Boehmer case,

18 on paragraph 20, you alleged that you were informed and

19 believe that the foregoing act of infringement was willful

20 and intentional.  Who informed you of that?

21     A.   Again, this is written by my attorney.

22     Q.   Okay.  So there was no basis for that --

23     A.   I don't know.

24     Q.   -- contention?

25     A.   I mean --

ADLER MEDICAL, LLC vs. HARRINGTON                      Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1      Q.   You don't know of any basis for that contention?

2      A.   No.

3      Q.   Did the -- your attorney not -- you've testified,

4  earlier, that you reviewed Complaints before they were

5  filed.

6      A.   Yes.

7      Q.   Did you not review this Complaint before it was

8  filed?

9      A.   Again, I mean, this is an older Complaint, and my

10  memory of it is vague.

11     Q.   Okay.  Paragraph 22 says, "Plaintiff is informed

12  and believes that defendant, without the permission or

13  consent of plaintiff, knowingly and with the intent to

14  conceal infringement, intentionally removed the copyright

15  management information from the copyrighted photograph."  Is

16  it not so that you have no knowledge of facts to support

17  that contention?

18     A.   I can't remember.

19     Q.   So you do not know, as we sit here today, of any

20  facts that you had --

21     A.   I -- I don't -- I don't remember what the --

22  what -- what the knowledge between -- either my attorney or

23  I had at that point.

24     Q.   Okay.  Do you -- do you understand that when you

25  file Complaints -- filed and probably drafted by your

 1  attorneys -- that you are responsible for the assertions

 2  contained in the Complaints?

 3       A.   Yes.  But as I said, it -- I'm not the one who

 4  wrote it, the legalese.  I'm not an attorney, and sometimes

 5  the -- you know, I mean, he -- he is writing it.  I'm -- I'm

 6  perhaps reviewing it, and said -- and saying, "Yeah.  It

 7  looks okay to me."  Right?  I'm not an attorney.

 8       Q.   Okay.  I'm going to show you a document -- it's

 9  called a "Verified Answer and Counterclaims" -- in the case

10  of Blaine Harrington v. Monica Boehmer, and I'd ask that it

11  be marked as Exhibit -- Mr. Deal was your lawyer at the

12  time, correct?

13            (Exhibit 30 marked.)

14       A.   Yes.

15       Q.   Did he advise you that a counterclaim had been

16  filed?

17       A.   I don't recall.

18       Q.   Have you ever seen that document before?

19       A.   I believe so.

20       Q.   Did you discuss the fact that a counterclaim had

21  been filed against you with your counsel at the time?

22       A.   I don't recall.

23       Q.   I'm going to show you a document marked as Exhibit

24  Next.  It is an Offer of Judgment in the Monica Boehmer

25  case, and the court reporter will mark it as Exhibit No.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1    Next.  Have you seen that before?

2            (Exhibit 31 marked.)

3        A.   I believe so, yes.

4        Q.   Okay.  And you -- you know that -- by that

5    document, you agreed to awarding judgment to the person you

6    had sued, Monica Boehmer, DDS, in that matter that would

7    terminate that matter with a judgment in her favor?

8        A.   Again, I don't recall the specifics.

9        Q.   Did you discuss this with your attorney at the

10   time?

11       A.   I'm not sure.

12       Q.   When --

13       A.   Several of your dealings with Mr. Deal, as I said,

14   I was really not privy to, and had I been better informed,

15   I -- I might have reacted differently.  I was -- he -- he

16   really did not inform me a lot of many of the things that

17   transpired between you and him.

18       Q.   Well, it's not between me and him.  It's

19   between --

20       A.   You representing --

21       Q.   -- the clients.

22       A.   Well, you representing your client.

23       Q.   And you are aware, I believe, that on behalf of

24   Monica Boehmer I accepted the offer of judgment; is that

25   correct?

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1    A.    I believe so, yeah.

2    Q.    Do you know what an offer of judgment is?

3    A.    To settle a case --

4    Q.    Fair enough.

5    A.    -- more or less.

6    Q.    Okay.  On the terms set forth in the offer?

7    A.    Right.

8    Q.    Okay.  I'm going to show you a document marked No.

9  Next.

10         (Exhibit 32 marked.)

11   A.    Uh-huh.

12   Q.    This is a judgment in a civil action, correct?  Is

13  that what I gave you?

14   A.    Yes.

15   Q.    Okay.  Are you aware the judgment was entered in

16  accordance with -- as -- as reflected in that document?

17   A.    Again, looking at this, I see it.  Do I recall it?

18  No.

19   Q.    Are you saying you don't know whether you knew it

20  at the time?

21   A.    I -- I can't say.

22   Q.    Do you pay attention to the cases that are filed

23  on your behalf?

24   A.    Yes, I do.  But as I said, you're -- you're

25  bringing up cases that are years ago.  My wife has been very

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1   busy in the last three or four years.  I travel extensively.

2   I work on my business.  This is primarily what I'm thinking

3   about.  I only have so much brain matter.

4        Q.   Look at the date on the top line of that document.

5   What's the date?

6        A.   The date it was filed?

7        Q.   Yeah.

8        A.   7-21.

9        Q.   What year?

10       A.   No.  It says, "Filed 7 of '21."

11       Q.   Oh, '21.  So a little over a year ago -- just a

12   couple months over a year ago; is that right?

13       A.   As I said, at that time, I basically had no

14   contact with Mr. Deal.  I can't tell you what was going on.

15       Q.   Well, you talked about how you're traveling,

16   right?

17       A.   True.

18       Q.   But you weren't traveling then, were you?

19       A.   Last summer?  No.  So I'm not -- I'm not using

20   that as an excuse.  I'm just saying in my day-to-day life,

21   you know, I have a lot of other things on my mind, but

22   again, to point that for three-quarters of that year, he

23   basically wasn't working for me, although he was still,

24   quote/unquote, "My attorney."  So I -- things that may --

25   I -- I don't know.  He -- he would say, "Oh, yeah, by the

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1   way, here's this," or something, you know.

2        Q.    Did you have any communications with him about

3   your displeasure with the fact that he wasn't working for

4   you?

5        A.    Yes.

6        Q.    Were any of those communications written?

7        A.    I imagine they were in emails.

8        Q.    Okay.  I'd like to request that you produce all

9   correspondence between you and David Deal concerning your

10  displeasure with his -- or your concern about his neglect of

11  his obligations to you during the time period beginning

12  January 1st, 20- --

13       A.    '21?

14       Q.    '21.

15       A.    Well, I'll -- I'll -- I'll discuss that with my

16  attorney.

17       Q.    Okay.  And that would include any expression of

18  concern or displeasure as a result of judgment having been

19  entered in this case.  And let's go back just a short period

20  of time before January 1st, 2021, to any displeasure over

21  the terms of the conclusion of the Mountain States Agency

22  case.

23       A.    Well -- and -- and then a -- a certain amount of

24  it was -- was by phone, and not -- and not written.

25       Q.    I understand; I understand.

ADLER MEDICAL, LLC vs. HARRINGTON        Blaine Harrington, III
1-22-cv-00072-KG-LF                            September 28, 2022

1     A.   So --

2     Q.   I don't expect you to produce voice recordings.

3     A.   No, but -- so I'm saying some of these

4 conversations are -- are verbal, and I wouldn't have a

5 record of them.

6     Q.   And I don't think that I could expect to get

7 verbal.

8     A.   Right.  I'm just -- I'm just saying.

9     Q.   Sure.  Okay.  I'm going to show you a document to

10 be marked as Exhibit Next.  Complaint for Copyright

11 Infringement, Blaine Harrington v. Elevation Counseling,

12 LLC.

13     (Exhibit 33 marked.)

14     A.   You know, I would add too, in terms of this pile

15 of paper, for example, that -- I don't deny reading many of

16 these things.  My memory of them is not always good, and the

17 other factor is I'm not an attorney, so I don't read them

18 word-for-word.  I'm like -- because it's -- a lot of it is

19 legalese.  I mean, it's up to me --

20     Q.   How old -- excuse me.  I'm sorry I interrupted.

21     A.   No.  I'm -- I'm just saying that, you know, I --

22 I'm in the middle of working in my workday.  I'm working on

23 projects; I'll stop; I'll -- I will -- I will read this

24 thing.  Do I read it word-for-word?  I don't; I admit it.

25     Q.   How old are you?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                 September 28, 2022

1    A.    Huh?

2    Q.    How old are you?

3    A.    Sixty-seven.

4    Q.    Okay.  And over what period of time have you been

5  asserting claims for copyright infringement in your

6  photographs, and if necessary, filing lawsuits?

7    A.    Probably, as I said, within the last five years or

8  so.

9    Q.    Okay.  And you've become familiar with the legal

10  process, have you not?

11    A.    More or less, yes.

12    Q.    So in this Complaint for Copyright Infringement,

13  page 4, at the bottom of the page, the same statement,

14  "Plaintiff is informed and believes that defendant violated

15  plaintiff's exclusive rights.  Action constitutes

16  infringement" -- strike that.

17          I meant to refer to paragraph 19.  "Plaintiff is

18  informed and believes that the foregoing act of infringement

19  was willful and intentional" -- again, consistent with your

20  previous responses, is it true that you had no factual

21  information to support that contention at the time?

22    A.    The fact is that I did not write it, and it was

23  done so in my name.  My attorney must have had information

24  that led him to that conclusion, but I -- I can't recall any

25  discussions, and so on, as to what -- what led to that, but

1    it was -- it -- it was written in my name, but I didn't

2    write it and it's not my words.

3         Q.   Who discovered the fact of the use of the alleged

4    infringing photograph without consent?

5         A.   In this case?

6         Q.   Yes.

7         A.   Well, as in -- as in almost all cases, I assume I

8    was.

9         Q.   Okay.  Was your attorney tasked, as part of his

10   responsibility, to go out and discover instances of

11   infringement of your photographs?

12        A.   I don't know if "tasked" is the right word, but

13   it -- I -- I do believe that it -- it happened that some

14   other infringements were found in searching for -- for

15   example, one infringement, other infringements of the -- of

16   the same photograph may come to light, and that's, again,

17   speaking hypothetically.

18        Q.   Because you don't know that?

19        A.   Well, I mean, I -- I -- you know, I believe that

20   happened, but in terms of specifics, I can't give you

21   specifics.

22        Q.   Okay.

23             MR. DeSOUZA:  And -- and Jeff -- and, Jeff, just

24   to -- excuse me -- just to clarify.  You keep saying "this"

25   and "that."  I assume we're still talking about this

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1   Elevation Complaint and not -- to whatever attorney he had

2   at that time.  That's what you're talking about now, right?

3           MR. SQUIRES:  Yes.

4           MR. DeSOUZA:  Okay.

5       Q.   (BY MR. SQUIRES)  And did Mr. Deal, who was your

6   attorney at the time, tell you that he had factual

7   information to support that contention, about the

8   infringement being willful?

9           MR. DeSOUZA:  I'm going to object.

10          Hold -- hold on, Blaine.

11          THE WITNESS:  Uh-huh.

12          MR. DeSOUZA:  I'm going to object on the basis of

13  attorney-client privilege.  I don't think --

14          And -- and again, Mr. Harrington, I can't really

15  advise you as to that former attorney, but to the extent

16  that your answer would reveal attorney-client

17  communications -- you have the option to waive that

18  privilege, but I do believe it to be privileged.

19          MR. SQUIRES:  The -- the -- the witness has

20  already testified that it could have been his attorney who

21  advised him of facts that --

22          THE WITNESS:  Well, perhaps --

23          MR. SQUIRES:  -- supported that --

24          THE WITNESS:  -- I shouldn't have said that.

25  Maybe that's not information that's germane.  Is that

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

1  correct?

2      Q.   (BY MR. SQUIRES)  Well, then let me ask the same

3  question I've asked before again to put a cap on this.  Are

4  you aware, as we speak today, of any factual information

5  that existed at the time this Complaint was filed to support

6  the contention that that defendant's actions were willful?

7      A.   I don't remember.

8      Q.   I'm asking you if you know today.  I'm not asking

9  you if you remember.  I'm asking you if you know --

10     A.   Well, if I don't remember, then the answer is no,

11  because --

12     Q.   Good; good.  Okay.  As long as we're clear.  I'm

13  going to show you a document marked as Exhibit No. Next.  It

14  is a Confidential Settlement Agreement and Release dated

15  April 24th, 2018, between Blaine Harrington and Elevation

16  Counseling, LLC.  I -- I would propose and suggest that the

17  same treatment be shown this settlement agreement and the

18  settlement agreement that we previously discussed, I believe

19  in the Atlantis CDS case, and therefore that this exhibit be

20  marked as "Confidential," under seal.

21         MR. DeSOUZA:  I -- as -- as -- sorry.  Jeez.  As

22  with before, I agree to treat this as confidential and still

23  express my belief that doing so is not -- is not in line

24  with what the confidentiality clause in this agreement

25  likely requires, but again, that's -- that's for a different

1   day.

2              (Exhibit 34 marked.)

3       Q.   (BY MR. SQUIRES)  Have you seen this before,

4   Mr. Harrington?

5       A.   This?

6       Q.   The Confidential Settlement Agreement.

7       A.   Yes.  I believe so.

8       Q.   And is that your signature --

9       A.   Yes, it is.

10      Q.   -- on this document?

11      A.   Yes.

12      Q.   And did you discuss this with Mr. Deal before you

13  executed it?

14      A.   I believe so.

15      Q.   Do you know who drafted the initial draft of this

16  agreement?

17      A.   On our part?

18      Q.   Yes.

19      A.   I believe David Deal.

20      Q.   Yes.  And did he draft confidential settlement

21  agreements in a significant number of cases that he settled

22  on your behalf?

23      A.   I don't know.  I mean, I can't recall exactly.

24      Q.   He did represent you in a significant number of

25  cases that were settled, right?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1          A.    Yes.

2          Q.    Okay.  And in each case, was there a settlement

3    agreement entered by the parties?

4          A.    I'm not a hundred percent sure.  There should have

5    been, but I -- I'm not -- I'm not sure I recall seeing

6    documents on every single case that I was paid for.

7          Q.    Did you see documents in, would it be safe to say,

8    the large majority of cases in which --

9          A.    Yeah.  I think so.

10          Q.    Okay.  And were they all essentially of the same

11    form as this one when -- when Deal was representing you?

12          A.    As best I can tell.  I mean, you know, most people

13    use boilerplate, so I -- I imagine -- I imagine it doesn't

14    change that much from one to the next.

15          Q.    Right.  And in this case, Elevation Counseling,

16    there were two photographs involved.  Do you recall that?

17          A.    I don't recall, but -- I mean, I see that from the

18    screenshots of my website and they -- their use by them.

19          Q.    And you see here, in paragraph 5(a), that a total

20    of $3,000 was paid --

21          A.    Yes.

22          Q.    -- as consideration?  Did you discuss that amount

23    with Mr. Deal?

24          A.    Probably not.  He had -- he had the authority, as

25    other attorneys of mine have, to use their best judgment,

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1   and so -- so I -- I can't say that in every case where

2   there's a settlement am I informed, before it settled, of

3   the amount.

4       Q.   So your attorneys have the authority to use their

5   best judgment in determining how much to accept in

6   settlement of cases?

7       A.   Yes.  I mean, that's -- as copyright attorneys,

8   that's more their expertise than mine, or it ought to be.

9       Q.   Okay.  Were you aware -- were you aware that

10  Elevation Counseling was a not-for-profit organization?

11      A.   No.

12      Q.   Okay.  I'm going to show you a document -- a

13  Complaint for Copyright Infringement in the case of

14  Blaine Harrington v. Industrial Commercial Coatings, and I'm

15  going to ask that this be marked as Exhibit Next.  Do you

16  recognize this?

17          (Exhibit 35 marked.)

18      A.   Do I recognize what?

19      Q.   The Complaint.

20      A.   Oh, okay.  Yes.

21      Q.   Okay.  This was filed on your behalf by Mr. Deal,

22  I think.

23      A.   Yes.

24      Q.   Did you review this Complaint before it was filed?

25      A.   I believe so.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                      September 28, 2022

1    Q.   At paragraph 15 on page 4, it says that you were

2    informed and believe that the foregoing act of infringement

3    was willful and intentional, in disregard of and with

4    indifference to the rights of plaintiff.  At the time, did

5    you have any factual information on the basis of which that

6    statement was made?

7    A.   Again, that would be the determination of my

8    attorney.  I do notice here, though, that No. 9 shows how

9    extensively they made use of the photo -- Facebook,

10   YouTube --

11   Q.   Could I ask --

12   A.   -- Twitter.

13   Q.   Could I ask you, Mr. Harrington, to try to adhere

14   to answering my questions.

15   A.   Well, it seems pretty egregious to me.  That's

16   what I'm saying.

17   Q.   I'd ask -- I'd ask you to adhere to answering my

18   questions.

19   A.   Okay.

20   Q.   So is it true that you had no factual basis for

21   that statement?

22   A.   Me, personally?  No.

23        MR. DeSOUZA:  Object to form.  It's all right.  I

24   just want to object to form.

25   Q.   (BY MR. SQUIRES)  The answer is no; is that

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

1    correct?

2         A.    Correct.

3         Q.    Do you know how this case was resolved?

4         A.    I don't recall.  I believe it was.  No?

5         Q.    Excuse me?

6         A.    I said, "I believe it was resolved."

7         Q.    Okay.  Settled?

8         A.    Settled.

9         Q.    Do you remember how much was paid?

10        A.    No, I do not.

11        Q.    Do you remember that something was paid?

12        A.    I believe so.

13        Q.    Okay.  I'm going to show you a document that's

14   marked as Exhibit No. 36.

15              (Exhibit 36 marked.)

16        A.    This case was not yours, correct?

17        Q.    Do you recall this case?

18        A.    I --

19              MR. DeSOUZA:  Jeff, can you tell me what it is?

20              MR. SQUIRES:  This is Blaine Harrington v. Cool

21   Destinations.

22        A.    Yes.

23              MR. DeSOUZA:  Is it a Complaint?

24              MR. SQUIRES:  It is a Complaint.

25              MR. DeSOUZA:  Thank you.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1          MR. SQUIRES:  It is in the Western District of

2  Virginia from -- filed in 2017.

3          Q.    (BY MR. SQUIRES)  Are you familiar with this case?

4          A.    I recall the name of the company.

5          Q.    Paragraph 17 of the Complaint states similarly to

6  others.  I -- I know these are the same questions, and I

7  just want to get it on record that plaintiff is informed and

8  believes that the foregoing act of infringement was willful

9  and intentional.  You have no factual basis for having said

10 that; is that correct?

11         A.    Again, this was --

12         MR. DeSOUZA:  Object to form.

13         A.    This was said on my behalf.  Do I -- do I have

14 knowledge of it?  No.

15         Q.    (BY MR. SQUIRES)  Okay.

16         A.    That doesn't mean -- that doesn't mean it's not

17 true, but it -- it means that, right now, I can't tell you

18 what exactly transpired.

19         Q.    Did you discuss -- Mr. Deal was your lawyer in

20 this case, was he?

21         A.    Yes.

22         Q.    Did you discuss this with him at the time?

23         A.    Well, I imagine I was shown it to review it.

24 Beyond that, probably not.  Again, I'm not an attorney.  I

25 leave legal matters to my attorneys.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                      September 28, 2022

1      Q.   You see the photograph that is attached to this --

2      A.   Yes.

3      Q.   -- Complaint?  What is that a photograph of?

4      A.   It's a sailing ship called the "Western Union"

5   that is based in Key West, Florida.

6      Q.   And do you know when you took it?

7      A.   Well, according to my file number that is there,

8   2011.

9      Q.   Okay.  Have you ever licensed the use of that

10  photograph?

11     A.   That particular photograph, I cannot tell you.  I

12  know that the series of photographs have -- from the overall

13  series of photographs, certainly some have been licensed,

14  but in terms of that particular image, I don't know.

15     Q.   I'm going to show you a Complaint in the case of

16  Blaine Harrington v. Perikin Enterprises and ask that it be

17  marked as Exhibit 37.

18          (Exhibit 37 marked.)

19          MR. DeSOUZA:  Can you spell that for me, Jeff?

20          MR. SQUIRES:  P-E-R-I-K-I-N, in the District of

21  New Mexico.

22          MR. DeSOUZA:  Thank you.

23     Q.   (BY MR. SQUIRES)  Do you recall this case,

24  Mr. Harrington?

25     A.   Yes, I do.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1        Q.   Do -- if you look at the -- the photograph on

2   page 7 and on the last page as well -- oh, I've got the

3   wrong -- oh, I'm sorry.  I've got the wrong -- the

4   photograph is on page 8.

5        A.   Oh, yes.

6        Q.   And on the last page, there's an image of it.

7        A.   Yes.

8        Q.   Was this photograph taken on the same occasion,

9   on -- in 2012, that --

10       A.   Yes.

11       Q.   -- you testified to previously?  Is this

12  photograph a photograph that is also the subject of one of

13  your claims in the present case?

14       A.   I'm not sure.  It could be.  I mean, I've had -- I

15  had multiple panoramics.

16       Q.   Okay.

17       A.   But, you know, certainly, if we put one next to

18  the other, I could tell you if they're the same, or the file

19  number.

20       Q.   And in paragraph 17, same -- same statement,

21  you're informed and believe the foregoing act of

22  infringement was willful and intentional, in disregard of

23  and with indifference to the rights of plaintiff.  And as we

24  sit here today, you know of no factual basis for that

25  statement; is that correct?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1        A.    Yeah.   It's the -- it's the same -- it's the same

2   statement, and --

3        Q.    Right.

4        A.    -- as -- as made in the other filings, so -- yeah.

5   The answer is no, I -- I believe.

6        Q.    The same statement is repeated in paragraph 23, is

7   it not, for -- for -- for emphasis?

8        A.    Yes.

9        Q.    Okay.   I'm going to show you a document.   It's

10  going to be marked as Exhibit 38.   I ask you if you recall

11  this case.

12            (Exhibit 38 marked.)

13       A.    Yes.

14       Q.    It's Blaine Harrington v. Sandia Insurance Group,

15  LLC, in the United States District Court for New Mexico --

16       A.    Yes.

17       Q.    -- filed in 2018.   And Mr. Deal was your lawyer.

18  The image is Exhibit I -- 1 -- I guess 1, and repeated on

19  Exhibit 2.   Is that photograph a photograph that you have

20  licensed?

21       A.    I don't know.

22       Q.    Might you have?

23       A.    I might have.

24       Q.    I'd like to make a request that you search -- I've

25  asked for this before.   I haven't received anything, I don't

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                              September 28, 2022

```
 1  believe, but I could be in error here -- for any licenses

 2  you have entered for any of the four photographs that are at

 3  issue in the present proceeding.

 4       A.   Uh-huh.

 5       Q.   Paragraph 17 of the Sandia Insurance Group

 6  Complaint -- identical to those I've been reviewing

 7  previously -- says that plaintiff is informed and believes

 8  that the foregoing act of infringement was willful and

 9  intentional, in disregard of and with indifference to the

10  rights of the plaintiff.  I -- is it true that you know of

11  no facts that support that allegation?

12       A.   Yes.

13       Q.   Next, I'm going to show you a document that will

14  be marked as Exhibit 39.  It's a Complaint for Copyright

15  Infringement in the case of Blaine Harrington v. The

16  International Spy Museum.  I'd like to particularly bring

17  this case to light because I've been to The International

18  Spy Museum, and it's pretty boring.  And I wouldn't

19  encourage anybody to go there, but --

20            (Exhibit 39 marked.)

21            MR. DeSOUZA:  Talking about the one in D.C.?

22            MR. SQUIRES:  Yes.

23       Q.   (BY MR. SQUIRES)  And this --

24            MR. DeSOUZA:  I've been there as well.

25       Q.   (BY MR. SQUIRES)  This case is in the District of
```

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1 Columbia, District Court.  Now, I've packaged together in

2 this exhibit the Complaint and a demand letter dated

3 February 15th, 2017, from the law firm Schneider Rothman in

4 Boca Raton, Florida, a Mr. Joel Rothman.  I take it that

5 this law firm represented you at one time?

6        A.    Through Pixie.

7        Q.    When you say "through Pixie," what does that mean?

8        A.    It means that Pixie retained -- or had

9 relationships with a number of different attorneys, both in

10 the U.S. and other countries, and if I deemed it -- deemed

11 it fit, I would allow them to turn it over to one of their

12 attorneys, and then -- and then as part of that, Pixie takes

13 a percentage of the -- of the reward, or the settlement.

14        Q.    And the law firm takes a percentage of the

15 reward --

16        A.    Of course.

17        Q.    -- as well?

18        A.    Yes.

19        Q.    And you take the balance?

20        A.    Or -- yeah, however it works.

21        Q.    Okay.  Did the law firm represent Pixie or did it

22 represent you?  Do you know?

23        A.    No, I don't know.  I mean, I assume they're -- I

24 don't know.  In terms of exactly -- I mean, I assume they're

25 representing both of us.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON          Blaine Harrington, III
1-22-cv-00072-KG-LF                                 September 28, 2022

1      Q.    Did anybody ever explain to you what it meant for

2   Pixie to be involved in that sort of --

3      A.    Arrangement?

4      Q.    -- in-between -- go-between --

5      A.    Well, no.

6      Q.    -- situation?

7      A.    I mean, I under- -- I understood what was going

8   on.

9      Q.    Right.

10     A.    Sure.

11     Q.    But you don't know whether the law firm was

12  representing you?

13     A.    Well, I assume -- I -- my assumption -- again,

14  it's an assumption -- it's me, because I'm the one whose

15  name is on it.  Pixie's name is not on it --

16     Q.    Okay.

17     A.    -- so --

18     Q.    In this letter that's part of Exhibit 39, the law

19  firm makes a settlement demand -- it's on page 5 -- 4 --

20  page 4 of the letter -- sorry -- page 4 of the letter -- of

21  $4,200.  Did you authorize them to do so?

22     A.    I'm sorry.  Where is it?

23     Q.    On page -- it says, "page 4 of the letter."

24     A.    And it's under what number?  Or -- oh, the letter,

25  page 4 of the letter.  Okay.  Is that further back?

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

```
 1        Q.   Further back.

 2        A.   Okay.  This is a -- a letter written to this

 3   Mr. Maltz?  Is that what you're talking about, or something

 4   else?

 5        Q.   Yes, page 4 of the letter.

 6        A.   I don't see where it is on page 4.

 7        Q.   Do you see where the letters are numbered -- where

 8   the pages of the letter are numbered?

 9        A.   Well, I see, at the top, where it says, "Case,"

10   "Filed" --

11        Q.   No, no, no.  Look at the left side.

12        A.   Oh, all right.  This says, "page 5."  Oh, and it

13   says, "page 4."  Yeah.  Okay.

14        Q.   You see where they demanded $4,200?

15        A.   Yes.

16        Q.   Did they do that with your authority?

17        A.   I believe so.

18        Q.   Okay.  Do you recall --

19        A.   No, I don't recall.

20        Q.   -- discussing this with them?  Now, the -- the

21   photograph at issue, as described in the Complaint, is a

22   photograph of one of the most well-known and one of the most

23   often photographed sites in Washington, D.C., correct?

24        A.   Yes.

25        Q.   I take no credit away from you -- it's a nice
```

1  picture; it's interesting -- but the memorial at Iwo Jima,

2  everybody and their brother goes there and everybody and

3  their brother takes pictures there, right?

4      A.   Sure; yes.

5      Q.   Okay.

6      A.   Is there a point to that?

7      Q.   Well --

8      A.   The -- the amount that something is photographed

9  doesn't have anything to do with the value.  I mean, I'll

10  give you examples of where pictures of mine of things that

11  are photographed day in and day out around the world -- like

12  the Taj Mahal of mine, in -- in -- in search results on

13  Getty, and so on, that they use algorithms, rank much

14  higher.  The same can be said of hot air balloons in -- in

15  Albuquerque, and you could say, "Oh, well, that's something

16  that people photograph every day."  That has nothing to do

17  with the merits of a -- pardon me -- of a professional

18  photo.

19      Q.   Does it have nothing to do with the value of a

20  professional photo?

21      A.   Does it have to -- no, not really.  Does it --

22  how -- how common something is?  I -- it -- I really don't

23  believe so.  There are things that I photograph that are

24  uncommon, that people don't have.  It -- the value of -- you

25  know, values are all over the place.  But the fact that it's

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1   something that people have seen over and over again --

2   the -- the -- Machu Picchu in Peru, or something like

3   that -- does that -- does that hinder money I've made in the

4   past, on those kind of really well-known -- what you would

5   say are common things?  No, not at all.  That's where a

6   professional photo is important and that's where there are

7   intrinsic values that only professionals could understand

8   that would make my picture more valuable than Joe Blow with

9   his phone.

10      Q.   So the -- the rarity of photographic images of a

11   particular subject have nothing to do with the value of the

12   photograph?

13      A.   I won't say -- I won't say -- I'm sorry for

14   interrupting -- I won't say that it has nothing to do with

15   it.  I mean, you know, if I saw, you know, the Abominable

16   Snowman, and no one else had taken a picture of it, well,

17   that's going to make that very valuable, but it -- it --

18   it -- it -- it depends more on supply and demand -- well, I

19   won't say "supply and demand."  That is not exactly the

20   right words, but -- you know, I could have a really unusual

21   picture taken in some African country that nobody goes to,

22   and then I could have a picture taken in Morocco, where many

23   people go to.

24           So, you know, there's a lot of factors that go

25   into it, but I -- I'm just saying that -- you know, just

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  because a lot of people have taken a picture of something,

2  especially untrained people -- but even lesser

3  professionals -- I mean, I've -- I -- this is how I win

4  awards on a regular basis, versus -- sometimes up against

5  10- or 20,000 other photographers, with one image that I've

6  won.  And this is how my pictures have gotten on Bing, where

7  they have access to hundreds of millions of pictures, you

8  know.  I mean, there -- there are people who make these

9  decisions, who understand better than -- than -- than most

10  people, and that's what I base my career on.

11      Q.   Did you win any awards for this picture -- this

12  picture at Iwo Jima?

13      A.   No.  No, because I haven't ever entered it into

14  an -- for an award.

15      Q.   Did you ultimately settle this case?

16      A.   Yes.

17      Q.   Do you remember what the terms of the settlement

18  were, in terms of monetary consideration paid?

19      A.   Well, I assume it's the amount that was given, the

20  4,200, or whatever you said.

21      Q.   You assume it was the amount that was demanded?

22      A.   Yes.

23      Q.   Is that usually the way it works, in your

24  experience?

25      A.   Well, I -- I doubt that that -- I doubt that that

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  was their first offer.

2      Q.   Why do you doubt it?  It wasn't their offer.  It

3  was your demand.

4      A.   Well, I can't tell you for certain, but I do

5  believe it settled for that amount.

6      Q.   Okay.  I'd like to see a copy of the settlement

7  agreement, please.  Of course, I'd like to see a copy of the

8  settlement agreements --

9      A.   Yes.  I understood.

10      Q.   -- in all the cases I've asked for.

11      A.   Uh-huh.

12          MR. DeSOUZA:  We're going to objection [sic] to

13  that, Jeff.  You know that.

14          MR. SQUIRES:  I know.

15      Q.   (BY MR. SQUIRES)  Okay.

16          MR. DeSOUZA:  Jeff, can we take a couple minutes

17  just for a quick bathroom break?

18          MR. SQUIRES:  Of course.  It's -- listen, it's 20

19  of 5:00.  The court reporter would like to get out of here

20  at some kind of reasonable hour.  She would like to be able

21  to leave by --

22          (Court reporter response.)

23          MR. SQUIRES:  I think we will not have to go all

24  day tomorrow, but we will have to go tomorrow.  And so if

25  the court reporter would like to leave by 5:30 -- if she'd

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1    like to leave by 5:15, it's okay with me.

2           If you're -- your comfort level is what matters

3    here, because I will be able to finish tomorrow.

4           Is that okay with you, Dan and Mr. Harrington and

5    Mr. Best and --

6           THE VIDEOGRAPHER:  No.

7           MR. DeSOUZA:  I mean, at the -- at the -- at -- at

8    the end of the day, you know, Mr. Harrington is here.  He's

9    happy to keep going as long as it takes.  You know,

10   obviously, if this were one party -- one party, I would say,

11   "We've got seven hours on the record.  He's here for the

12   full seven hours.  That's what you get."  I understand your

13   point, that I've got multiple clients on your side and that

14   you're not necessarily limited to the same seven hours,

15   so -- you know, at the end of the day -- if -- if you have

16   to go tomorrow, you have to go tomorrow, but Mr. Harrington

17   will stay tonight, as long as necessary, to wrap up the

18   depo.  But if you -- obviously, if you can't finish tonight,

19   then so be it.

20          MR. SQUIRES:  We should be off the record.

21          THE VIDEOGRAPHER:  We're now going off the record.

22   The time is approximately 4:38 p.m.  Watch your mics.

23          (Brief recess taken.)

24          THE VIDEOGRAPHER:  We're now going back on the

25   record.  The time is approximately 4:47 p.m.

ADLER MEDICAL, LLC vs. HARRINGTON          Blaine Harrington, III
1-22-cv-00072-KG-LF                         September 28, 2022

```
 1        Q.   (BY MR. SQUIRES)  Show you a document that I'm --
 2   well, let me see if -- yeah.  Marked as Exhibit 40, I think.
 3   This is a Complaint in the matter of Blaine Harrington v.
 4   North Bay Bavarian, Inc., in the Northern District of
 5   California.  Mr. Harrington, do you recall this matter?
 6             (Exhibit 40 marked.)
 7        A.   Yes.
 8        Q.   Do you remember what the nature of the
 9   infringement was in this matter?
10        A.   No.
11        Q.   Is it not the fact that in -- do you -- do you
12   recall how the fact of the infringement was discovered --
13   the alleged --
14        A.   I --
15        Q.   -- infringement?
16        A.   I believe I discovered it.
17        Q.   And how did you discover it?
18        A.   By some kind of reverse search, as always.
19        Q.   As always.  Because in all these cases, they all
20   involve people posting your images on their websites or
21   social media, correct?
22        A.   Yes.
23        Q.   Okay.  Attached to and part of this exhibit, at
24   the very end, is a letter from Savur Threadgold --
25   apparently from Beverly Hills, California -- to a Mr. Rick
```

1    Row.  Do you see that?

2        A.   Yes.

3        Q.   Okay.  In that letter, the lawyers assert that

4    the -- and I quote from the second paragraph on the first

5    page of the letter, "This blatant unauthorized use of the

6    infringed work constitutes knowing, willful, and flagrant

7    violations of our client's rights."  Did you talk to the

8    lawyers --

9        A.   I don't recall.

10       Q.   -- at any time?

11       A.   I don't recall.

12       Q.   How did you find these lawyers?

13       A.   They were through Pixie.

14       Q.   Okay.  So might they have filed a Complaint in

15   this case without communicating with you?

16       A.   Possibly.

17       Q.   Did they have the authority to set the price

18   demanded for the payment for the infringement?

19       A.   Yes.

20       Q.   And the terms of their compensation was set by

21   whom?

22       A.   By Pixie.

23       Q.   And do you know how much they demanded?

24       A.   No.  I don't recall.

25       Q.   Okay.  Do you know how much -- was this case

ADLER MEDICAL, LLC vs. HARRINGTON                Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1  settled?

2      A.   I don't recall.

3      Q.   Do you have any cases that were just left open

4  and -- that you filed over the past five years that there

5  was no resolution to?

6      A.   I don't recall.

7      Q.   Okay.  And you don't recall whether there was any

8  settlement agreement entered in this case?

9      A.   That's what I said.

10     Q.   Do you recall this picture, the image, that was

11  the subject of the case that was attached to the letter that

12  we're discussing?

13     A.   Yes.

14     Q.   What is that an image of?

15     A.   It's a coastline of California, Highway 1.

16     Q.   Taken where?

17     A.   Somewhere between Sonoma and Mendocino Counties in

18  Northern California.

19     Q.   Okay.  Have you ever licensed?

20     A.   I don't recall.

21     Q.   If you have, I'd like to see copies of the license

22  for this, and any other photographs that are the subject of

23  any of your infringement suits.  Mr. Harrington, I'm going

24  to give you a copy of a document that's going to be marked

25  as Exhibit 41.  Let's see.  Like some of the others, it's a

ADLER MEDICAL, LLC vs. HARRINGTON                 Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1  Complaint in the matter of Blaine Harrington v. Color

2  Passport, Inc., in the District Court for the Southern

3  District of New York, and part of this document is a letter

4  dated April 10th, 2017th [sic], from the firm of Spector

5  Gadon & Rosen.  This one addressed to Bart Van Tigchelt.  I

6  can't pronounce the name.  Are you familiar with this,

7  Mr. Harrington?

8          (Exhibit 41 marked.)

9      A.   Yes.

10      Q.   Who chose the law firm that represented you in

11  this matter?

12      A.   This also came from Pixie.

13      Q.   Okay.  Did the law firm discuss this matter with

14  you?

15      A.   I don't recall.

16      Q.   Might they have drafted this Complaint without

17  having communicated with you?

18      A.   I don't recall.

19          MR. DeSOUZA:  Object to form.

20      A.   I don't recall.

21      Q.   (BY MR. SQUIRES)  Do you know where they got

22  the -- I'm looking at the information alleged on the second

23  page of the Complaint, under Parties, describing you.  Do

24  you know where they could have gotten that information, if

25  not from you?

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1     A.    From my website.

2     Q.    Who discovered the alleged infringement?

3     A.    I did.

4     Q.    Through the use of Pixie's services?

5     A.    I would -- I -- I -- I think so.

6     Q.    See the image, several copies of which are

7   attached to this -- is this the same image that is the

8   subject of one of your claims in the current lawsuit?

9     A.    Yes.

10    Q.    Have you ever licensed this image?

11    A.    I don't recall.

12    Q.    The letter which is at the very back of this

13  exhibit, dated April 10th, 2017, demands -- or I should

14  say -- it says that, "Mr. Harrington has authorized me to

15  attempt resolution of this matter amicably by issuance of a

16  retroactive license for an unauthorized use consisting of a

17  three-month term for up to half-screen use for promotional

18  purposes on a website with a worldwide market for a fee of

19  $5,000." Is that true? Did you authorize him to attempt to

20  resolve this on those terms?

21    A.    I believe so.

22    Q.    Was this matter ultimately resolved?

23    A.    I don't recall.

24    Q.    And therefore you wouldn't know what, if any,

25  terms were ultimately agreed to to resolve the matter?

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1        A.   Yes.  And I -- I -- I don't remember.

2        Q.   But if it had been resolved and there was a -- an

3   agreement, written, there would be a copy of that agreement

4   in your files, would there not be?

5        A.   Most likely, yes; uh-huh.

6        Q.   Consistent with what I've asked for in other

7   cases, I'd like to see a copy of that agreement.

8        A.   Uh-huh.

9        Q.   I'm looking at the Complaint now.  Paragraph 27,

10  you say that, "Plaintiff alleges, on information and belief,

11  that defendant operates its business by routinely stealing

12  and exploiting photographic images without payment."

13       A.   Uh-huh.

14       Q.   Did -- did you, at the time, have any factual

15  basis for that statement?

16       A.   I believe the --

17            THE WITNESS:  Bless you.

18       A.   I believe the attorney did.

19       Q.   (BY MR. SQUIRES)  I don't --

20       A.   Do you want any -- not --

21       Q.   That's not -- that wasn't my question.  My

22  question was, did you?

23       A.   I don't remember.

24       Q.   So you cannot recall that there was a factual

25  basis for that statement?

1      A.   Correct.

2      Q.   So you do not know if there was a factual basis

3  for that statement?

4      A.   I don't recall.

5      Q.   But you don't know?

6      A.   Well, I don't recall what -- what transpired.

7  Again, these -- these -- you know, without having the

8  paperwork in front of me, I can't give you a -- a definite

9  answer.

10     Q.   You can't tell me whether, today, you know of any

11 facts that would have justified that statement?

12     A.   I don't recall.

13     Q.   Okay.  I'm going to show you a copy of a Complaint

14 in the matter of Blaine Harrington v. Mark Nagler, or

15 Nagler, N-A-G-L-E-R, doing business as Telluride Venture

16 Accelerator, in the District of Colorado, and ask you if you

17 recall having seen that.  Mark this Exhibit 42, I believe.

18          (Exhibit 42 marked.)

19     A.   Yes.

20     Q.   Do you recall what that was about?

21     A.   I believe it was some kind of venture capital

22 company down there -- in Telluride area, in Southern

23 Colorado.

24     Q.   And do you recall what use they made of a

25 photograph that you claim infringed your copyright?

1    A.   Well, it -- it looks like it's on a website or a

2  blog from their -- yeah, from their website.

3    Q.   Okay.  What is the photograph of in -- in question

4  here?

5    A.   It's taken near Telluride in fall, and it's a

6  well-known road through the mountains that is extremely

7  photogenic.

8    Q.   And how did you take this photograph?

9    A.   While driving, and stopped.  I -- I've driven this

10 area of Colorado many times over many years, so it's

11 well-known to me.

12   Q.   Okay.  It's well-known to others as well?

13   A.   Correct.

14   Q.   Similar to allegations in other pleadings we have

15 looked at, paragraph 22 says, "Plaintiff has engaged the

16 undersigned attorneys and has agreed to pay them a

17 reasonable fee."  Just want to make sure I understand.  Do

18 you recall whether you engaged them or Pixie engaged them?

19   A.   Pixie engaged them.

20   Q.   Okay.  Attached to this Complaint, there is a

21 letter dated May 8th, 2016, from David Deal, which he sent

22 to the company that you ultimately sued.  Did you see this

23 letter before it was sent?

24   A.   I don't remember.

25   Q.   It says that -- on page 2, it proposes that the

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1   ultimate defendant pay $4,000 to Mr. Deal's office to

2   compensate for the infringement.  And Mr. Deal, you've

3   testified, had the authority to set that dollar figure,

4   right?

5        A.   Yes.

6        Q.   Okay.  How -- what was the percentage of that

7   dollar figure that Mr. Deal would have been entitled to

8   keep?

9        A.   I do not recall the -- the -- how this case

10  transpired -- I mean, the fact that there was a letter from

11  Schneider Rothman and from Deal.  They would both have been

12  representing Pixie.  Deal worked for Pixie often.

13       Q.   Did you have -- other than in this case, did you

14  have a standing relationship with Mr. Deal in terms that

15  governed his representation?

16       A.   Not in writing.  But again, if this case orig- --

17  originally began from Pixie, that's where it ended.

18       Q.   Well, you had an arrangement with Pixie.  What

19  percentage --

20       A.   I don't --

21       Q.   -- would you --

22       A.   I don't remember.

23       Q.   -- would you keep?

24       A.   I don't remember.

25       Q.   Okay.  You said you had an understanding with

1   Mr. Deal outside of this case, oral, about the terms of his

2   representation; is that right?

3       A.    Basically, yes; uh-huh.

4       Q.    What was the percentage that he was entitled to

5   keep?

6       A.    I believe if no lawsuit was filed, the percentage

7   was 30 percent, and I think -- otherwise, the percentage

8   went to 35 percent.

9       Q.    Okay.  What is the arrangement -- what are the

10  percentages that you have with your present law firm,

11  CopyCat Legal?

12      A.    Is -- is that not privileged?

13      Q.    I don't think so.

14            MR. DeSOUZA:  Jeff, under --

15      Q.    (BY MR. SQUIRES)  You're -- you're claiming

16  damages.

17            MR. DeSOUZA:  I -- I -- Jeff, I'm not going to

18  help him along, but under Florida law, the engagement letter

19  is not privileged.

20            So, Mr. Harrington, to the extent you -- to the

21  extent you recall the terms in our relationship -- or the

22  terms of our engagement, you can certainly testify about

23  that.

24            THE WITNESS:  Okay.

25      A.    Their percentage, regardless, is 40 percent.

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                       September 28, 2022

1       Q.   (BY MR. SQUIRES)  Okay.  And you bear the

2  expenses?

3       A.   Of court costs and so on?

4       Q.   Yes.

5       A.   Yes.

6       Q.   I'm going to show you a document I'm sure you've

7  seen.

8            MR. SQUIRES:  Dan, this is a -- to be marked as

9  Exhibit 43.  This is an order granting a motion to dismiss

10  Counts II and III of plaintiff's first Amended Complaint in

11  the case of Blaine Harrington v. Pinterest.  In the --

12            (Exhibit 43 marked.)

13       A.   No, no, no.  No, no.

14            THE WITNESS:  What did he say?

15            (Court reporter response.)

16            THE WITNESS:  Oh, okay.  I -- I heard it wrong.

17       Q.   (BY MR. SQUIRES)  You filed this case.  It's in

18  the Northern District of California.  What is it about?

19  What was the case about?

20       A.   Essentially, photographs are loaded onto Pixie's

21  site by individuals.

22       Q.   Are you talking about Pixie or are you talking

23  about Pinterest?

24       A.   I'm talking about Pinterest.  I'm sorry.  Onto

25  Pinterest's site, and at that point, Pinterest strips out

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                    September 28, 2022

1  the metadata.  They also take it, at that point, and

2  repackage it and send it to more people, and most of the

3  boards that they're on are -- every third or fourth picture

4  is advertising, so they're -- they're -- they're not paying

5  professional photographers to use their work, but they are

6  monetizing it.

7            As well, people, again, think the pictures on

8  Pixie -- or I'm sorry.  I keep confusing them -- on

9  Pinterest is there for the taking, and many of the pictures

10 that are on Pinterest are stolen by either -- either

11 individuals or they have been stolen by companies.  And as I

12 said, I -- I have done my own searches, as well as these

13 attorneys have -- have done their work, but, you know, I've

14 found something like a hundred thousand links to my work on

15 Pinterest.

16    Q.   And there has been a decision -- you have in your

17 hands -- dismissing a part of your Complaint?

18    A.   Yes.

19    Q.   It's complex legal stuff, right?

20    A.   Well, yeah.  I mean, from my understanding,

21 Pinterest has already had to change some of their methods

22 and their -- and -- and the way they go about some of these

23 things, even as a result of perhaps things that were

24 dismissed.  I mean, ultimately, like all social media

25 companies, Pinterest is extremely successful, and they --

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                  September 28, 2022

1  they make billions of dollars, and I've -- you know, while I

2  was watching this case, I should have bought their stock,

3  because it's done pretty well.

4      Q.   Let that be a lesson to you.  And you are probably

5  aware of the decision in the case of Harold Davis v.

6  Pinterest --

7      A.   Yes.

8      Q.   -- Inc., that has been brought to the attention of

9  the Court that is overseeing your case, correct?

10     A.   Davis's case is filed by the same attorneys, and

11 Davis's case came first.  At some point, they wanted to join

12 our two cases, but the judge did not agree to do so.

13     Q.   So your concern is that Pinterest has your images

14 accessible on its website; is that correct?

15     A.   Yes, and that they -- and -- and that,

16 consequently, they monetize it and -- and make money, and

17 they do not compensate those photographers for doing so,

18 and -- and particularly someone like me, who has, like I

19 said, a hundred thousand links.

20     Q.   And Pinterest, as I understand it -- I think you

21 used the word "stripped," but does not include any

22 information identifying you as the photographer or the

23 copyright proprietor?

24     A.   In some cases, pictures have been taken --

25           THE WITNESS:  Bless you.

ADLER MEDICAL, LLC vs. HARRINGTON                     Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1      A.   -- from my website, and they contain my name

2  and -- and/or other information, but in other cases where

3  they may have originated somewhere else on the web, they

4  don't.  But regardless, if they -- if they did have

5  metadata, they stripped it, removed it.

6      Q.   (BY MR. SQUIRES)   Metadata is different than a

7  overt visible statement of whatever information it is that

8  you're referring to as metadata, correct?

9      A.   Metadata was -- was created for the very point --

10  I mean, there's all -- there's various kinds of metadata.

11  There's metadata such as -- that comes out of the camera,

12  that is created by the camera.  It tells you the f-stop,

13  shutter speed, camera that's made, the lense that was made.

14  There's metadata that I input, that I have created when I'm

15  in my postproduction photos, before they're released

16  anywhere -- to stock agencies, to my website, and so on --

17  that, again, identifies me as the owner, gives the full

18  information, my address, my phone number, my -- my website,

19  my email, and then contains information about what the

20  picture is, key words that are linked to it, so it can be

21  found on the web.  And -- but at any rate, it -- it -- it

22  was considered a first line of defense; in other words, you

23  know, that it -- you're not supposed to be able to remove

24  metadata that someone puts on there.  That is showing who

25  the owner is.

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1    Q.    But Pinterest does remove the metadata?

2    A.    Well, they have.  I don't know how that played out

3 in the decision so far.

4    Q.    But forget the decision for the moment.

5    A.    Yeah.  They did, yes.  Uh-huh.

6    Q.    So a user could go to Pinterest, find photographic

7 images, and not have any idea who the photographer --

8    A.    Well, I mean, this is something that you keep

9 referring to, and this is where we have a very different

10 outlook on the thing.  You're saying that, you know, "Oh,

11 you need to put" --

12   Q.    I'm just asking questions.

13   A.    Well, I know, but you're -- you're saying you need

14 some overt way of showing that you're the owner.  I'm saying

15 that, you know, if -- if people followed the rules and the

16 laws, then you're not supposed to be able to strip the

17 metadata off.

18   Q.    Okay.  So we'll go back to my question.  A user

19 who found an image on Pinterest from which metadata had been

20 stripped would have no way of knowing who the photographer

21 or copyright proprietor --

22   A.    Well, again, no.  If you go --

23   Q.    Is that -- is my statement true or not?

24        MR. DeSOUZA:  Object to form.

25   A.    But again, I will -- I will say, in response to

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

1  that, that there are many photos of mine that contain my

2  name on there, and do -- do people -- do -- do people use

3  that to contact me?  No.  They consider it a free source of

4  photography.

5      Q.   (BY MR. SQUIRES)  Well, then -- then let me

6  rephrase my question.  A user who accesses photographs on

7  Pinterest that do not identify the owner, the photographer,

8  the copyright proprietor, which information had been

9  stripped from the photograph, would have no way of knowing,

10  at that time, who the photographer or copyright proprietor

11  was; is that correct?

12     A.   Yes.  But I would clarify that -- and you --

13  you -- you put that statement onto the end of it, "at that

14  time," because -- again, as the copyright owner, I do not

15  say, "Oh, they don't know who my picture [sic] is" -- they

16  have -- it's incumbent upon anyone who wants to use my

17  picture to find out who I am, you know, and -- you know,

18  it's not -- they're not excused by saying, "Oh, gee.  I

19  don't know who the photographer is."

20     Q.   Okay.  Did you ever issue a takedown notice to

21  Pinterest with respect to your copyright claims?

22     A.   No.  I don't believe so, because I never dealt

23  with Pinterest before this lawsuit came up.  I think that

24  Mr. Davis did extensively, and he -- his primary goal,

25  originally, was to get them to just -- to take his pictures

1  down, and that was a big problem with Pinterest, was that

2  people would ask and they didn't comply.

3      Q.   Okay.  I'm through for the day.  It's 5:25.

4  Somebody has obligations.  And I will not go the full day

5  tomorrow.  I'm guessing I will go about a half a day

6  tomorrow.  And I hope you enjoy your evening in Albuquerque.

7           THE VIDEOGRAPHER:  Shall we go off the record?

8      Q.   (BY MR. SQUIRES)  You're -- you're here just in

9  time to hang around for a few days and attend the

10 Balloon Fiesta.

11     A.   Yeah.  I saw them flying this morning.

12     Q.   And --

13     A.    Interesting timing.

14     Q.   So take advantage of the opportunity.

15          THE VIDEOGRAPHER:  We're now going off the record.

16 The time is approximately 5:24 p.m.  Watch your microphones

17 when you stand up, please.

18          (The proceeding concluded at 5:24 p.m.)

19

20

21

22

23

24

25

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

```
1   ADLER MEDICAL, et al. vs. BLAINE HARRINGTON, III

2              DEPONENT SIGNATURE/CORRECTION PAGE

3        If there are any typographical errors to your
    deposition, indicate them below:
4

5   PAGE  LINE

6   _____   Change to _____

7   _____   Change to _____

8   _____   Change to _____

9   _____   Change to _____

10       Any other changes to your deposition are to be listed
    below with a statement as to the reason for such change.
11

12  PAGE   LINE   CORRECTION           REASON FOR CHANGE

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19

20       I, BLAINE HARRINGTON, III, do hereby certify that I
    have read the foregoing pages of my testimony as transcribed
21  and that the same is a true and correct transcript of the
    testimony given by me in this deposition on September 28,
22  2022, except for the changes made.

23

24  _____   _____
    Date signed                    BLAINE HARRINGTON, III
25
```

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON
1-22-cv-00072-KG-LF

Blaine Harrington, III
September 28, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW MEXICO
 2

 3   ADLER MEDICAL, LLC; WALT ARNOLD
     COMMERCIAL BROKERAGE, INC.; XUAN
 4   NATION, LLC; AND NM CCIM CHAPTER
     OF THE COMMERCIAL INVESTMENT REAL
 5   ESTATE INSTITUTE,

 6                    Plaintiffs,

 7   vs.                      Case No. 1-22-cv-00072-KG-LF

 8   BLAINE HARRINGTON, III,

 9                    Defendant/Counterclaim Plaintiff
                      Third-Party Plaintiff,
10
     vs.
11
     ADLER MEDICAL, LLC; WALT ARNOLD
12   COMMERCIAL BROKERAGE, INC.; XUAN
     NATION, LLC; AND NM CCIM CHAPTER
13   OF THE COMMERCIAL INVESTMENT REAL
     ESTATE INSTITUTE,
14
                      Counterclaim Defendants,
15
     and
16
     CCIM INSTITUTE,
17
                      Third-Party Defendant.
18

19

20                    REPORTER'S CERTIFICATE

21        I, VERONICA E. BYRD, CCR, RPR, DO HEREBY CERTIFY that

22   on September 28, 2022, the Deposition of BLAINE HARRINGTON,

23   III was taken before me at the request of, and sealed

24   original thereof retained by:

25
```

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                        September 28, 2022

```
1         Jeffrey Louis Squires, Esq.
          SQUIRES LEGAL COUNSEL, LLC
2         P.O. Box 92845
          Albuquerque, New Mexico 87199
3         (505) 835-5500
          jsquires@squireslegal.com}
4
```

5       I FURTHER CERTIFY that copies of this Certificate have

6    been mailed or delivered to all Counsel, and parties to the

7    proceedings not represented by counsel, appearing at the

8    taking of the deposition.

9       I FURTHER CERTIFY that examination of this transcript

10   and signature of the witness was REQUESTED by the witness

11   and all parties present.  On _____, a letter was

12   mailed or delivered to DANIEL DeSOUZA, ESQ., regarding

13   obtaining signature of the witness, and any corrections, if

14   any, were appended to the original and each copy of the

15   Deposition.

16      I FURTHER CERTIFY that the recoverable cost of the

17   original and one copy of the Deposition, including exhibits,

18   to JEFFREY LOUIS SQUIRES, ESQ., is $_____.

19      I FURTHER CERTIFY that I did administer the oath to the

20   witness herein prior to the taking of this Deposition; that

21   I did thereafter report in stenographic shorthand the

22   questions and answers set forth herein, and the foregoing is

23   a true and correct transcript of the proceeding had upon the

24   taking of this Deposition to the best of my ability.

25

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

ADLER MEDICAL, LLC vs. HARRINGTON                    Blaine Harrington, III
1-22-cv-00072-KG-LF                                   September 28, 2022

1      I FURTHER CERTIFY that I am neither employed by nor

2   related to nor contracted with (unless excepted by the

3   rules) any of the parties or attorneys in this case, and

4   that I have no interest whatsoever in the final disposition

5   of this case in any court.

6

7

8

9                           _____
                            VERONICA E. BYRD, CCR, RPR
                            New Mexico CCR #36
10                          License Expires: 12/31/22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789